UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FRANK MILLER, GARY C. GITTO,<br>CHARLES N. GITTO, JR., WILLIAM M.<br>DEAKIN, LOUIS J. PELLEGRINE, JR., and<br>JOHN M. MORITZ, JR.,<br><br>    Defendants | Crim. No. 08-40026-FDS |

## MEMORANDUM IN SUPPORT OF DEFENDANT FRANK MILLER'S MOTION FOR DOWNWARD DEPARTURE AND VARIANCE

Frank Miller files this Memorandum in support of his Motion for a sentence below the advisory guideline range. Such a sentence is "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a).

As explained below, there are at least three grounds that, individually or collectively, warrant a substantial downward departure from the advisory guideline range of 121 to 151 months: (1) Miller's substantial assistance to law enforcement (an issue under consideration at the U.S. Attorney's Office); (2) the amount of loss significantly overstates the seriousness of Miller's conduct; and (3) the serious coercion and duress that directly contributed to Miller's conduct.

A variance from the advisory guideline range is warranted in this case to offset the significant increase in guideline points that were not based on empirical evidence or past practices and have resulted in a substantial increase in the length of that range. A sentence well below the bloated guideline range is "sufficient, but not greater than necessary" given: (1) the

nature and circumstances of Miller's offense conduct, including the fact that most of the funds

drive the guideline range were not taken for his personal profit; (2) Miller's history and

characteristics, including his otherwise unblemished life, his genuine efforts to prevent the loss,

and the subsequent assistance he has given to law enforcement and the primary victim of the

fraud; (3) Miller's low risk of recidivism, his age and lack of any prior record; (4) to avoid

unwarranted sentencing disparities; and (5) to allow Miller to make restitution.

## I.     Background

For over 45 years, Frank Miller was a law abiding citizen with no criminal record of any

kind. PSR, ¶¶ 49-50. He was educated, hardworking, involved with his family and his

community and genuinely liked and admired by his many colleagues, including his customers,

the people he employed, even his lenders. However, Miller's lawful living changed dramatically

after he became business partners with Charles N. Gitto, Jr. and Gary Gitto at Gitto/Global

Corporation ("Gitto/Global"). Unable to stop the Gittos' out-of-control spending, unaware of

their pilfering, and unglued by their threats and intimidation, yet unwilling to accept the failure

of the business they were operating together for a host of reasons, Miller lost his moral compass.

### A.     Miller's Goal:  Not to Live His Father's Life

Miller's unwillingness to accept failure is deeply rooted in his past, where from a very

young age he observed his own father struggle with business and financial failures and a general

lack of respect. PSR, ¶¶ 53-54. Miller's father – an observant Jew, who tried his hand at several

mostly unsuccessful businesses, including rubbish disposal and truck driving in and around

Dorchester, MA – worked so hard, yet achieved so little financial security that he was largely

unable to enjoy life. See Psychiatric Evaluation Report of Julia M. Reade ("Reade"), attached at

Addendum to Miller's Motion for Downward Departure and Variance ("Add."), 22, at 6-7.

Pressures of life on the edge of poverty caused embarrassment to the Miller children (Frank is the youngest of four) and strife within the household, where as a young boy Miller witnessed physical altercations between his father and his older brother, Marvin Miller, which frightened him. Id.; Letter of Martin Miller, Add 15. Miller viewed his father as "a poor slob with no respect." Reade at 7. His father's sudden and unexpected death from a coronary hemorrhage at age 57 left the Millers in an even more tenuous financial state. The effects of his death were especially pronounced for Miller, who was the only child still living in the family home at that time; he became his mother's "de facto husband," helping her to grieve and get by each day. PSR, ¶ 56; Reade at 7.

Early on, Miller decided that his life would be different than his father's – one where he would not be disrespected by others, a goal he figured he could achieve by having sufficient financial security that he could provide for his children and be able to spend time with them. See Reade at 6-8.

B.     Miller's Education Puts Him on Path Toward Success

Despite the tumult in his own home, Miller performed well enough in school to gain admission to the Boston Latin School, where he observed that education and perseverance could be pathway to the kind of life he wanted. He pursued his studies doggedly. He was accepted early admissions at Northeastern University, which he opted to attend in part so he could live at home and continue to care for his mother and afford college. With savings from part-time jobs and taking loans as necessary, Miller completed his degree in chemical engineering and graduated with a Bachelors of Sciences in 1972 – the first in his family to attend, let alone graduate from, college. PSR, ¶ 86; Reade at 8.

Driven to succeed professionally and financially, Miller accepted technical positions with several companies, moving from one to the next to assume more senior positions (with Goodyear from 1972 to 1973; with Stedfast Rubber from 1973 to 1977; and with Plymouth Rubber from 1977 to 1982). Reade at 8. In 1982, when he accepted a position as Vice President and General Manager with Global Products ("Global"), a plastics compounding business located in Leominster, MA, which had about 20 employees. Id. When Global's owner died a few years later, he had an opportunity to buy the company, which he jumped at that opportunity, persuading his wife's uncles to provide the necessary additional financial support. Id. By 35, Miller was an owner of small plastics compounding company.

C.     A Loving Father, Son and Family Member

Twelve years or so before then, in 1974, Miller married his college sweetheart, Gail Darman, with whom he had two children, Jacquelyn, born in 1982, an Joel, born in 1985. Miller was (and is) a terrific father – nurturing, caring and involved, as is attested to in the detailed letters submitted to this Court by Jacquelyn and Joel. See Add. 12 and 13, respectively. Despite the heavy demands of his career, Miller took the time to be with his children at Father/Daughter Dances, on family vacations, and the like, instilling in his children life's important lessons – the value of hard work, perseverance, education and treating others with dignity and respect. Id. Miller remained a committed father even after going through a painful break up and eventual divorce in the mid-1990s – keeping joint custody, talking with his children on a daily basis, supporting them financially and making them feel welcomed and part of his new family. Id.

After separating from his wife, Miller began a relationship with Maria LaFrenier, who he would subsequently marry and became a step father to her two children, Jennifer and Michael, who were then in elementary school. See Letters of Jennifer Lanigan and Michael LaFrenier,

Add. 9 and 10.  Jennifer had never known their biological father and Michael had a poor

relationship with his, so Miller filled a large void in their lives, as Michael confirms:

> My teenage years were not easy;  I felt a sense of abandonment
> due to the absence of my biological father in my life and often
> projected my frustration towards Frank.  He made it very clear to
> me that he cared for me, but that disrespect would not be tolerated
> in our home.  Out of all the kids, I was probably the most
> challenging to deal with and there were times when I made poor
> decisions.  Frank quickly stepped in set me straight.  He was
> tough on me, but his love never waived.  I came to understand
> how much he cared for me, and that he only wanted me to be the
> best person that I could be, and eventually I found myself wanting
> to make him proud.

LaFrenier letter, Add. 10 at 1-2.  See also Lanigan, Add 9, at 2 (describing Miller's entry into

her life as "my introduction to a real family because I gained a father, a sister and another

brother.  We took family trips, had great holidays and we were very happy.  There was a lot of

quality time in those days and we all grew very close.").

Miller remained supportive of other family members as well.  He remained close to his

mother, visiting her regularly, keeping her actively engaged with her grandchildren, and ensuring

that she had proper medical care, even after she developed serious dementia.  Jacquelyn Miller,

Add. 12, at 2.  He also cared for and supported his sister-in-law, whose husband developed brain

cancer and died at a young age, ensuring his sister-in-law kept her health insurance and could

take time off from work to be with her dying husband and their young children.  See Letter of

Lucy Hawkins, Add. 5 at 1 ("Losing my husband was the worst experience of my life, but Frank

was there for me every step of the way.").  He has remained close with his siblings and extended

family as well, who have submitted letters to the Court.  See Letters of Mildred and Marvin

Miller, Add, 16; Martin Miller, Add. 15; Robert Miller, Add. 17.

D.    **REDACTED- ORIGINAL FILED UNDER SEAL**

**REDACTED- ORIGINAL FILED UNDER SEAL**

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████

**REDACTED- ORIGINAL FILED UNDER SEAL**

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████

E.    <u>Start of Gitto/Global</u>

Needing to replace his business partner at Global quickly, Miller was approached by

Charles and Gary Gitto, whose family owned a competing compounding business, with an offer

to merge the two companies.  He was warned about doing so by friends and colleagues, who

reported to Miller that the Gittos were untrustworthy and cruel.  <u>See</u>, <u>e.g.</u>, Letters of Nicholas J.

Semenza, Jr., Add. 20 at 1 (cautioning Miller based on having worked for the Gittos for five years in the 1980s of the Gittos' "management style of employee beratement, belittlement, intimidation, harassment and coercion"); Edward Calhoun, Add. 3 at 2 (recalling asking Miller before the merger "Frank, why would you want to get involved with those people"). Unfazed, Miller felt he was up for the challenge and could structure the company in ways to keep the Gittos under control. Little did he know.

In late 1992, the Gittos and Miller founded Gitto/Global Corporation, which was owned 50% by Gary Gitto and 50% by Frank Miller. Gary Gitto was the Chief Executive Officer; Miller was the President and Chief Operating Officer; Charlie Gitto had no formal ownership in the company, but took the title of Chairman of the Board.

The Gittos behavior was far worse than anything Miller imagined – they were rude and ruthless, not just to Gitto/Global employees, but to Miller as well, as Semenza describes:

> Over … 14 years I performed the duties of General Manager for the Gitto-Global Corporation and personally witnessed Frank not being exempt from the effects of the Gitto management style. He was constantly bullied and bombarded with epithets by the Gittos questioning his intelligence and trying constantly to undermine his authority with employees. At times even his religious beliefs were questioned.

Semenza, Add 20 at 1. The Gittos operated by threats and intimidation, frequently yelling and berating others. Physical assaults were not beyond them; Charles Gitto physically beat a Gitto/Global shipping clerk; Charles and Gary fought each other inside Gary's office (smashing glass and breaking furniture); they were arrested and prosecuted for physically beating two Leominster police officers at Gary's home.[1]  See also Letter of Timothy Talbott, Add 21

---

[1]  See, e.g., Matt O'Brien, Plastics Executives Arrested, Sentinel & Enterprise, Dec. 9, 2003, Add. 23.  According to newspaper reports, Leominster police officers attempted to respond to Gary Gitto's residence after a nighttime 911 hang up / domestic incident call, but were blocked

(describing the "near insanity of the Gittos" and their "constant screaming matches and actual physical altercations"). Within the company, it was thought that Gary Gitto had a drug addiction.[2] The Gittos also gained control by causing people who had been hired by Miller to leave, then replacing them with people whose loyalties ran to them. Talbott at 1; Reade at 4-5.

G.    The Origin of the Fraud

It was in that toxic atmosphere that the fraud was bred. Although Gitto/Global's legitimate plastics compounding business was real and growing throughout the 1990s, its revenue simply could not keep up with the spending of its principals – especially Charles and Gary Gittos.[3] Rather than accept limitations about their ability to spend, all three Gitto/Global principals – Charles Gitto, Gary Gitto and Frank Miller – found illegitimate ways to skirt those restrictions to keep the money flowing. By 1998, Miller knew of and approved the pre-billing

from entering the residence by the then-71 year old Charles Gitto, who had threatened to "call (Police) Chief Peter Roddy" if the police dispatcher did not call off the officers. Id. Upon entering the residence to conduct a well-being check, Gary Gitto charged one of the officers *like a bull*," forcing the second officer to *"hit [Gary] with his baton and sprayed [Gary] with pepper spray before he could subdue him.*" Id. (emphasis added). Charles Gitto "was screaming at police and trying to intervene" in a scene described as "utter chaos." Nonetheless, the next day, Steve Panagiotes, a lawyer who was representing them and is married to Charles Gitto's daughter, publicly blamed the police for "storm[ing] the house like a militia," and noted that the Gittos had "paid for one of the hospital wings" where one of the officers was treated for his injuries and had employed hundreds of people. Id.

Unsurprisingly, both officers received sizable payoffs from the Gittos: one reportedly received $20,000; the other an unspecified amount of money sufficient to refurbish his pool. See 3/14/06 Sciliano 302, Add. 24. The charges against Charles and Gary Gitto were continued without a finding and scheduled to be dismissed with the Gittos to serve probation and to pay restitution of over $13,000 to Leominster for lost wages of its injured officers. See Emily Young, Gittos Get Probation, Sentinel & Enterprise, Jan. 25, 2005, Add. 25.

[2]  See 12/8/04 Susan Kenna 302, Add. 40 at 4.

[3]  As discussed below at 16, 17, a forensic accountant for the Chapter 11 Bankruptcy Examiner and LaSalle determined after an exhaustive study that, during the time frame LaSalle provided financing (July 2002 to September 2004), the Gittos took more than 80% of the excess proceeds from the company (over $4.8 million) and Miller took less than 20% of the proceeds ($957,514.33).

of product orders, whereby the company would book sales before the sale actually occurred as a way of being able to draw down funds on a line of credit earlier than when those funds should have been available.

Once the fraud began and got rolling, it morphed and grew several times, always to permit even greater amounts of money to flow through (and be taken out of) the company. When legitimate sales unexpectedly dropped in the early 2000s, yet spending (legitimate and illegitimate) increased, efforts to perpetuate the fraud kicked into even higher gears. All three Gitto/Global Principals were knowledgeable about and involved with those efforts, though Miller, with his oversight responsibilities for the company's finance and accounting functions, had the most day-to-day contact with it. The value of Gitto/Global's inventories and receivables were greatly overstated; its legitimate companies were asked to lie about how much they owed to Gitto/Global; fake paperwork and companies were created to perpetuate and conceal the scheme. Charles Gitto switched from flying first-class to private jet; Gary Gitto charged not just his yacht, but its entire crew to the company. Gitto/Global was paying for numerous personal expenses of the Principals (again, disproportionately favoring the Gittos) – home landscaping, home repairs, private school tuitions, interior decorators, salaries and health insurance for family members who did not actually work at Gitto/Global, etc. By the early 2000s, the company's finances were out of control.

F.     Miller's Efforts to Rein in the Fraud

Miller did what he could to regain some semblance of control. Time and again, he tried to persuade Charles and Gary Gitto to take less – a message not well received by them – even bouncing their checks. Desperate for help, Miller also went to the company's outside counsel,

Michael Angelini, who was stunned by what Miller told him.[4]  Angelini's advice was to repay the lenders (by selling the company, if necessary) and he agreed to talk with Charles and Gary Gitto about their spending.  Gary Gitto's reaction was emblematic of the difficulties Miller faced; Gary threatened "to rip [Miller's] tongue out" if he ever complained to Angelini about spending again.  PSR, ¶ 69.

When the excessive spending continued, Miller even tried to get out, informing the Gittos that he wanted out, and would invoke his rights under the corporate papers to force a sale, if necessary.  Charles Gitto told Miller that he was liable to find "a bullet in his head" if he did not cooperate with them to sell in the way they wanted.  Believing the business could be sold (and lenders repaid) and not wanting the business to collapse if he did leave (since that would make him a failure and unworthy of respect), Miller decided to stick it out.

Indeed, many investors were contacted thereafter, trying to find someone either to buy the company or take Miller's interest out.  Because of the company's legitimate business, there was significant interest among potential buyers.  For example, an Gitto/Global employee, who knew the value of the company's legitimate business, offered to buy the entire company for $36,000,000 (5.5 x legitimate EBITDA) in February 2004.  See Semenza, Add. 20.  Miller wanted to accept; Charles and Gary Gitto refused to do so.  Id.  The fraud continued.

For quite some time, it appeared that Gitto/Global would be sold to VirtroTech, a California-based minerals technology company that conducted substantial due diligence at Gitto/Global in the Fall of 2003 and Winter of 2004 (where the fraud was openly discussed), then entered into a Purchase Agreement to pay as much as $50,400,000 for Gitto/Global's assets

---

[4]  That Miller disclosed the fraud to Angelini in this timeframe is confirmed by a May 2002 letter (also sent to Gary Gitto), in which Angelini confirmed that, as of that date, neither he nor anyone at his law firm could continue to serve as Gitto Global's counsel with respect to any banking or refinancing matters.  See Angelini letter, Add. 26.

in a closing originally scheduled for May 2004, but then was delayed numerous times. See

March 2004 Purchase Agreement, Add 27; VitroTech Form 10-QSB/A (6/04), Add 28, at 14.

For months thereafter, personnel from VitroTech and its outside accounting firm remained on

site performing audit and due diligence work through the Summer of 2004. Miller worked

tirelessly to complete the sale process; he worked around the clock with VitroTech's internal and

external auditors to furnish whatever financial information they needed; Miller also pumped

significant amounts of his own money back into Gitto/Global throughout this time period to

ensure VitroTech due diligence process would be completed, the sale would be completed, and

Gitto/Global's lenders would be repaid. It was not until late August or early September that

VitroTech – which was experiencing its own financial difficulties – pulled the plug on the

Gitto/Global acquisition.

      G.    Miller's Cooperation with Law Enforcement

      Within days of the VitroTech sale falling through, Miller decided he was done lying and

done with the Gittos. He opted to walk away entirely and to report what he and others had done

to federal law enforcement. At a meeting on September 17, 2004, Miller walked representatives

of the U.S. Attorney's Office and the Federal Bureau of Investigations through the receivables

and inventory schemes – confessing to his own wrongdoing and truthfully disclosing the many

others who were involved with him.

      During the nights leading up to his initial meeting with law enforcement, Miller and his

wife, Maria Miller, spent hours late at night at Gitto Global copying over 10 Bankers' boxes of

documents to ensure that key materials would not be taken or destroyed. Working with a

forensic computer technician recommended by undersigned counsel, Miller imaged hard drives

of the firm's accounting system and the computers of several key Gitto Global employees (including his own). Miller promptly made all of those materials available to law enforcement.

Throughout the investigation that ensued, Miller served as a resource to federal investigators, who requested follow up meetings with him at regular intervals during their investigation, including on May 24, 2005, August 1, 2006 and February 28, 2008 and February 29, 2008. During those meeting, Miller furnished investigators with, among other things, (a) detailed information, including emails sent from the personal email account of Gitto/Global's outside accountant, Louis Pellegrini, which contributed to the evidence against him; and (b) identifying by name of half dozen or so outside investors who could (and did) confirm that Charles and Gary Gitto knew about the fraud, which substantially undermined their primary defense.[5]

H.     Miller's Cooperation with LaSalle

Miller likewise cooperated with LaSalle, the victim who lost the most money in the fraud. Within days, Miller voluntarily produced to LaSalle all of the documents and materials he had copied from Gitto/Global during his late-night copying sessions. Miller also provided LaSalle's outside counsel with assistance by explaining aspects of the scheme to them, suggesting the

---

[5]  This was directly contrary to what the Gittos had been publicly professing throughout the investigation (and even thereafter) when the Gittos publicly blamed Miller for the entire fraud. For example, on November 11, 2005, Gary Gitto's lawyer was quoted stating:

> If one looks beyond the examiner's suspicions and focused on the evidence he reports, the only conclusion that one can reach is that the wrongdoing was accomplished not by anyone named Gitto at all, but by Frank Miller, the president and its major stockholder, with the assistance of his wife, Maria – without the knowledge of Gary Gitto or his father, Charles.

See Paul Burton, Examiner's Report Alleges Massive Fraud by Gitto Officials, The Deal (Nov. 11, 2005).

names of additional fact witnesses, and furnishing them additional documents. At LaSalle's request, Miller also agreed to be deposed in connection with LaSalle's lawsuit against VitroTech and its principal owner, Jess Rae Booth, whom LaSalle alleged knowingly and intentionally assisted Gitto/Global perpetuate the fraud against LaSalle and others from late 2003 forward. Miller was deposed in April 2009, where he provided truthful testimony. After Miller furnished that testimony, LaSalle moved for summary judgment and the lawsuit was then settled.[6]

LaSalle, which has since been acquired by Bank of America, N.A., has submitted a letter to this Court acknowledging Miller's cooperation and assistance and asking the Court to take those factors into consideration in sentencing Miller. See Letter of Thomas B. Hirsh, Assistant General Counsel, Bank of America, N.A., Add 29.

III.   <u>Argument</u>

A.   <u>The Court Should Depart Downwardly From the Guideline Range</u>

1.   <u>Miller's Substantial Assistance (§ 5K1.1)</u>

Miller believes he has substantially assisted within the meaning of U.S.S.G. § 5K1.1, met each of the factors under § 5K1.1 and is entitled to a departure on that basis. The issue has been debated between undersigned counsel and counsel for the government, who offered to submit the issue to the U.S. Attorney's Office Substantial Assistance Committee for review and consideration. As of the time of the drafting of this Memorandum, undersigned counsel had not been informed of the resolution of the issue at Substantial Assistance Committee level.

Even if the Substantial Assistance Committee does not agree to file a § 5K1.1 motion, the issue still may require attention from this Court. As indicated in our 5K1.1 Memorandum (App. 30), we argue that Miller has been improperly denied § 5K1.1 for reasons having nothing to do

---

[6]  See <u>LaSalle Business Credit, LLC v. VitroTech Corporation, <i>et al.</i></u>, No. 05-cv-12150-DPW (D. Mass.), Dkt Nos. 92, 100.

substantial assistance, and instead because the government wants to him to receive the longest

sentence out of the defendants in this case.  As explained in detail in our Memo., we contend that

is an inappropriate basis to withhold § 5K1.1 credit and an improper effort to manipulate the

length of Miller's sentence, which may be subject to review by this Court as a § 5K1.1 refusal

that is not related to any legitimate government end.  See United States v. Beatty, 538 F.3d 8, 14-

15 (1st Cir. 2008) (describing standard for judicial review of government's refusal to file

substantial assistance motion under § 5K1.1) (citing Wade v. United States, 504 U.S. 181, 185-

86 (1992)).[7]

  2. Loss Substantially Overstates the Seriousness of Miller's Conduct

  As the Sentencing Commission itself points out, "[t]here may be cases in which offense

level determined under [§ 2B1.1] substantially overstates the seriousness of the offense" and

therefore "a downward departure may be warranted." U.S.S.G. § 2B1.1 (2010), comment. n.

19(c).  Departures have been awarded on this basis where, as here, a defendant borrows funds

with the intention to repay them.  See United States v. Monaco, 23 F.3d 793, 799 (3d Cir. 1994)

(explaining that loss overstates seriousness where defendant had no intent to steal but rather

misled the victim in order to obtain an interest free loan); United States v. Fourchette,  220 F.

Supp.2d 914, 925 (E.D. Wisc. 2002) (downward departure may be appropriate where defendant

entered into the scheme with honest intentions or with the intent to make good on his obligations,

as where he could have obtained a loan by truthful means but at a higher interest rate).

Departures have been also awarded where multiple factors – including ones beyond the

defendant's control – contribute to the loss.  See e.g., United States v. Gregorio, 956 F.2d 341,

---

[7]  Of course, Miller's assistance to law enforcement is relevant to the Court's analysis of several
§ 3553(a) factors.  See United States v. Fernandez, 443 F.3d 19, 34-35 (2d Cir. 2006) (sentencing
judge should take "non-5K cooperation" into account in considering § 3553(a) factors given it
bears on the defendant's "character," remorse and likelihood of rehabilitation).

344-48 (1st Cir. 1992) (multiple causation of victim loss is a "Commission-identified circumstance in which a downward departure may be warranted."); United States v. Rostoff, 53 F.3d 398, 405 (D. Mass. 1995) (affirming a downward departure for multiple causation in a fraud case where senior bank management's involvement, the buyers' greed and a nosedive in condominium market all contributed to loss). Both of those situations occurred here.

      a.   <u>Miller Intended to Repay the Funds</u>

      This is not a situation where Miller took money not intending to repay it. Despite the significant misuse of corporate funds, the money at issue was lent to Gitto/Global and backed not just by its promise to repay, but substantial security – all of the assets of Gitto/Global, which included the company's valuable patents, other intellectual property rights and equipment, as well as the personal guarantees of Miller and Gary Gitto. The loans at issue were capped at levels that many people – including Miller – thought was a fraction of what the company's assets would fetch if in fact they had to be sold. For example, LaSalle's revolving line of credit was capped at $27 million -- $21 million for receivables and $6 million for inventory. See 12/7/10 Zappala Memo., Add. 32 at 1. Even if the "float" between the banks increased LaSalle's potential exposure to $35,000,000 (something Miller disputes),[8] Miller believed there was more than enough assets backing that company to ensure that the lenders would be repaid.

---

[8] It was not realistically possible for any bank to be responsible for all of the $27 million dollar line of credit and the $8 millions being "floated" between Clinton Savings and Fleet, as the government contends. There was over $2 millions at Clinton Savings to secure at least part of the "float." Also, the amount "floating" would have been under the $27 million cap at LaSalle, meaning that, even taking into consideration the checks being "floated" between Clinton Savings and Fleet, the total amount would have been less $27 million. This is why LaSalle's loss on the revolving line of credit was around $18 million and the amount between the banks was roughly $11 million in mid September when Gitto/Global shut down. See Zappala Memo. LaSalle's only additional exposure to loss stemmed from the $830,000 extended to Frank Miller and Gary Gitto on a personal basis.

The reasonableness of Miller's belief is reflected in the purchased offers that Gitto/Global received. As noted above, Semenza, backed by a financial service known as Matrix Capital, submitted an offer to purchase Gitto Global in February 2004 for $36,000,000 – $1 million more than what even the government claims was LaSalle's worst-case financial exposure. See Semenza, Add. 20 at 1-2. Just months later, VitroTech topped the Semenza/Matrix Capital offer substantially, entering into a Purchase Agreement to acquire Gitto Global for over $50,400,000. See 2004 Purchase Agreement, Add 27; VitroTech Form 10-QSB/A (6/04), Add 28. Gitto/Global's equipment alone was worth $20,830,665 in the fair market or $14,692,020 in an orderly liquidation, according to an appraisal the company had received in August 2003. See 8/03 Marshall Engineering Audit, Add. 42. Miller believed there was more than sufficient collateral backing the loans.[9]

      b.    Other Factors Contributed to the Loss

          i.    The Gittos Took More Money than Miller

There were several other factors – wholly unrelated to Miller's conduct – that caused the loss. The first (and most obvious) is the amounts the Gittos took more of the money. This was a topic that was examined at length in the bankruptcy process, and in the civil litigation, where a forensic accounting firm was retained by the Chapter 11 Examiner and by LaSalle to conduct a comprehensive review of relevant financial records – reportedly sifting through hundreds of boxes of documents – to determine where the funds went during the period when LaSalle furnished financing (July 2002 to September 2004). In April 2006, the forensic accountant issued his report, which concluded funds were taken as follows:

---

[9] That certain corporate assets were purchased at auction for $8.97 million in the Ch. 11 bankruptcy process does not mean the company was only worth that much. In the bankruptcy, the Trustee also recovered millions of additional dollars that were properly "assets" of Gitto/Global. See Zappala Memo. Add. 32.

| Company Funds Paid to/on Behalf of: | Dollar Amounts |
|---|---|
| Garry Gitto | $2,874,644.41 |
| Charles Gitto | $1,964,258.91 |
| Frank Miller | $957,514.33 |

See Jalbert Report, Add 33 at 6, 8 & 9.[10]  In other words, the forensic accountant concluded that

Garry and Charles Gitto *each* took *more than twice* as Miller, and collectively diverted over 80%

of the funds, when Miller received less than 20%.[11]

        ii.     The Gittos Accelerated Their Takings Near the End

The Gittos refused to take less, even after it was clear to them that the company had

significant financial difficulties.  Gary Gitto increased his own salary by $145,075 from 2001 to

---

[10]  Jalbert's Report is supported by eight large binders of documents, copies of which we did not include in the Addendum, but would furnish if Jalbert's conclusions are questioned.

[11]  It is not just the discrepancy in amounts that is so telling; but also the nature of the expenses. The auditor details Gary Gitto's spending to include $40,263 for a motorcycle; $27,500 in payments to the Applewild School; $80,664 for accommodations in vacation locations such as Bermuda, Puerto Rico, Barbados, Santiago, St. Martin, Santa Domingo and Nantucket; $8,341 for jewelry, including purchases from Tiffany's. Jalbert, App.33 at 4-5. The auditor indicates that Charles Gitto spent three fourths of his expenses on travel, restaurants, air travel and lodgings, including charges "notable for the number of well-known, high-end Boston-area establishments" and "lodgings charges that are striking similar, not only for their known opulence, but for their location" (Four Seasons Tokyo, Four Seasons Milan, etc.). Id., at 6-7. None of the credit charges attributed to Miller are anything like those; they generally consist of far less extravagant travel and accommodations that Miller legitimately incurred for work. Id. at 8-9. Additionally, some of the non-payroll checks issued to Miller were, in turn, sent to LaSalle for purposes of increasing the amount of credit available. See, e.g., Wire transfers dated 2/13/04 ($40,000), 3/24/04 ($98,000) & 5/13/04 ($65,000), attached at App. 35; Gitto Global GL Account "Due from Frank Miller," entries dated 6/11/03, showing wire transfers 4/3/04 ($100,000) and 4/10/04 ($210,000), App. 36.

2003 (to $396,875); Charles Gitto bumped his salary by $32,970 during that same period; Miller cut his salary slightly (to $259,700) over those years. See Ch. 11 Examiner Report, Schedule 2, Add. 43. Over the final nine months or so, Gary Gitto devised other illegal ways to take the money out of Gitto/Global (and LaSalle); from mid-December 2003 through late May 2004, he paid himself kickbacks of $175,000. See Indictment, ¶ 48.

In marked contrast, Miller was putting his personal funds *into* Gitto/Global: (a) to keep the company running so it could be sold (and the lenders repaid); (b) to help VitroTech complete its audit. The Millers took a $800,000 second mortgage on their personal residence in April 2004 "to provide working capital to Gitto/Global," (see 4/20/04 Loan Agreement, Add. 34 at 1), $790,000 of which was wired from Commerce to LaSalle. (Loan to Officer Account, Add. 36). To attempt to get the VitroTech audit complete, Miller paid VitroTech's external auditor, Stonefield Josephson, to complete the audit. See 8/6/04 Wire transfer, Add. 37. Bill Deakin, who was in charge of the companies finances, testified that only Miller was putting money into the company in this time frame, and that he (Deakin) told Miller, "[y]ou're nuts," because while he (Miller) was putting money in, Gary Gitto was taking it out. 11/16/05 Deakin depo., attached at Add. 38 at 494[4] to 495[8]. Deakin also testified that he accurately tracked funds in and out of the company by officer. Id. Miller's Loan to Officer account statement reflects Miller's multiple deposits of funds into the company throughout the Spring and Summer of 2004, and reflects that the company owed Miller $1.932,966.34 by the end. See Account Statement, App. 36 at 4.

3.    Miller Acted Under Serious Coercion / Duress

Section 5K2.12 of the Guidelines permits this Court to depart "[i]f the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not

amounting to a complete defense." U.S.S.G. § 5K2.12.  To warrant a departure, Miller is not

required to prove duress that would have relieved him of any criminal liability (*i.e.*, well founded

fear of imminent bodily harm, no opportunity to escape); rather "a lesser showing of duress may

still play a role at sentencing to permit a downward departure ...." United States v. Sachdev, 279

F.3d 25, 28 (1st Cir. 2002) (citing United States v. Amparo, 961 F.2d 288, 292 (1st Cir. 1992)).

While "personal financial difficulties and economic pressures" are insufficient to warrant a

departure (§ 5K2.12); coercion that involves a "threat of physical injury, substantial damage to

property or similar injury resulting from the unlawful action of a third party" is "[o]rdinarily"

enough.  Id.  See Sachdev, 279 F.3d at 28-29 (departure is warranted where coercion is "serious"

and can "encompasses both explicit and implicit threats").  That is what occurred here.

      a.    Miller Was Physically Threatened By the Gittos

Time and again, Miller was physically threatened by the Gittos, including in ways that

caused Miller to commit the offense.  The threats included:

1.    Gary Gitto's threat to "rip Miller's tongue out," if he ever went to
Angelini again over the amounts of money being spent at Gitto/Global.
(PSR, ¶ 69; Reade, Add. 22 at 12-13)

2.    Charles Gitto's threat that Miller might wind up with "a bullet in his head"
if he forced a sale of the company before a buyer could be found.  (Reade,
at 12-13)

3.    Charles Gitto's threat "to put [Miller's] mother fucking head through a
window" if Miller ever bounced a check of Charles Gitto's again (PSR, ¶
70; Reade at 12-13).

Proof that the Gittos made those threats against Miller comes from a variety of sources,

which both independently and cumulatively demonstrate they did occur. First, the threats are

confirmed by Talbott, a longtime Gitto/Global representative, to whom Gary Gitto boasted of the

Gittos' physical threats against Miller:

> Not having been there, you cannot imagine – and I know this must
> seem overblown – the near insanity of the Gittos. I witnessed
> constant screaming matches and actual physical altercations
> between Charles and Gary Gitto at the office. *I know that Frank
> was threatened with physical harm by both Gary and Charlie –
> Gary made statements to that effect to me when traveling.* The
> boat captain on the payroll; the LearJet used to ferry Charlie back
> and forth from his Florida home – with the mandatory sales call at
> my customer (Accuma) in North Carolina to justify the company
> paying for the fuel – I know that Frank fought this, but the
> absolute viciousness of the Gittos when it came to money was
> incredible. *I know Frank feared for his safety.*

Talbot, Add. 21 at 2. Second, the threats are completely consistent with the frequently violent

and utterly chaotic conduct of the Gittos, which was observed by so many, both inside and

outside of Gitto/Global.[12] If the Gittos were capable of physically attacking police officers for

conducting a wellness check (see above at 7-8), it is hardly a stretch that they would threaten the

same against Miller, a business partner who was jeopardizing their livelihoods. Finally, the

effect of the threats on Miller were obvious – based on their interactions with him, people knew

Miller was "scared shitless" of the Gittos. See 11/9/05 Elbaum 302, App. 39 at 4; Talbott, Add.

21 at 1 (describing his "almost daily" talks with Miller about the "incredible duress he faced"

while trying to run the company "in the face of the chaos created by the Gittos").

---

[12]  See, e.g., id., Semenza, Add. 20 at 1 (Gittos' management style: "beratement, belittlement,
intimidation, harassment and coercion"); 2/22/05 Mortiz 302, Add 44, ¶¶ 7, 12 (confirming
fights between Gary or Charlie Gitto and Dean Childs, a Gitto/Global shipper; "malcontents or
anybody questioning the GITTOs would be fired;" Charles Gitto thought to be "connected");
11/16/05 Deakin depo., Add. 38 at 481[16 to 24] (Gary Gitto threatened to "kick [Deakin's] ass
up and down the driveway" if Deakin bounced another check); 3/1/06 Minardi depo. Add. 45 at
62[8] to 63[7] (Charles Gitto "prone to anger" and "bombastic").

b.     <u>Miller Had "Particular Vulnerabilities" to the Gittos' Coercion</u>

While the explicit threats of physical injury that the Gittos made against Miller are precisely the type of threats that the Commission recognized would suffice to warrant a departure on this basis for virtually any defendant, one is all the more justified on this basis given Miller's "particular vulnerabilities" to that behavior. <u>See</u> Sachdev, 279 F.3d at 29 n.2 (suggesting that it would be appropriate to consider "particular vulnerabilities to coercion and duress," such as battered person's syndrome) (approvingly citing cases from other Circuits indicating that such evidence was relevant and appropriate). Miller's personal background and psychiatric profile is highly relevant on this point.



REDACTED- ORIGINAL FILED UNDER SEAL

REDACTED- ORIGINAL FILED UNDER SEAL

Stuck in a cycle, Miller was unable to stop the fraud, in part because of the threats from the Gittos. In that way, the Gittos' conduct caused Miller to remain a participant in the offense conduct, and was at least one factor that contributed to his conduct. A downward departure is therefore appropriate on this basis. Cf. United States v. Coleman, No. 95 CR 729, 1997 WL 666512, at *4 (N.D.Ill. Oct. 22, 1997) (departing downwardly where defendant's "Dependent Personality Disorder," made defendant feel worthless and depended on her boyfriend which made her "extraordinarily susceptible to criminal direction;" sufficient if defendant shows condition "contributed to the commission of the offense").

C.    The Court Should Vary From the Guidelines Under 18 U.S.C. 3553(a)

    1.    Because Miller's Guideline Range is Driven By Factors That Are Not Based on Past Practice or Empirical Data, the Guideline Range Is Entitled to Little Deference

The advisory guideline range in this case (121 to 151 months) is vastly greater than necessary to satisfy the goals of sentencing. The harsh sentencing recommendations of § 2B 1.1 are not based on past practice or empirical data and have been increasingly rejected by sentencing courts in high-loss fraud cases, like this one.

Indeed, Miller's advisory guideline range is over *three times* longer than the sentencing range he would have faced under the original guidelines adopted in 1987. Since then, the Sentencing Commission has dramatically increased the severity of sentences for fraud offenders, mostly by raising the number of points imposed for the amount of loss. Because the Commission failed to rely on empirical data when making these changes – and thus failed to fulfill its institutional role – sentencing courts have tremendous discretion to disagree, on policy grounds, with § 2B1.1's sentencing recommendations. See Spears v. United States, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on policy disagreement

with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure that white collar offenders faced "*short* but definite period[s] of confinement." U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, ("Fifteen Year Report") at 56 (Nov. 2004) (emphasis added).  The Commission thus reduced the availability of probation and adopted a fraud guideline that subjected a defendant to no more than 78 months in prison.  To justify the increase in the rate of confinement above pre-guidelines practice, the Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987).

But the Commission has abandoned its original goal of ensuring "short but definite" sentences, and has instead steadily increased the prison sentences for fraud.  Calculating Miller's guideline range under various versions of the Guidelines provides a stark illustration of the dramatic escalation in the punishment for fraud over the past twenty-four years:

**1987**

| | |
|---|---|
| 2F1.1(a) – base offense level: | 6 |
| 2F1.1(b)(1) – amount of loss over $5 million | 11 |
| 2F1.1(b)(2) – more than minimal planning and/or multiple victims | 2 |
| 3B 1.1 – organizer / leader | 4 |
| | 23 |
| 3E1.1 – acceptance of responsibility | -2 |

| | |
|---|---|
| **TOTAL OFFENSE LEVEL** | **21** |
| **GUIDELINE RANGE** | **37 - 46 months** |

**1989**

| | |
|---|---|
| 2F1.1(a) – base offense level: | 6 |
| 2F1.1(b)(1) – amount of loss between $20 and 40 million | 16 |
| 2F1.1(b)(2) – more than minimal planning and/or multiple victims | 2 |
| 3B 1.1 – organizer / leader | 4 |
| | 28 |
| 3E1.1 – acceptance of responsibility | -2 |

**TOTAL OFFENSE LEVEL**                         26

**GUIDELINE RANGE**                  **63 - 78 months**

**2001**

| | |
|---|---|
| 2B1.1(a) – base offense level: | 6 |
| 2B1.1(b)(1) – amount of loss between $20 and $50 million | 22 |
| 2B 1. 1 (b)(8) – sophisticated means | 2 |
| 3B 1.3 – leader / organizer | 4 |
| | 34 |
| 3E1.1 – acceptance of responsibility | -3 |

**TOTAL OFFENSE LEVEL**                         31

**GUIDELINE RANGE**                  **108 - 135 months**

**2010**

| | |
|---|---|
| 2B1.1(a)(1) – base offense level: | 7 |
| 2B1.1(b)(1) – amount of loss between $20 and $50 million | 22 |
| 2B 1. 1 (b)(8) – sophisticated means | 2 |
| 3B 1.1– organizer / leader | 2 |
| | 35 |
| 3E1.1 – acceptance of responsibility | -3 |

**TOTAL OFFENSE LEVEL**                         32

**GUIDELINE RANGE**                  **121 - 151 months**

In other words, the Commission has increased the sentencing range for a defendant guilty of Miller's crimes by over *300 percent* in the twenty years since the Guidelines were first adopted.  The Commission has adopted this radical shift in sentencing policy without the support of any empirical data demonstrating the penological value of its substantial increases in sentence severity.  See United States v. Aldelson, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (Rakoff, J.) (citing Kate Stith & Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 69 (1998)) ("[Be]cause of their arithmetic approach and also in an effort to appear 'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors").  Moreover, "since Booker, most judges faced with a corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high.  This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives."  Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After Booker, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

The chart attached at Appendix A highlights recent fraud cases involving more than two dozen other defendants in which district court judges in this district and elsewhere have imposed sentences below the advisory guideline range.  In the above-cited cases, courts have frequently varied from the guideline range in high loss fraud cases for non-5K1-departure ground based on § 3553(a) factors.  Weighing those same factors in this case confirms that a

sentence below the appropriate guideline range is the one that would be "sufficient, but not greater than necessary" to achieve the purposes listed in § 3553(a).

    1.    <u>Nature and Circumstances of Miller's Offense Conduct (§ 3553(a)(1))</u>

A defendant's motive for committing his crime is relevant at sentencing. <u>See</u>, <u>e.g.</u>, <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 485 (1993). Courts have routinely granted departures or variances where a fraud defendant was motivated by something other than a desire for profit of personal financial gain. <u>See</u>, <u>e.g.</u>, <u>Rostoff</u>, 53 F.3d at 405-07 & n.7 (affirming sentencing court's downward departure where economic factors – and not defendants' conduct – increased magnitude of the loss); <u>United States v. Milne</u>, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance below guidelines' recommendation where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat).

In this case, the extra funds were withdrawn, at least in the first instance, primarily for the benefit of Gitto/Global, and not for the benefit of any one individual, and certainly not for Miller. As discussed above, this is not a situation where Miller (or even the Gittos, as far as Miller knows) reaped a financial gain of anything close to the over $20 million loss that was incurred. The funds from the secured lines of credit were deposited into Gitto/Global's business accounts, then used on a variety of purposes – some illegitimate, but also many legitimate expenses (employee salaries, product and equipment was purchased; numerous other business expenditures were made). While it is now clear that Gitto/Global overspent even on legitimate items (<i>i.e.</i>, too much equipment, too much in rent, too many employees, paid them too much), it cannot be said that Miller was trying to personally profit in drawing out excess funds for those items. The legitimate expenditures made to keep Gitto/Global's

business afloat. Milne, 384 F. Supp. 2d at 1310-11 (recognizing that variance is appropriate under those conditions).

Even with respect to that portion of the excess funds that were withdrawn for improper reasons, it cannot be said that Miller personally profited on the vast majority of it. As explained above, over 80% of that money went to the Gittos; less than 20% of it went to Miller. See Jalbert, Add. 33. By no means was this a situation where Miller was running the scheme to enrich his confederates; to the contrary, Miller was doing whatever he could to prevent them from doing so – urging them to stop, seeking assistance of outside counsel; attempting in good faith to sell the company; and bouncing their checks. That the Gittos were able to continue to do so, and took substantial sums *despite* Miller's efforts (including through Gary Gitto's secret kickback scheme) is more proof that Miller was *not* seeking to profit personally from the fraud. As discussed above, Miller was putting significant sums of money into Gitto/Global from late 2003 to September 2004 in an effort to get it sold and the lenders repaid. In the end, Gitto/Global owed Miller over $1.9 million. See G/L Account, "Due from Miller," Add. 36.

Miller expects the government nonetheless to attempt to portray Miller as greedy by emphasizing certain real estate holdings (his former home in Bolton, his former home on Nantucket, his former condominiums in Florida), and insisting that ownership of those properties proves that Miller had a profit motive. We disagree. The bulk of Miller's real estate was not purchased with proceeds "taken" from Gitto/Global in an improper way, but instead financed by real estate lenders, who required little money down, then "flipped" by the Millers – at substantial profits in the early years, at substantial losses in later years (no different than so many other real estate investors of late). While there were some amount of

Gitto/Global funds spent on Miller's real estate related expenses (home landscaping, interior design in Florida), those expenditure were relatively small in relation to the total amount of loss) and were believed by Miller to be tracked on the company's General Ledger accounts as funds borrowed (and repaid) by him. See Add. 36.[13]  Importantly, the Millers took what remained of their real estate equity and put those funds back *into* Gitto/Global in April 2004 by taking an $800,000 second mortgage on their primary residence and sending all but the closing fees to LaSalle. See Add. 34 (Miller's second mortgage for $800,000); Add. 36 at 4, entry dated 4/22/04 (showing credit to Miller's account of $790,000 for deposit of second mortgage funds (less back fees)).  Indeed, having put essentially everything they owned into Gitto/Global; the Miller's primary (and only) residence was foreclosed upon in early 2005. The Millers' were not the ones to personally profit from this; indeed, they lost virtually everything.

In short, Miller's scenario is distinguishable from the run-of-the-mill fraud case in which a defendant misappropriates large sums of money for the sole purpose of supporting a lavish lifestyle.  Though the fraud became increasingly out of hand as it progressed, Miller was not a primary beneficiary of the extra funds flowing through the company.  Moreover, he believed – not unrealistically, based what he was told and believed the company to be worth and the multiple offers the company did receive (ranging from $30 to $50 million)– that Gitto/Global would be able to repay all of the fund it had taken.  Miller did everything in his power to ensure that occurred.  The Court can and should take that into account in determining what sentence is

---

[13] There is no question that Miller took funds for other improper expenses, such as his ex-wife's health care insurance and paying her a salary.  But again, those expenses were relatively small and did not materially contribute to the company's inability to operate, given it had legitimate annual revenue in the tens of millions of dollars.

"sufficient, but not greater than necessary" to achieve the sentencing purposes in this specific case.

>    2.    Miller's History and Character (§ 3553(a)(1))

>        a.    Miller's Otherwise Unblemished Life

The advisory Guideline range is likewise inappropriate given the otherwise exemplary life that Miller has lead.  As detailed above and in the attached character letters, Miller is widely regarded as a fundamentally good, kind and caring person.  Miller has been an exceptional father to four children, deeply involved in their lives and doing an excellent job parenting each of them, notwithstanding the extra challenges presented by his divorce, becoming a step father to children who lacked biological fathers and the need to stitch together and make binding ties between two families.  Letters written by his children vividly illustrate Miller's unmitigated success as a father – how being actively involved in their lives, and taking the time to teach them the importance of education, hard work and perseverance has paid off for each of them in each becoming productive members of society.  The letters are also powerful testaments to their deep love and admiration for their father.  See Letters of Jacquelyn Miller, Add 12, Joel Miller, Add. 13, Jennifer Lanigan, Add. 9 and Michael LaFrenier, Add 10.[14]

Miller's kind and caring character was also revealed throughout the Gitto/Global years. Several colleagues and former employees have written to confirm to the Court that despite the madness of the Gittos, Miller treated everyone with dignity and respect.  For example, a long-time receptionist, Carol Brand, describes Miller as "just a regular guy" who permitted her

---

[14] Many others note what an unusually dedicated father Miller has been.  See, e.g., Ron Cadler, Add 2 (Miller "a staunch family man," who has [n]ever ... ridden in my car" talking with his children on his cell phone); Hawkins, 5 (his children "the center of [Miller's] universe"); Mildred and Marvin Miller letter, 16 ("wonderful ... father");

extended leaves to deal with her ill father, displayed "kindness, caring and respect towards [her] and others," and defended her from the Gittos' abuse:

> [W]hile working for Gitto-Global Corporation, I have seen the workplace become a little harsh and sometimes hostile toward other employees, and even once toward myself – to the point where I began to gather my belongings and leave. This type of treatment never came from Frank. In fact, when Frank happened by my desk and saw me sobbing and wanting to leave, he spoke kindly to me and told me that he would handle the matter and see to it that this type of treatment would not happen again.

Brand, Add. 1. See also Semenza, Add. 20 (Miller "demonstrated integrity and honesty" and was "committed to the development of his employees' potentials to the fullest"); Talbott, Add 21 ("the *only* person dedicated to the company professionally and ethically was Frank Miller") (emphasis in original); Calhoun, Add 3 at 2 (Miller remained "honest and trustworthy").

Miller's character has also been revealed since September 17, 2004, when he reported this matter to law enforcement over six years ago. These years have been extremely difficult for the Millers, given the public failure of Gitto/Global, the bankruptcy proceedings, the public reports of the fraud (which Miller, unlike the Gittos, never disputed), the civil proceedings, and the need to re-start his professional career from something less than scratch (given what people in the industry knew had happened). Tellingly, Miller has been able to do that. In early 2005, Miller was approached by Ronald Hoffman, an owner of a plastics compounding business outside of Los Angeles, CA, who needed to replace a plant manager. After performing his own careful due diligence on Miller within the industry and candidly discussing the Gitto/Global situation with Miller (including the fact that he expected to be prosecuted federally), Hoffman and his wife decided to give Miller a chance. See Letters of Ronald P. Hoffman, Add. 6 and Susan V. Hoffman, Add. 7. It has worked out well for the Hoffmans and their company, where Miller has proven to be "very professional [and] very trustworthy," "an incredible asset," (R.

Hoffman) who, with his background in the industry and chemical engineering degree, has handled "major purchases of raw materials" and has gained "several very large accounts" for Hoffman Plastics. S. Hoffman. See also Cadler, Add 2 (Hoffman Account Executive calling Miller "our MVP" and "a straight shooter").[15]

The outpouring of support for Miller from Hoffman Plastics is in no way limited to those at the company's top. There has also been a groundswell of support for him from employees on the lowest rungs of the Hoffman corporate ladder. Eighteen of them – fifteen plant workers and three plant supervisors – have submitted their observations about Miller's character to the Court through a handwritten letter in Spanish, which an office employee translated into English and typed for the Court. In that letter, those employees recognize Miller as "the best plant manager" they have had, in part because he treats people "fairly and with respect," and "takes personal interest in all employees." They note that while other employers "take[] advantage" of Hispanic workers, Miller took up their cause for improved wages, using his negotiating skills with the Hoffmans to obtain employees "a major pay raise" for those employees – the "first time anyone [from management] came to [their] defense for a good wage." See Hoffman Plant employee letter, Add 8. This one letter speaks volumes about Miller's true nature as a human being.[16]

   b.   Miller's Substantial Assistance to Law Enforcement

---

[15] Since moving to California, Mr. Miller has also contributed to the community, volunteering as a mentor for Jewish Family Services and serving food to the needy at the Laguna Beach Alternative Sleeping Location Emergency Shelter. See letter of Marcia Marcinko and letter of Ann Richardson, Add. 11 and 19.

[16] One of the signatories to that joint letter – Alex Perey – also wrote separately about another occasion where Miller assisted him in buying a laptop computer for Perey's son, a small but meaningful event for Perey, who wanted the computer as a graduation present for his son, but knew very little about computers. See Perey letter, Add. 18 ("Frank is one of those people that truly cares about others"). Another Hoffman employee wrote separately to describe how Miller assisted him with the process of becoming a U.S. Citizen. See Gonzalez letter, Add. 4.

Whether or not the government files a § 5K1.1 motion, the Court can and should weigh

Miller's cooperation and assistance to law enforcement and to LaSalle in assessing § 3553(a)

factors.  See Fernandez, 443 F.3d at 34-35 (sentencing judge should take "non-5K cooperation"

into account in considering § 3553(a) factors since it bears on the defendant's character, remorse

and likelihood of rehabilitation).

As reflected in detail in his Memorandum to the U.S. Attorney's Office's Substantial

Assistance Committee, Miller furnished assistance to law enforcement in numerous ways,

including each of the following:

- Being "first in" by initially bringing this entire matter to the attention of law enforcement in mid-September of 2004 – within just days after efforts to sell the company (and avoid the loss) broke down and four years before indictments were returned and six years before other key individuals offered began "cooperating;"

- Preserving documents and materials – hard copies of numerous documents, imaging key individual's computer hard drives – during risky late-night copying sessions during the company's final days when others were actively concealing or destroying documents to ensure that criminally culpable individuals did not avoid prosecution;

- At the very outset, furnishing authorities with an "insider's view" of what your Office has characterized as a highly complex case, which benefitted your Office in many ways, including a more complete understanding of how the scheme operated and identifying several additional facts witnesses who could have given testimony that rebutted the expected defenses of other defendants;

- Meeting with the AUSA assigned to this matter and investigating agents not just at the outset, but also repeatedly during the course of the investigation, and thereby furnishing additional information and documents upon request of authorities that we feel contributed significantly to the decision to bring charges against at least one criminally-culpable individual; and

- Encouraging others to fully and truthfully share whatever information they knew about the scheme with law enforcement by telling family members and friends to do so, giving the names and addresses of other witnesses who furnished useful information, voluntarily waiving the underlying attorney-client privilege and publicizing his cooperation with law enforcement.

<u>See</u> Miller Substantial Assistance Memo., Add. 30

      c.     <u>Miller's Assistance to LaSalle</u>

     Apart from cooperation to law enforcement, Miller also provided assistance and

cooperation to LaSalle, the entity which (by far) lost the most as a result of the fraud.  That

cooperation is described more fully above at 12-13 and in the accompanying letter submitted by

LaSalle (now Bank of America).  <u>See</u> Hirsh letter, Add 29.  Such cooperation shows that Miller

is truly remorseful for his conduct and has taken steps to undo the harm he caused by helping the

victim's efforts to be made whole.

      3.     <u>Miller Poses an Extraordinary Low Risk of Recidivism (§ 3553(a)(2)(C))</u>

     As a first-time, sixty-one year old white-collar offender, Miller poses a very low risk to

recidivate.  The Sentencing Commission has itself recognized that: (1) recidivism rates

decline dramatically with age, and (2) first-time offenders are even less likely to reoffend than

defendants with a limited criminal history who also fall within Criminal History Category I.

<u>See</u> U.S. Sentencing Commission, <u>Measuring Recidivism: The Criminal History Computation</u>

<u>of the Federal Sentencing Guidelines</u>, Exhibits 9-11 (May 2004) (hereinafter <u>Measuring</u>

<u>Recidivism Report</u>); U.S. Sentencing Commission, <u>Recidivism and the "First Offender"</u>, at 13-

14 (May 2004) (hereinafter <u>First Offender Report</u>)  The Commission's research has, for

example, demonstrated that a 20-year-old defendant in Criminal History Category I has a 29.5%

chance of reoffending, a 61-year-old defendant with the same criminal history has only a 6.2%

chance of recidivating. <u>Measuring Recidivism Report</u>, Ex. 9. With respect to first

offenders, the Commission has found that offenders with zero criminal history points have a

recidivism rate of just 11.7%.  <u>First Offender Report</u> at 13-14.

     Courts have taken both age and first-offender status into account when fashioning an

appropriate sentence under § 3553(a).  See, e.g., United States v. Hamilton, 2009 WL 995576, at *3 (2d Cir. Apr. 19, 2009) (holding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); United States v. Cabrera, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate than all other offenders); Simon v. United States, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (explaining that sentence of 262 months – as opposed to Guidelines sentence of 324 to 405 months – constituted "sufficient, but not excessive, deterrence" for 44-year-old defendant).

Miller is 61 years old and has no prior history of criminal behavior. The Sentencing Commission has recognized that an offender within his age range – and with his lack of any criminal record – is extremely unlikely to recidivate.  That low risk is likewise confirmed by Miller's personal experience over the past six and one half years, where he has lived as a significantly productive member of society, without reoffending in any way.  See generally Hoffman letters, Add. 6 & 7; PSR, ¶ 4.  Given Miller's extraordinarily low risk of recidivism, a within-guidelines sentence of 121 to 151 months is simply greater than necessary to protect the public from the small chance of his committing future crimes.

4.      The Need to Avoid Unwarranted Sentencing Disparities Among Defendants

Miller believes a variance below the advisory range is appropriate in this case to avoid two different types of unwarranted sentencing disparities: (a) disparities among defendants in other fraud cases with similar backgrounds and convicted of similar criminal conduct; and (b) disparities among co-defendants of equal, if not more culpability, in this case.

a.      Defendants With Similar Backgrounds, Convicted of Similar Crimes

It has long been recognized that the sentencing court can depart or vary a sentence to avoid unwarranted sentencing disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct. Rita v. United States, 127 S. Ct. 2456, 2463 (2007) (citing 18 U.S.C. § 3553(a) and 28 U.S.C. § 991(b)); United States v. Carr, 932 F.2d 67, 73 (1st Cir. 1991). The Commission performs its function "at wholesale," while the district court performs its function "at retail." Id. Ideally, the two entities should have a symbiotic relationship, with the sentencing court taking the guidelines into account in its § 3553(a) analysis and the Commission considering feedback from the courts, in the form of departures and variances, when making its regular revisions to the guidelines. See 18 U.S.C. § 3553(a)(4) (requiring that sentencing court consider the guidelines' recommendation); see also Rita, 127 S. Ct. at 2464 (explaining that "[t]he statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and the courts of appeals" with the courts departing or varying in individual cases and the Commission "collect[ing] and examin[ing] the[se] results").

In making its own effort to avoid unwarranted sentencing disparities – as suggested by 18 U.S.C. § 3553(a)(6) – the sentencing court clearly can concern itself more with national disparities among similarly situated defendants than with the narrower consideration of equity between defendants charged under the same indictment. United States v. Simmons, 501 F.3d 620, 623-24 (6th Cir. 2007). The sizeable chart attached at Appendix A is, therefore, of particular importance. That chart highlights a large sample of cases from this district and districts across the country where defendants in high-loss fraud cases have received sentences substantially below their guideline ranges. None of the defendants included in this chart received any sentencing benefit based on cooperation. As corporate fraud defendants

responsible for substantial losses, the defendants are of similar criminal background and have

been convicted of similar criminal conduct. The national sentencing trend exemplified by this

chart should, therefore, be taken into account by this Court. To avoid unwarranted – and

unfair – sentencing disparities between Miller and the many defendants highlighted in the chart,

this Court should grant a variance/departure of similar magnitude in Miller's case.

       b.    <u>Disparity Among Co-defendants</u>

Since <u>Booker</u>, a majority of courts have concluded that sentencing courts may consider

co-defendant disparity under § 3553(a)(6). <u>See</u> Ryan Scott Reynolds, <u>Equal Justice Under Law:</u>

<u>Post-Booker, Should Federal Judges Be Able to Depart From the Federal Sentencing Guidelines</u>

<u>to Remedy Disparity Between Codefendants' Sentencings?</u> 109 Colum L. Rev. 538, 552 (2009)

(citing cases from six circuits allowing such consideration; only one circuit not allow it). Two

judges in this district consider the issue and agreed with the majority view. <u>See</u> <u>United States v.</u>

<u>Jones,</u> __ F. Supp.2d __, No. 09-10048-WGY, 2010 WL 5475651 at **8-9 (D. Mass. Dec. 30,

2010) (adopting view that in assessing sentences of similar offenders who committed similar

offenses "the best place to look is to people who have been arrested in the same sweep, in the

same place, at the same time, largely charged with doing the same thing") (quoting <u>United States</u>

<u>v. Whigham,</u> __ F. Supp.2d __, 2010 WL 4959882-NG (D. Mass. Dec. 3, 2010)).

In this case, it is clearly appropriate to consider the sentences to be imposed on Gary

Gitto and Charles Gitto as co-defendants who were charged in all of the same conduct, and in

Gary Gitto's case, even more (money laundering). Neither of them have been sentenced yet.

After the lengthy, four year investigation, and over two years after the indictments were filed in

this case, Gary Gitto entered into a plea agreement with the government and pleaded guilty on

October 1, 2010. <u>See</u> Dkt entry dated 10/1/10 & Dkt No. 92. Thirty-three days later, the

government voluntarily moved to dismiss all charges against Charles Gitto based on a medical determination that he was not mentally competent. See Dkt No. 95. The government has repeatedly moved Gary Gitto's sentencing, citing his cooperation agreement with the government and the claim that his "cooperation" may not be complete until Miller is sentenced. See Dkt No. 110, 119.

Miller believes this Court should have all of the pertinent information before it in assessing appropriate sentences for the Gitto/Global principals, and should know what the government's sentencing recommendation will be for him. If the government is recommending a lighter sentence (despite having taken significantly more money, committed an entirely separate fraud and refused to cooperate for the first six years that this matter was at the U.S. Attorney's Office), the Court should know the reason for that. If the government recommends a departure for Gary Gitto's alleged substantial assistance to the government, the Court should be in a position to determine whether Miller deserves similar (or even greater) credit given Miller's vastly superior efforts to assist. See Miller Substantial Assistance Memo. Add. 30 (explaining why Miller's cooperation was vastly superior to Gary Gitto's). It is not appropriate to sentence Miller without having information on the sentence likely to be imposed on a more culpable codefendant.

The Court should also consider the disposition of Charles Gitto in view of additional information that Miller has submitted to the U.S. Attorney's Office showing that, despite the medical evaluations opining that Charles Gitto is unable to understand the nature of the charges or assist with his defense, he has been spotted frequently since then living, from all appearances, what seems to be an essentially normally life – driving his car (a late-model Mercedes), living own his own at his own home, dining out frequently, babysitting for his grandchildren and

interacting with a variety of people in and around Leominster, none of whom believes that Charles Gitto is suffering from any significant mental infirmity.  See Affidavits Ron Smith, Lisa Nugent and Report of Surveillance of Charles Gitto, Add. 41.  At minimum, Miller believes this information bears on whether either of the Gittos – Charles or Gary – have properly accepted responsibility for his offense conduct and whether Gary Gitto has provided substantial assistance.

If there was any connection between Gary Gitto's plea and the government's decision to dismiss the charges against Charles Gitto, that information would also surely reflect on the government's view on what type of sentence is necessary to reflect the "seriousness of the offense," "to promote respect for the law" and to provide "just punishment" under § 3553(a)(2)(A).  The proximity and sequence of the government's decisions with respect to the Gittos clearly suggests those events are not unrelated.  It is also suggested by the fact that the government, after and exhaustive investigation and just two years after bringing serious charges against Charles Gitto, not only did not oppose, but moved to dismiss the charges on competency grounds despite information that Charles Gitto was not incompetent.  See Add. 41.  Miller has requested disclosure of information from the government on these grounds,[17] but not received anything yet.  If there is relevant information, Miller needs it to make appropriate sentencing arguments and the Court needs it to impose an appropriate sentence on him.

5.    The Need to Make Restitution to Victims (§ 3553(a)(7))

Finally, Miller has a significantly better chance of making at least some restitution to the victims of the fraud if the Court imposes a sentence below the advisory guideline range.  Miller is a smart, hard working, highly educated individual, who still has the skills and capacity to be

---

[17]  See Miller Substantial Assistance Memo., Add. 30 at 14, n.8.

employed within the plastics compounding industry, as his experience at Hoffman over the last six years shows.  Even if serving some moderate amount of jail time, there is every reason to believe that he would be able to get a reasonably-well paying job and make at least some restitution to his victims.  If, however, Miller is sentenced even at the bottom of the advisory guideline range, he will not get out of prison until he would be in his 70s, well past normal retirement age (which Miller will be in no position to do), but also past the age when his peers and colleagues in the industry will retire.  See Letter of Maria Miller, Add. 14, p. 7.  Any chance to develop new contacts will be effectively eliminated by having spent a decade or so out of the industry.

A more moderate sentence below the advisory guideline range may enable Miller to have a chance of maintaining part of his career, and thus afford him some possibility of repaying some restitution.  The Hoffmans clearly would like Miller to continue working for them.  If the Court imposed a sentence that allowed Miller to be released in a few years, it is possible that Miller could resume his position there or with the business contacts he has developed there.

III.    Conclusion

For each of these reasons, Miller respectfully requests that this Court impose a sentence

that is significantly below the advisory guideline range.

Respectfully submitted,

/s/ Thomas E. Dwyer
Thomas E. Dwyer (BBO 139660)
tdwyer@dwyerpartnersllp.com
Dwyer Partners, LLP
1 Broadway
Cambridge MA 02142
(617) 401-2943

/s/ Michael B. Galvin
Michael B. Galvin (BBO No. 630515)
mgalvin@collorallp.com
Serina Q. Barkley
sbarkley@collorallp.com
COLLORA, LLP
600 Atlantic Avenue
Boston, MA 02210
(617) 371-1000
(617) 371-1037 (Facsimile)

Dated March 8, 2011


CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that a true and correct copy of this document filed
through the ECF system will be sent electronically to counsel of record as identified on the
Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as
nonregistered participants on March 8, 2011.

/s/ Thomas E. Dwyer
Thomas E. Dwyer (BBO 139660)
tdwyer@dwyerpartnersllp.com
Dwyer Partners, LLP
1 Broadway
Cambridge MA 02142
(617) 401-2943

/s/ Michael B. Galvin
Michael B. Galvin (BBO No. 630515)
mgalvin@collorallp.com
Serina Q. Barkley
sbarkley@collorallp.com
COLLORA, LLP
600 Atlantic Avenue
Boston, MA 02210
(617) 371-1000
(617) 371-1037 (Facsimile)

Dated  March 8, 2011