# EXHIBIT 27

ASSET PURCHASE AGREEMENT


DATED MARCH 31, 2004


BY AND BETWEEN


GITTO/GLOBAL CORPORATION, AS SELLER,

GARY GITTO AND FRANK MILLER, AS SELLER SHAREHOLDERS,

CHARLES GITTO, JR.

AND

VITROTECH CORPORATION, AS PURCHASER

## Table of Contents

|  |  | Page |
|---|---|---|
| **ARTICLE I PURCHASE AND SALE** |  |  |
| 1.1 | Purchased Assets | 1 |
| 1.2 | Excluded Assets | 2 |
| 1.3 | Purchase Price | 3 |
| 1.4 | Assumed Liabilities | 4 |
| 1.5 | Excluded Liabilities | 4 |
| 1.6 | Prorations | 5 |
| 1.7 | Transfer Tax Payments | 5 |
| 1.8 | Purchase Price and Cash Purchase Price Component Adjustment | 5 |
| 1.9 | Escrow Amount | 5 |
| **ARTICLE II DEFINITIONS** |  |  |
| 2.1 | General | 5 |
| 2.2 | Definitions | 5 |
| 2.3 | Interpretation | 10 |
| **ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** |  |  |
| 3.1 | Status of Seller; Enforceability; Conflicts; Consents | 10 |
| 3.2 | Ownership of Seller | 12 |
| 3.3 | Financial Statements | 12 |
| 3.4 | Undisclosed Liabilities | 12 |
| 3.5 | Title to Properties | 12 |
| 3.6 | Real Property | 12 |
| 3.7 | Equipment and Improvements | 13 |
| 3.8 | No Commitments | 13 |
| 3.9 | Continued Use of Real Property | 13 |
| 3.10 | Real Estate and Personal Property Taxes; Assessments | 13 |
| 3.11 | Inventory | 13 |
| 3.12 | Accounts Receivable | 13 |
| 3.13 | Contracts | 14 |
| 3.14 | Equity Interests | 14 |
| 3.15 | Intellectual Property | 14 |
| 3.16 | Required Assets; Sufficiency of Assets | 14 |
| 3.17 | Suppliers | 14 |
| 3.18 | Personnel Identification and Compensation | 15 |
| 3.19 | Existing Employment Related Contracts | 15 |
| 3.20 | Compliance with Laws | 15 |
| 3.21 | Litigation | 15 |
| 3.22 | Environmental | 15 |
| 3.23 | Employee Benefit Plans | 16 |
| 3.24 | Tax Matters | 16 |
| 3.25 | Consents | 17 |
| 3.26 | Licenses and Permits | 17 |
| 3.27 | Occupational Safety and Health | 17 |
| 3.28 | Insurance | 17 |
| 3.29 | Certain Transactions | 18 |
| 3.30 | Regulatory Compliance | 18 |
| 3.31 | Conduct of Compounding Business Since Most Recent Balance Sheet Date | 18 |
| 3.32 | Broker's or Consultant's Fees | 19 |
| 3.33 | Claims Against Insiders | 19 |
| 3.34 | Disclosure | 19 |
| 3.35 | No Other Representations and Warranties | 21 |

Gilto Asset Purchase Agreement 3/31/04

<u>Table of Contents</u>
(continued)

| | | Page |
|---|---|---|
| **ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** | | |
| 4.1 | Status of Purchaser | 22 |
| 4.2 | Authority of Purchaser | 22 |
| 4.3 | Due Authorization | 22 |
| 4.4 | Enforceability | 22 |
| 4.5 | Consents | 22 |
| 4.6 | Broker's or Consultant's Fees | 22 |
| | | |
| **ARTICLE V PRE-CLOSING COVENANTS** | | |
| 5.1 | Ordinary Conduct | 22 |
| 5.2 | Right of Inspection; Access to Books and Personnel; Oversight of Collections and Expenditures | 24 |
| 5.3 | Notification of Material Events | 24 |
| 5.4 | Supplemental Disclosures | 24 |
| 5.5 | Exclusivity | 24 |
| 5.6 | Publicity | 25 |
| 5.7 | Preparation of Pre-Closing Estimated Purchase Price Certificate | 25 |
| 5.8 | Power of Attorney; Right of Endorsement, Etc. | 25 |
| 5.9 | Covenants Not to Compete, Solicit or Disparage | 25 |
| 5.10 | Post-Closing Confidentiality | 26 |
| 5.11 | Performance of Contracts | 26 |
| 5.12 | Employees | 26 |
| 5.13 | Allocation for Tax Purposes | 26 |
| 5.14 | Hi-Tech Agreement | 27 |
| 5.15 | Real Estate Purchase Agreement | 27 |
| 5.16 | Miller Consulting Agreement | 27 |
| 5.17 | Gitto Independent Manufacturer's Representative Agreement | 27 |
| 5.18 | Assumed Contracts | 27 |
| 5.19 | Minimum Purchaser Financing | 27 |
| | | |
| **ARTICLE VI CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS** | | |
| 6.1 | Obligations to be Satisfied on or Prior to Closing Date | 27 |
| 6.2 | Procedure for Failure to Satisfy Conditions | 29 |
| | | |
| **ARTICLE VII CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS** | | |
| 7.1 | Obligations to Be Satisfied on or Prior to Closing Date | 29 |
| 7.2 | Procedure for Failure to Satisfy Conditions | 29 |
| | | |
| **ARTICLE VIII CLOSING** | | |
| 8.1 | Time and Place | 30 |
| 8.2 | Closing Transactions | 30 |
| 8.3 | Deliveries by Seller to Purchaser | 30 |
| 8.4 | Deliveries by Purchaser to Seller | 31 |
| 8.5 | Determination of Final Purchase Price | 31 |
| | | |
| **ARTICLE IX OTHER AGREEMENTS** | | |
| 9.1 | Further Assurances | 32 |
| 9.2 | Access to Records After Closing | 32 |
| 9.3 | Collection of Receivables | 33 |
| 9.4 | Third Party Consents | 33 |

Table of Contents
(continued)

| | | Page |
|---|---|---|
| **ARTICLE X INDEMNIFICATION** | | |
| 10.1 | Survival of Representations, Warranties and Indemnity | 33 |
| 10.2 | Indemnification by Seller | 33 |
| 10.3 | Limits on Indemnification by Seller and Seller Shareholders | 34 |
| 10.4 | Indemnification by Purchaser | 34 |
| 10.5 | Specific Breaches | 34 |
| 10.6 | Cross-indemnification for Broker's, Consultant's or Finder's Fees | 34 |
| 10.7 | Procedure for Indemnification | 35 |
| 10.8 | Payment | 35 |
| 10.9 | Reduction for Insurance and Taxes | 35 |
| 10.10 | Remedies Exclusive | 35 |
| 10.11 | No Consequential Damages | 36 |
| 10.12 | Bulk Sales | 36 |
| **ARTICLE XI TERMINATION** | | |
| 11.1 | Rights to Terminate | 36 |
| 11.2 | Effects of Termination | 36 |
| **ARTICLE XII MISCELLANEOUS PROVISIONS** | | |
| 12.1 | Notices | 36 |
| 12.2 | Assignment | 37 |
| 12.3 | Benefit of the Agreement | 37 |
| 12.4 | Exhibits and Schedules | 37 |
| 12.5 | Headings | 37 |
| 12.6 | Entire Agreement | 38 |
| 12.7 | Modifications and Waivers | 38 |
| 12.8 | Counterparts | 38 |
| 12.9 | Severability | 38 |
| 12.10 | GOVERNING LAW | 38 |
| 12.11 | Expenses | 38 |
| 12.12 | JURISDICTION; WAIVER OF JURY TRIAL; VENUE | 38 |
| 12.13 | Seller Acknowledgement | 39 |

Gitto Asset Purchase Agreement 3/31/04

EXHIBITS

Exhibit A   Assumption Agreement
Exhibit B   Escrow Agreement
Exhibit C   Real Estate Purchase Agreement
Exhibit D   Miller Consulting Agreement
Exhibit E   Independent Manufacturer's Representative Agreement
Exhibit F   Final Settlement Payment Computation

SCHEDULES

Schedule 1.1(b)      Business Tangible Property
Schedule 1.1(c)      Business Inventory
Schedule 1.1(d)      Business Accounts Receivable
Schedule 1.1(e)      Business Real Property
Schedule 1.1(f)      Business Contracts
Schedule 1.1(g)      Business Governmental Authorizations
Schedule 1.1(h)      Business Intellectual Property
Schedule 1.2(a)      Excluded Brokerage Operation Assets
Schedule 1.2(c)      Excluded Contracts
Schedule 1.2(d)      Miscellaneous Excluded Assets
Schedule 1.4         Trade Payables and Other Assumed Payables
Schedule 3.1         Status of Seller; Conflicts
Schedule 3.5         Title to Properties
Schedule 3.13        Contracts
Schedule 3.15        Intellectual Property and Confidentiality
Schedule 3.17        Suppliers
Schedule 3.18        Personal Identification and Compensation
Schedule 3.19        Existing Employment Related Contracts
Schedule 3.20        Legal Compliance
Schedule 3.21        Litigation
Schedule 3.22        Environmental
Schedule 3.23        Employee Benefit Plans
Schedule 3.24        Tax Matters
Schedule 3.25        Consents
Schedule 3.26        Licenses and Permits
Schedule 3.27        Occupational Safety and Health
Schedule 3.28        Insurance
Schedule 3.29        Certain Transactions
Schedule 3.30        Regulatory Compliance
Schedule 3.31        Conduct of Business

Gitto Asset Purchase Agreement 3/31/04

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into this 31ˢᵗ day of March, 2004, by and between GITTO/GLOBAL CORPORATION, a Massachusetts corporation ("*Seller*"), GARY GITTO, an individual ("*Gitto*"), FRANK MILLER, an individual ("*Miller*")(Gitto and Miller, being the principal shareholders of Seller, collectively, are hereinafter referred to as the "*Seller Shareholders*"), CHARLES GITTO, JR., an individual ("*Charles Gitto*")(Seller, Seller Shareholders and Charles Gitto, collectively, are hereinafter referred to as the "*Seller Parties*") and VITROTECH CORPORATION, a Nevada corporation ("*Purchaser*").

### RECITALS

WHEREAS, Seller is engaged in, among other activities, the delivery of value-added compounding services to base resins to produce, and distribute, specialty polyvinyl chloride, polyethylene, polypropylene and thermoplastic olefinic compounds (the "*Compounding Business*"); and

WHEREAS, Seller desires to sell the Compounding Business and substantially all of its assets utilized in the Compounding Business to Purchaser, and Purchaser desires to purchase the Compounding Business and substantially all of the assets of Seller utilized in the Compounding Business on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Purchaser, Seller and Seller Shareholders (collectively, the "*Parties*") hereby agree as follows:

### ARTICLE I
### PURCHASE AND SALE

1.1 *Purchased Assets*. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Compounding Business and all of Seller's right, title and interest in and to the following properties, rights and assets (but in all cases excluding the Excluded Assets) of Seller, as and to the extent existing on the Closing Date (such properties, rights and assets are hereinafter collectively referred to as the "*Purchased Assets*"), free and clear of all Liens, claims, options, charges, encumbrances and restrictions of any kind, other than Liens relating to Assumed Liabilities:

(a) all cash and cash equivalents, including, without limitation, checking accounts, bank accounts, lock box numbers, marketable securities, commercial paper, certificates of deposit and other bank deposits, and treasury bills;

(b) all Equipment and Improvements located in, at or upon the Facilities (excluding the Facilities) and used by Seller primarily or exclusively with respect to the operation of the Compounding Business, including, but not limited to, the tangible personal property set forth on Schedule 1.1(b) (the "*Business Tangible Property*");

(c) all Inventory located in, at or upon, or in transit to, the Facilities and used by Seller primarily or exclusively with respect to the operation of the Compounding Business, including, but not limited to, those items set forth on Schedule 1.1(c) (the "*Business Inventory*");

(d) all Accounts Receivable of Seller arising exclusively out of Seller's operation of the Compounding Business, including, but not limited to, those set forth on Schedule 1.1(d) (the "*Business Accounts Receivable*");

(e) all real property (including buildings, structures and improvements located thereon, fixtures contained therein and appurtenances thereto) owned or leased by Seller and used primarily or exclusively in the conduct of the Compounding Business, including, but not limited to, the real property set forth on Schedule 1.1(e) (the "*Business Real Property*");

(f) all Contracts (other than the Excluded Contracts), including the Lease Agreements, to which Seller is a party and which relate primarily or exclusively to Seller's operation of the Compounding Business or the Facilities, including, but not limited to, those set forth on Schedule 1.1(f) (the "*Business Contracts*");

(g) to the extent transferable, all Governmental Authorizations of Seller relating primarily or exclusively to Seller's operation of the Compounding Business or necessary to Seller's use, ownership or operation of the Compounding Business or the Purchased Assets and all pending applications therefor or renewals thereof, including, but not limited to, those (to the extent transferable) set forth on Schedule 1.1(g) (the "*Business Governmental Authorizations*");

(h) the Intellectual Property used by Seller primarily or exclusively with respect to Seller's operation of the Compounding Business as set forth on Schedule 1.1(h) (the "*Business Intellectual Property*");

(i) all of Seller's claims, demands, deposits (including security deposits made under the Lease Agreements), refunds, rebates, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment (other than those excluded pursuant to Section 1.2(d)) relating primarily or exclusively to Seller's operation of the Compounding Business, including, but not limited to, rights to or claims for refunds or rebates of Taxes and other governmental charges and the benefit of net operating loss carryforwards, carrybacks or other credits of Seller other than those excluded pursuant to Section 1.2(d), in each case relating primarily or exclusively to Seller's operation of the Compounding Business;

(j) all prepaid charges, expenses, sums and fees of Seller relating primarily or exclusively to Seller's operation of the Compounding Business, including all deposits/progress payments received by Seller relating to the Business Contracts to be assigned to Purchaser which Seller, as of the Closing Date, shall not have expended for work under the Business Contracts to which such deposits/progress payments relate;

(k) all general, financial and personnel records, ledgers, sales invoices, accounts and payable records, files, books and documents, correspondence and other files and records, including customer lists and sales records and all sales contact reports, whether daily, weekly or monthly, for prospective customers or regarding expanded sales to existing customers, of Seller pertaining primarily or exclusively to Seller's operation of the Compounding Business; and

(l) all other assets and property of Seller of whatever kind and nature, real or personal, tangible or intangible, that are owned, leased or licensed by Seller on the Closing Date and which are used by Seller primarily or exclusively in Seller's operation of the Compounding Business or the Facilities, including, but not limited to all Underwriters Laboratory approvals.

Anything to the contrary notwithstanding, the term "Purchased Assets" shall mean all of the goodwill, assets, properties and rights of every nature, kind and description, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of the Seller, which are used in, or which were acquired in connection with, the operation of the Compounding Business, including the value of the Compounding Business as a going concern, excepting only the Excluded Assets and any of the above which relate exclusively to the Excluded Assets. Notwithstanding the foregoing, Seller may retain and use in appropriate circumstances copies of any Contracts or records: (i) which relate to properties or activities of Seller other than the Compounding Business, or (ii) which are required to be retained pursuant to any legal requirement, for financial reporting purposes, for tax purposes, or otherwise in connection with the Excluded Liabilities.

1.2. Excluded Assets. Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "*Excluded Assets*") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets and shall remain the property of Seller after the Closing:

(a) all assets exclusively associated with and attributable to Seller's Excluded Operations as set forth on Schedule 1.2(a);

(b) all insurance policies and all rights of every nature (including proceeds) under or arising out of such policies;

Gitto Asset Purchase Agreement 3/31/04

(c) all Contracts to which Seller is a party and which (i) do not relate primarily or exclusively to the Compounding Business, or (ii) are set forth on Schedule 1.2(c) (collectively, the "*Excluded Contracts*");

(d) all claims, demands, deposits, refunds, rebates, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment to the extent relating to any of the Excluded Assets or Excluded Liabilities, including, but not limited to, rights to or claims for refunds or rebates of Taxes and other governmental charges and the benefit of net operating loss carryforwards, carrybacks or other credits of Seller and those set forth on Schedule 1.2(d);

(e) the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, shares of capital stock, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller as a corporation;

(f) all proprietary or confidential business or technical information, records and policies that relate generally to Seller and are not used primarily or exclusively in Seller's operation of the Compounding Business, including, without limitation, organization manuals, strategic plans and Tax records and related information;

(g) all personnel records and other records that Seller is required by Law to retain in its possession or is not permitted under Law to provide to Purchaser;

(h) all rights in connection with, and assets of, any Employee Plan;

(i) all rights of Seller under this Agreement, any other Transaction Document or the Transactions;

(j) all rights to the Hi-Tech Inventory to be conveyed to Hi-Tech pursuant to Section 5.14;

(k) all records prepared in connection with the sale of the Compounding Business to Purchaser; and

(l) all other properties, rights and assets of Seller which are not used by Seller primarily or exclusively in Seller's operation of the Compounding Business.

1.3 Purchase Price. Subject to the terms and conditions of this Agreement, Purchaser shall, at the Closing, pay to the Seller (or in the case of the Assumption Agreement referred to below, execute and deliver) the purchase price for the Purchased Assets, in the amount of Fifty Million Four Hundred Thousand Dollars ($50,400,000); subject to the adjustment described in Section 1.8 (the "*Purchase Price*"), consisting of:

(a) cash in the amount of the Purchase Price, as adjusted pursuant to Section 1.8, less (i) the Escrow Amount provided for in Section 1.9, (ii) $1,000,000 (the "*Holdback*"), to be retained and disbursed in accordance with Section 8.5(e), (iii) the amount of Trade Payables assumed, pursuant to Section 1.4(a), giving effect to the adjustment made pursuant to Section 1.8, and (iv) the amount of Other Assumed Payables, giving effect to the adjustment made pursuant to Section 1.8 (the "*Cash Purchase Price Component*"), which amount shall be remitted, at the sole option of Purchaser, directly to Seller or directly to pay amounts owing by Seller to creditors of Seller at the Closing Date with any excess being remitted directly to Seller; notwithstanding the foregoing, Seller may, at its sole option, elect to receive any or all of the Cash Purchase Price Component in the form of shares of common stock of Purchaser to be issued to Seller based on the average closing bid price of Purchaser common stock over the twenty trading days ending on the trading day prior to the Closing Date; and

(b) an assumption agreement in the form attached as Exhibit A hereto (the "*Assumption Agreement*") pursuant to which Purchaser assumes specific liabilities of Seller set forth in Section 1.4.

3

Gitto Asset Purchase Agreement 3/31/04

1.4 <u>Assumed Liabilities</u>. Subject to and pursuant to Section 1.6 and 1.8, Purchaser shall, at the Closing, irrevocably and absolutely, assume, agree to perform, and, when due, pay and discharge, only (a) the Trade Payables of Seller which are, as of the Most Recent Balance Sheet Date, reflected on <u>Schedule 1.4</u>, (b) other indebtedness of Seller that Purchaser shall, at its sole option and on terms acceptable to Purchaser, assume and/or refinance and/or pay (the "<u>*Other Assumed Payables*</u>"), such Other Assumed Payables to include, but not be limited to, the indebtedness of Seller, as of the Most Recent Balance Sheet Date, reflected on <u>Schedule 1.4</u>, and (c) the obligations and liabilities of Seller relating to the Assumed Contracts (excluding any liabilities set forth in Section 1.5), which arise after the Closing Date or are attributable to the period following the Closing Date and only to the extent such obligations and liabilities are not overdue or delinquent on the Closing Date without regard to any grace period and without the incurrence of any increase in amounts due (collectively, the "<u>*Assumed Liabilities*</u>").

1.5 <u>Excluded Liabilities</u>. Purchaser shall not assume or pay, and Seller shall continue to be responsible for, any debt, obligation or liability, of any kind or nature (fixed or contingent, known or unknown) of Seller whether or not relating to the Compounding Business, not expressly assumed by Purchaser pursuant to Section 1.4 (the "<u>*Excluded Liabilities*</u>"). Without limiting the foregoing, Purchaser shall not, except as specifically provided for in Section 1.4, assume:

(a) any action, suit or proceeding pending as of the Closing Date notwithstanding the disclosure thereof on the Most Recent Balance Sheet, or any subsequent claim, action, suit or proceeding arising out of or relating to such pending matters, any other similar event occurring on or prior to the Closing Date or, resulting from the conduct of the Compounding Business by Seller on or prior to the Closing Date;

(b) any liability of Seller for any Taxes for any periods prior to or subsequent to the Closing whether or not relating to the Compounding Business and notwithstanding the disclosure thereof on the Most Recent Balance Sheet;

(c) any obligation or liability arising from claims, proceedings or causes of action resulting from property damage or personal injuries (including death) caused by products, materials or services invoiced, sold, performed or shipped by Seller or the Compounding Business on or prior to the Closing Date;

(d) any obligation or liability arising from product warranty or product liability claims, with respect to products, materials or services invoiced, sold, performed or shipped by Seller or the Compounding Business, or disputed payables to suppliers relating to materials supplied to Seller or the Compounding Business where the materials were not in accordance with Seller specifications, on or prior to the Closing Date; provided, that the obligation or liability does not arise from acts of commission or omission by Purchaser subsequent to the Closing;

(e) any obligation or liability related to any actual or alleged violation or liability arising under any Environmental Laws, including, without limitation, any Release or threatened Release of Hazardous Substances, as those terms are defined herein, occurring prior to or, if as a result of Seller's activities, present, or if, not as a result of Seller's activities, to the extent present, on the Closing Date, regardless of whether such obligations or liabilities relate to Seller's ownership or operation of the Purchased Assets, to any predecessor, owner, tenant, occupant or user of the Purchased Assets, or to any other party unrelated to the Purchased Assets, and any Environmental Claims as herein defined, including, without limitation, any matters disclosed by Seller in <u>Schedule 3.22</u> and any matters identified in the Phase I Environmental Site Assessments provided by Seller or Charles Gitto to Purchaser (the "<u>*Environmental Reports*</u>");

(f) any obligation or liability of Seller arising from the transactions contemplated by this Agreement, including those (i) relating to the negotiation and preparation of this Agreement and the transactions contemplated herein and (ii) incurred by Seller with respect to its legal counsel, accounting, brokerage and investment advisors fees and expenses; or

(g) any obligation or liability arising from or related to the Retained Assets.

1.6 Prorations. All obligations and liabilities assumed by Purchaser under this Agreement shall be prorated as of the close of business on the Closing Date between Purchaser and Seller, whether or not such adjustment would normally be made as of such time. It is the intention of the parties that Seller should operate the Compounding Business for its own account pursuant to this Agreement until the close of business on the day immediately prior to the Closing Date, and that Purchaser shall operate the Compounding Business, including the Purchased Assets, for its own account from and after the Closing Date. Any overdue or delinquent obligations or liabilities of Seller on the close of business on the day immediately prior to the Closing Date, other than Trade Payables assumed by Purchaser pursuant to Section 1.3(a), shall not be prorated and shall remain the property of Seller.

1.7 Transfer Tax Payments. Seller shall pay any transfer, sales, purchase, use, value added, excise or similar Tax arising out of the transfer of any of the Purchased Assets to Purchaser.

1.8 Purchase Price and Cash Purchase Price Component Adjustment. At or prior to Closing, Seller shall prepare and deliver to Purchaser a balance sheet of Seller, including all of the Purchased Assets and Assumed Liabilities (the "*Preliminary Closing Balance Sheet*"), measured as of a date not more than three Business Days prior to the Closing. The Purchase Price will be adjusted up to reflect the excess, or down to reflect the deficiency, in the book value of the Purchased Assets as reflected on the Preliminary Closing Balance Sheet compared to the book value of the Purchased Assets as reflected on the Most Recent Balance Sheet. The Cash Purchase Price Component will likewise be adjusted to reflect the Trade Payables and Other Assumed Payables shown on the Preliminary Closing Balance Sheet. The Preliminary Closing Balance Sheet shall be prepared in accordance with GAAP applied in a manner consistent with prior accounting practices of Seller.

1.9 Escrow Amount. On or before the Schedule Approval Date, subject to Purchaser's right to terminate this Agreement as provided in Section 3.34, Purchaser and Seller will execute an escrow agreement, in the form attached hereto as Exhibit B (the "*Escrow Agreement*"), pursuant to which Purchaser will deposit with the escrow agent named in the Escrow Agreement (the "*Escrow Agent*") the sum of $2,000,000 (the "*Escrow Amount*") to be held and disbursed by the Escrow Agent in the manner described in the Escrow Agreement.

ARTICLE II
DEFINITIONS

2.1 General. Each term defined in the first Article of this Agreement and in the Recitals shall have the meaning set forth below whenever used herein, unless otherwise expressly provided or unless the context clearly requires otherwise.

2.2 Definitions. As used herein, the following terms shall have the meanings ascribed to them in this Section 2.2:

"*Accounts Receivable.*" All present and future rights to payment for goods or services rendered whether or not earned by performance, including, without limitation, all accounts or notes receivable owned or held by Seller.

"*Affiliate.*" As set forth in Rule 12b-2 of the general rules and regulations under the Securities Exchange Act of 1934, as amended.

"*Agreement.*" This Asset Purchase Agreement, together with all Exhibits and Schedules referred to herein, as amended, modified or supplemented from time to time in accordance with the terms hereof.

"*Assumed Contracts.*" All Business Contracts transferred from Seller to Purchaser pursuant to Section 1.1(f) and assumed by Purchaser pursuant to Section 1.4(b) including, but not limited to (i) the Contracts listed on Schedule 1.1(f) hereto as may be supplemented pursuant to Section 5.16, (ii) such Contracts entered into by Seller after the date hereof in the Ordinary Course of Business as Purchaser expressly agrees to assume and (iii) all Contracts entered into by Seller after the date hereof in the Ordinary Course of Business and individually in an amount not in excess of $10,000.00; provided, however, Seller shall have the right to enter into Contracts (and Purchaser shall be deemed to assume such Contracts subject to the immediately following sentence) after the date hereof in the Ordinary Course of Business and individually in an amount in excess of $10,000.00 if Purchaser does not object to Seller's entering into such Contracts within three Business Days following Purchaser's receipt from Seller of the written notification of Seller's intention to enter into such Contracts. Notwithstanding anything in this

Agreement to the contrary, it is expressly understood and agreed by the parties hereto that Purchaser will assume Contracts entered into by Seller after the date hereof and all purchase orders only to the extent that the delivery of services, products or other items pursuant to such Contracts or purchase orders is made to Purchaser after the Closing Date.

"*Assumed Liabilities.*" As defined in Section 1.4.

"*Assumption Agreement.*" As defined in Section 1.3.

"*Authority.*" Any governmental, regulatory or administrative body, agency or authority, any court or judicial authority, any arbitrator or any public, private or industry regulatory authority, whether foreign, federal, state or local.

"*Business Accounts Receivable.*" As defined in Section 1.1(d).

"*Business Contracts.*" As defined in Section 1.1(f).

"*Business Day.*" Any day other than a Saturday, Sunday or a day on which banks in California are not open for business.

"*Business Governmental Authorizations.*" As defined in Section 1.1(g).

"*Business Intellectual Property.*" As defined in Section 1.1(h).

"*Business Inventory.*" As defined in Section 1.1(c).

"*Business Real Property.*" As defined in Section 1.1(e).

"*Business Tangible Assets.*" As defined in Section 1.1(b).

"*Cash Purchase Price Component.*" As defined in Section 1.3(a).

"*CERCLA.*" Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., as amended.

"*Closing.*" The actual sale, conveyance, transfer, assignment and delivery of the Purchased Assets to Purchaser.

"*Closing Date.*" The date which is the later of: (a) ninety (90) days following the execution of this Agreement or (b) three (3) Business Days following the date on which all closing conditions have been satisfied or waived, or such other date as Seller and Purchaser may mutually agree in writing, and upon which the Closing shall occur.

"*Code.*" Internal Revenue Code of 1986, as it may be amended from time to time.

"*Compounding Business.*" As defined in the Recitals hereto.

"*Contracts.*" All contracts, leases, subleases, arrangements, commitments and other agreements of Seller relating to the Compounding Business or Purchased Assets, including, without limitation, all customer agreements, vendor agreements, purchase orders, installation and maintenance agreements, computer software licenses, hardware lease or rental agreements.

"*Disclosing Party.*" As defined in Section 5.10.

"*Disputed Items Notice.*" As defined in Section 8.5.

"*Employees.*" As defined in Section 5.12.

6                                        Gitto Asset Purchase Agreement 3/31/04

"*Employee Benefit Plan.*" Any employee benefit plan within the meaning of Section 3(3) of ERISA which (a) is maintained for employees of Seller or any of its ERISA Affiliates or (b) has at any time within the preceding six (6) years been maintained for employees of Seller or any current or former ERISA Affiliates, and any bonus or other incentive compensation, deferred compensation, salary continuation, sick or disability pay, severance, stock award, stock option, stock purchase, tuition assistance, vacation, vacation pay or other benefit plan or arrangement, and each employment, termination or other compensation arrangement or agreement, in each case with respect to current or former employees or consultants of or to Seller or any ERISA Affiliate, and under which Seller or any ERISA Affiliate could reasonably be expected to have any liability.

"*Environmental Claims.*" As defined in Section 3.22.

"*Environmental Laws.*" Each and every Law, Order, Permit, or similar requirement of each and every Authority and common law, pertaining to (A) the protection of human health, safety, the environment, natural resources and wildlife or (B) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Substance or (C) pollution, including without limitation, as amended, CERCLA, the Solid Waste Disposal Act, 42 U.S.C. Section 6901 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq. and the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, et seq.

"*Environmental Reports.*" As defined in Section 1.5.

"*Equipment and Improvements.*" All facilities and structures, buildings, installations, fixtures, improvements, betterments, additions, spare parts, stores, supplies, fuel and lubes, machinery, equipment, cranes, forklifts, platforms, vehicles, trucks, chassis, generators, containers, spare tires and parts; tools, appliances, furniture, office furniture, fixtures, office supplies and office equipment, computers, computer terminals and printers, computer software, telephone systems, telecopiers and photocopiers, and other tangible personal property of every kind and description, which are owned or leased by Seller, or are utilized in connection with Seller's operation.

"*ERISA.*" The Employee Retirement Income Security Act of 1974, as it may be amended from time to time, and the regulations promulgated thereunder.

"*ERISA Affiliate.*" Any corporation, partnership or trade or business which is a member of a group that includes Seller and is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"*Escrow Agent.*" As defined in Section 1.9.

"*Escrow Agreement.*" As defined in Section 1.9.

"*Escrow Amount.*" As defined in Section 1.9.

"*Excluded Assets.*" As defined in Section 1.2.

"*Excluded Liabilities.*" As defined in Section 1.5.

"*Excluded Operations.*" All operations and activities of Seller not relating, partly or wholly, to the Compounding Business.

"*Facilities.*" The Purchased Real Estate and the Leased Warehouse constituting the sole physical locations at which the Compounding Business is conducted.

"*Final Assumed Trade Payables.*" As defined in Section 8.5.

"*Final Net Assets Acquired.*" As defined in Section 8.5.

"*Final Other Assumed Payables.*" As defined in Section 8.5.

"*Final Purchase Price.*" As defined in Section 8.5.

Gitto Asset Purchase Agreement 3/31/04

"*Final Purchase Price Certificate*." As defined in Section 8.5.

"*Final Settlement Date*." As defined in Section 8.5.

"*Final Settlement Payment*." As defined in Section 8.5.

"*Financial Statements*." The financial statements of Seller for the fiscal years ended on December 31, 2002, and 2003, each audited by Stonefield Josephson, Inc., independent certified public accountants, and accompanied by the opinion of such accountants relating to such statements, and for the most recently completed fiscal quarter prior to the Closing Date, each together with the notes thereto, which are included in the consolidated financial statements of Seller.

"*GAAP*." Generally accepted accounting principles.

"*Gitto Independent Manufacturer's Representative Agreement*." As defined in Section 5.17.

"*Governmental Authorizations*." Any consent, license, registration, authorization or permit issued, granted, given or otherwise made available by or under the authority of any Governmental or Regulatory Body or pursuant to any Law.

"*Hazardous Substance*." Any substance which is (A) defined as a hazardous substance, hazardous material, hazardous waste, pollutant or contaminant under any Environmental Laws, (B) a petroleum hydrocarbon, including crude oil or any fraction thereof, (C) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive or carcinogenic or (D) regulated pursuant to any Environmental Laws.

"*Hi-Tech*." As defined in Section 5.14.

"*Hi-Tech Agreement*." As defined in Section 5.14.

"*Hi-Tech Inventory*." As defined in Section 5.14.

"*Hi-Tech Notes*." As defined in Section 5.14.

"*Holdback*." As defined in Section 1.3(a).

"*Indemnified Party*." As defined in Section 10.7.

"*Indemnifying Party*." As defined in Section 10.7.

"*Indemnity Basket*." As defined in Section 10.3.

"*Intellectual Property*." Trade names, trademarks, trademark registrations, trademark applications, service marks, service mark registrations, service mark applications; all copyrights, copyright registrations, copyright applications; patent rights (including, without limitation, issued patents, applications, divisions, continuations and continuations-in-part, reissues, patents of addition, utility models and inventors' certificates); licenses with respect to any of the foregoing; trade secrets, proprietary manufacturing information and know-how; inventions, inventors' notes, drawings and designs; and, customer and vendor lists and the goodwill associated with any of the foregoing.

"*Inventories*." All of Seller's raw materials, packaging, service parts, supplies, work-in-process and finished goods and any and all other inventories of Seller, plus any replacements for or additions to such inventories acquired on or before the Closing Date, and minus any items of inventory consumed, sold or otherwise disposed of in the Ordinary Course of Business by Seller on or before the Closing Date.

"*IRS*." Internal Revenue Service.

"*Law*." Any law, statute, regulation, rule, ordinance, requirement, announcement or other binding action or requirement of an Authority.

Gitto Asset Purchase Agreement 3/31/04

"*Purchased Real Estate*." The parcels of land and improvements, described more fully on Schedule 1.1(c), located at 140 Leominster-Shirley Road, Lunenberg, Massachusetts utilized by Seller pursuant to a lease from Charles Gitto and to be conveyed pursuant to the Real Estate Purchase Agreement.

"*Purchaser*." As defined in the heading hereto.

"*Purchaser Losses*." As defined in Section 10.2.

"*Real Estate Purchase Agreement*." As defined in Section 5.15.

"*Real Property Leases*." The leases pursuant to which Seller leases the Purchased Real Estate from Charles Gitto and the Leased Warehouse from a non-affiliated third party.

"*Receivable Settlement Date*." As defined in Section 9.3.

"*Release*." Any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including without limitation the abandonment or discarding of barrels, containers, and other receptacles containing any Hazardous Substance).

"*Schedule Delivery Due Date*." As defined in Section 3.34.

"*Scheduled Approval Date*." As defined in Section 3.34.

"*Seller*." As defined in the heading hereto.

"*Seller Parties*." As defined in the heading hereto.

"*Seller Schedules*." As defined in Section 3.34.

"*Seller Shareholders*." As defined in the heading hereto.

"*Subsidiary*." A Subsidiary of any Person means (i) a corporation more than 50% of the combined voting power of the outstanding stock of which is owned, directly or indirectly, by such Person or by one or more other Subsidiaries of such Person or by such Person and one or more Subsidiaries thereof, or (ii) any other Person (other than a corporation) in which such Person, or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, has the power to direct the policies, management and affairs thereof.

"*Taxes*." All net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, employment, excise, goods and services, severance, stamp, occupation, premium, property, assessments, or other governmental charges of any kind whatsoever, together with any interest, fines and any penalties, additions to tax or additional amounts incurred or accrued under applicable federal, state, local or foreign tax law or assessed, charged or imposed by any Authority, domestic or foreign; provided that any interest, penalties, additions to tax or additional amounts that relate to Taxes for any taxable period (including any portion of any taxable period ending on or before the Closing Date) shall be deemed to be Taxes for such period, regardless of when such items are incurred, accrued, assessed or charged. For the purposes of Section 3.24, Seller shall be deemed to include any predecessor to Seller, or any Person from which Seller incurs a liability for Taxes as a result of transferee liability, joint and several liability, or otherwise.

"*Third-Party Claim*." As defined in Section 10.7.

"*Third-Party Notice*." As defined in Section 10.7.

"*Time Covenant*." As defined in Section 5.9.

"*Trade Payables*." All accounts payable properly reflected on the balance sheet of Seller in accordance with GAAP and arising in connection with the provision of goods or services to Seller relating to the Compounding Business.

Gitto Asset Purchase Agreement 3/31/04

"*Uncollected Business Accounts Receivable*." As defined in Section 8.5.

2.3 Interpretation. Unless otherwise expressly provided or unless the context requires otherwise, (a) all references in this Agreement to Articles, Sections, Schedules and Exhibits shall mean and refer to Articles, Sections, Schedules and Exhibits of this Agreement; (b) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations; (c) words using the singular or plural number also shall include the plural and singular number, respectively; (d) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement (including the Schedules and Exhibits hereto); and (e) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of an Authority, Persons succeeding to the relevant functions of such Person).

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER AND SELLER PARTIES

As an inducement to Purchaser to enter into and perform this Agreement, and in consideration of the covenants of Purchaser contained herein, Seller and Seller Parties represent and warrant to Purchaser (which representations and warranties shall survive the Closing (subject to Section 10.1) regardless of any examinations, inspections, audits and other investigations Purchaser has heretofore made, or may hereafter make, with respect to such representations and warranties) as follows:

3.1 Status of Seller; Enforceability; Conflicts; Consents.

(a) Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts. Seller has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to use its name and to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, except where the failure to possess any such franchise, license, permit, authorization or approval would not have a material adverse effect on Seller or the Compounding Business. Seller is duly qualified and in good standing to do business in each jurisdiction in which the nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary, except where the failure to be so duly qualified and in good standing would not have a material adverse effect on Seller or the Compounding Business. Seller has no Subsidiaries.

(b) Seller has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery by Seller of this Agreement, and the performance by Seller of its obligations hereunder, have been duly and validly authorized and approved by all necessary action on the part of Seller and the Seller Shareholders.

(c) This Agreement is binding upon, and enforceable against, Seller and Seller Parties in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally and by general principles of equity (whether in a proceeding at law or in equity).

(d) Except as set forth on Schedule 3.1, neither the execution or delivery of this Agreement by Seller or Seller Parties nor the performance by Seller or Seller Parties of their obligations under this Agreement will (assuming the receipt of all consents and approvals referred to in Section 3.25), conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, any contract, lease, license, franchise, permit, indenture, mortgage, deed of trust, note agreement or other agreement or instrument to which Seller or Seller Parties are parties or are bound or any judgment, order or decree, statute, law, ordinance, rule or regulation applicable to Seller or Seller Parties or the property or assets of Seller or Seller Parties (including, without limitation, the Purchased Assets) or the certificate of incorporation or by-laws of Seller, or any applicable Law or Order (collectively, "*Legal Provisions*"), except for conflicts, breaches or defaults which would not have a material adverse effect on Seller or the Compounding Business.

Gitto Asset Purchase Agreement 3/31/04

(e) No consent, approval, license, Permit, Order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, is required to be obtained or made by or with respect to Seller or Seller Parties in connection with (i) the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, or (ii) the conduct by Seller of its business following the Closing as conducted on the date hereof other than (A) the consents and approvals referred to in Section 3.25, (B) those that may be required solely by reason of Purchaser's (as opposed to any other third party's) participation in the transactions contemplated hereby, and (C) such other consents or approvals the failure of which to obtain would not have a material adverse effect on Purchaser or the ability of any party to consummate the transactions contemplated hereby.

(f) Seller has delivered to Purchaser true and complete copies of its certificate of incorporation and by-laws, as amended to date.

3.2 Ownership of Seller.

(a) The Seller Shareholders are the sole shareholders of Seller and each such shareholder is the registered and beneficial owner of the shares of Seller free and clear of all Liens of any nature whatsoever; and each such shareholder has the sole right to vote and to sell the shares owned by such shareholder.

(b) There are no outstanding warrants, options, agreements, convertible or exchangeable securities, phantom stock or other commitments pursuant to which Seller is or may become obligated to issue, sell, purchase, return or redeem any shares of capital stock or other securities of Seller and no equity securities of Seller are reserved for issuance for any purpose.

3.3 Financial Statements. The Most Recent Balance Sheet has been prepared, and the Preliminary Closing Balance Sheet will be prepared, in accordance with GAAP, consistently applied during the periods covered thereby, fairly present, or will fairly present, in all material respects the financial condition and the results of operations for the periods covered thereby, and are, or will be, in accordance with the books and records of Seller. Seller has provided Purchaser with the Financial Statements and the Most Recent Balance Sheet and will provide, prior to Closing, Financial Statements through the end of the last completed fiscal quarter preceding the Closing Date and the Preliminary Closing Balance Sheet.

3.4 Undisclosed Liabilities. On the Most Recent Balance Sheet Date and on the date of the Preliminary Closing Balance Sheet, Seller had, and will have, no debts, liabilities, Liens, claims, encumbrances or other obligations of any nature (whether accrued, absolute, contingent or otherwise) of the type which should be reflected in balance sheets (including the notes thereto) prepared in accordance with GAAP consistently applied in accordance with the prior Financial Statements of Seller, which were not, or are not, disclosed, reflected or reserved against on the Most Recent Balance Sheet or the Preliminary Closing Balance Sheet; and, except for liabilities which have been incurred since the Most Recent Balance Sheet Date in the Ordinary Course of Business, since the Most Recent Balance Sheet Date Seller has not incurred any liability of any nature (whether accrued, absolute, contingent or otherwise) of the type which should be reflected on the Most Recent Balance Sheet prepared in accordance with GAAP consistently applied in accordance with the Financial Statements.

3.5 Title to Properties. Except as set forth on Schedule 3.5, Seller has good and marketable title to all of the assets and properties reflected on the Most Recent Balance Sheet and used in the Compounding Business constituting Purchased Assets free and clear of all Liens of any nature.

3.6 Real Property.

(a) Schedule 1.1(d), listing the Facilities, contains an accurate description of each parcel of real property leased or occupied under Permit by Seller. No other real property is used in the Compounding Business or occupied by Seller. The Seller owns no real property. The Real Property Leases are valid and in full force and effect, and there does not exist any default or event that with notice or lapse of time, or both, would constitute a default by Seller under the Real Property Leases, and to the knowledge of Seller, there does not exist any default or event that with notice or lapse of time, or both, would constitute a default by any other party under the Real Property Leases.

12

Case 6:03-cr-40026-FDS   Document 180-1   Filed 02/09/11   Page 18 of 121
Case 4:03-cv-40265   Document 180-4   Entered 02/09/11   Page 18 of 121 Exhibit
31   Page 21 of 47

(b) All the buildings, fixtures and leasehold improvements used by Seller in the Compounding Business are located on the Facilities and, to Seller's knowledge, none of such buildings, fixtures or improvements encroach on any adjoining property owned by others or public rights of way. The Facilities abut on at least one side a public street or road in a manner so as to permit reasonable, customary and adequate vehicular and pedestrian ingress, egress and access to such parcel, or has adequate easements across intervening property to permit reasonable, customary and adequate vehicular and pedestrian ingress, egress and access to such parcel from a public street or road. There are no restrictions on entrance to or exit from the Facilities to adjacent public streets and, to Seller's knowledge, no conditions that will result in the termination of the present access from the Facilities to existing highways or roads.

(c) Seller has good and marketable leasehold interests in the Facilities, free and clear of all Liens, except for Liens for taxes not yet due and payable and any Liens on the underlying fee interest in the Facilities. Subject to the Real Property Leases, Seller has enjoyed the continuous and uninterrupted quiet possession, use and operation of the Facilities without any material complaint or objection by any Person.

3.7 Equipment and Improvements. The Equipment and Improvements, whether or not located on the Facilities, are in compliance with all applicable Laws and Orders, and, except as set forth in Schedule 1.1(b), are in reasonable and serviceable condition and repair, normal wear and tear excepted, except for any such non-compliance that would not have a material adverse effect on Seller or the Compounding Business. Neither the Facilities nor the use or occupancy thereof by Seller violates in any way any applicable Laws, Orders, Permits, covenants, conditions and restrictions, whether federal, state, local or, to Seller's knowledge, private, except for any such violation which would not have a material adverse effect on Seller or the Compounding Business.

3.8 No Commitments. There are no outstanding, defaulted or unsatisfied contracts, commitments, agreements or understandings which have been made to, with or for the benefit of any utility companies, school districts, water districts, improvement districts or other Authorities which could reasonably be expected to impose any obligation, liability or condition on Seller, or to the knowledge of Seller, the owners of the Facilities to grant any easements or to make any payments, contributions or dedications of money or land or to construct, install or maintain or to contribute to the construction, installation or maintenance of any improvements of a public or private nature, whether on or off the Facilities.

3.9 Continued Use of Facilities. There are no claims, governmental investigations, litigation or proceedings which are pending against Seller, or, to the knowledge of Seller, threatened against Seller, or, to the knowledge of Seller, pending or threatened against the owners of the Facilities which could reasonably be expected to affect the continued use of the Facilities in substantially the same manner as presently used by Seller.

3.10 Real Estate and Personal Property Taxes; Assessments.

(a) All obligations of Seller with respect to real estate taxes and personal property taxes and assessments which may be due and payable with respect to the Purchased Assets have been paid.

(b) Seller has not received any notice of any special tax assessment affecting any property owned or leased by it, and, to Seller's knowledge, no such assessments are pending or threatened.

3.11 Inventory. All Inventory, including without limitation all Inventory shown on the Most Recent Balance Sheet and all Inventory thereafter created or acquired by Seller prior to the Closing Date but excluding the Hi-Tech Inventory, has been created or acquired in the ordinary course of business and is of a quality usable and saleable in the ordinary course of business, except to the extent of normal obsolescence and subject, in the case of raw materials and work-in-progress, to the completion of the production process.

3.12 Accounts Receivable. The Business Accounts Receivable reflected on the Most Recent Balance Sheet (a) were acquired by Seller in the Ordinary Course of Business and represent fully completed bona fide transactions that require no further act on the part of Seller to make such Accounts Receivable payable by the account debtors; (b) except as reserved against on the Most Recent Balance Sheet, are not subject to any claim, counterclaim, set-off or deduction and are fully collectible at the face amounts thereof; (c) represent valid obligations owing to Seller by account debtors that are not Affiliates of Seller, which are enforceable in accordance with their respective terms; and (d) are owned by Seller free and clear of all Liens.

Gitto Asset Purchase Agreement 3/31/04

3.13 <u>Contracts.</u> (a) <u>Schedule 3.13</u> to this Agreement contains a complete list of all material Contracts (including, without limitation, all Assumed Contracts) entered into or agreed to by Seller or by which Seller is currently bound and true and complete copies of such written Contracts have been provided to Purchaser or its counsel. Identified with an asterisk on <u>Schedule 3.13</u> are those Contracts that contain a prohibition on assignment. All such Contracts are valid and binding upon Seller, and to Seller's knowledge, the other parties thereto except as limited by bankruptcy and insolvency laws and by other laws affecting the rights of creditors generally. There is no default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of such Contracts, and to the knowledge of Seller, there is no default or event that with notice or lapse of time, or both, would constitute a default by any other party under any of such Contracts. Seller has not received notice that any party to any of such Contracts intends to cancel or terminate any of such agreements or to exercise or not exercise any options under any of such agreements. True, correct and complete copies (or, if oral, written summaries) of each Contract, including all outstanding purchaser orders, have been delivered to Purchaser, a complete and accurate list of which is set forth on <u>Schedule 3.13</u>.

(b) The Assumed Contracts are adequate and appropriate for the continued conduct of the Compounding Business as conducted in the Ordinary Course of Business since January 1, 2004. The purchase commitments and other agreements for the provision of raw materials for use in the manufacture of Compounding Business products to be assumed by Purchaser will provide Purchaser with a supply of each raw material necessary in such manufacture which is not materially excessive or materially inadequate for the continued manufacture of such products in the Ordinary Course of Business in the quantities in which they have been produced since January 1, 2004.

3.14 <u>Equity Interests.</u> Seller does not directly or indirectly own any capital stock of, or other equity interests in, any corporation, partnership, joint venture or other entity.

3.15 <u>Intellectual Property.</u> <u>Schedule 3.15</u> contains a true and complete list and brief description of all patents, trademarks, service marks, trade names, and copyrights (whether or not such trademarks, trade names, service marks and copyrights are registered), and all pending applications therefor, if any, owned by Seller or in which Seller has any rights or licenses. No other patents, trademarks, trade names, service marks or copyrights are reasonably necessary for the conduct of the Compounding Business in substantially the same manner as presently operated by Seller. To Seller's knowledge, there is no infringement or alleged infringement by any Person of any such trademark, service mark, trade name, copyright or patent. Seller has not received any notice from any Person alleging Seller is infringing upon, and, to Seller's knowledge, Seller has not infringed and is not now infringing on, any trademark, service mark, trade name, copyright or patent belonging to any other Person. <u>Schedule 3.15</u> also contains (a) a true and complete list of all agreements between each employee of Seller and Seller relating to confidential information of Seller, including but not limited to patents, trademarks, service marks, trade names, and copyrights, and the ownership of any intellectual property developed by such employee under the scope of his employment and (b) a true and complete list of (i) all Underwriter's Laboratory Approvals received, and held, by Seller with respect to compounds manufactured by Seller, and (ii) all compounds manufactured by Seller during the five year period ending on the date hereof, including a detailed list of the formulation and procedures utilized to manufacture such compounds.

3.16 <u>Required Assets; Sufficiency of Assets.</u> There are no significant assets used or required by Seller in the conduct of the Compounding Business as presently conducted by Seller that are not either owned by it or licensed or leased to it and, in each case conveyed to Purchaser under this Agreement. The Purchased Assets constitute all of the assets, goodwill, properties and rights of every nature, kind and description, whether tangible or intangible, real, personal or mixed, necessary to conduct the Compounding Business in substantially the same manner as presently conducted by Seller.

3.17 <u>Suppliers.</u> <u>Schedule 3.17</u> sets forth the lists of all suppliers whose supplies to Seller and the Compounding Business as presently conducted exceeded $25,000 during the most recent calendar year. During the period from January 1, 2004 through the date hereof, none of such suppliers has canceled or substantially modified its agreement or commitment with Seller to supply products or services (or threatened in writing to do any of the foregoing). To the knowledge of Seller, the relationship of Seller with each of such suppliers of Seller is a good commercial working relationship. Seller has no knowledge that any such supplier intends to cancel or otherwise substantially modify its relationship with Seller or limit materially its services, supplies or materials to Seller either as a result of the transactions contemplated hereby or otherwise, or has any pending or threatened controversy with any Authority with respect to its relationship with Seller, except for such controversy that would not have a material adverse effect on Seller.

3.18 <u>Personnel Identification and Compensation</u>. Schedule 3.18 contains a true and complete list of the names, titles and compensation of all current officers, directors and employees of Seller whose compensation from Seller exceeded $40,000.00 during the most recent calendar year of Seller.

3.19 <u>Existing Employment Related Contracts</u>. Schedule 3.19 contains a list of all written and oral (with a short description thereof) arrangements or contracts relating to employment, compensation, bonuses, severance, pension and other related issues and collective bargaining agreements to which Seller is a party or by which Seller is bound. All these contracts and arrangements are in full force and effect, and neither Seller nor, to Seller's knowledge, any other Person is in default under any such contract or arrangement. There have been no claims of default and there are no facts or conditions that, with the passage of time or upon notice, will result in a default by Seller, or to the knowledge of Seller, any other Person, under these contracts or arrangements. There is no pending or, to Seller's knowledge, threatened labor dispute, strike, or work stoppage affecting Seller or the Compounding Business.

3.20 <u>Compliance with Laws</u>. Except as set forth in <u>Schedule 3.20</u> and subject to the provisions of Sections 3.22, 3.26, 3.27 and 3.30, Seller, all of the products manufactured, tested, and/or distributed by the Seller, and the Purchased Assets have complied with all, and are not in violation of any, applicable Laws, Permits and Orders (including, without limitation, any applicable building, zoning, environmental protection, water use, occupational health and safety, employment, or disability rights) affecting Seller's properties, the operation of the Compounding Business, or the Purchased Assets, except for any such non-compliance or violation which would not have a material adverse effect on Seller or the Compounding Business. No material capital expenditures are required for compliance with Laws by Seller in order to conduct the Compounding Business as presently conducted by Seller.

3.21 <u>Litigation</u>. Except as set forth in <u>Schedule 3.21</u>, there are no suits, actions, arbitrations, and legal, administrative and other proceedings and governmental investigations, pending or, to Seller's knowledge, threatened, against or, to Seller's knowledge, affecting Seller or the Compounding Business, involving $10,000.00 or more in dispute or, if determined adversely to Seller, could result in the expenditure or recovery of $10,000.00 or more by Seller in connection therewith. None of the matters set forth in <u>Schedule 3.21</u>, if decided adversely to Seller would result in a material adverse change, taken individually or in the aggregate, to the Compounding Business or Seller. Seller is not presently engaged in any legal action to recover moneys due to it or damages sustained by it.

3.22 <u>Environmental</u>. Except as set forth in <u>Schedule 3.22</u>:

(a) <u>Compliance with Environmental Laws</u>. Seller, the use by Seller of the Facilities, and the Compounding Business have been and are in compliance in all material respects with all applicable Environmental Laws, and there has been and is no liability against Seller under any applicable Environmental Laws. The use by Seller of any real property formerly owned or leased by Seller or otherwise related to the Compounding Business was in compliance in all material respects with all applicable Environmental Laws during Seller's period of ownership or operation. Seller has no knowledge of any facts or circumstances concerning any alleged violation or liability arising under any Environmental Law with respect to the Facilities, the Compounding Business or any formerly owned or operated real property or any use or condition thereof.

(b) <u>No Release of Hazardous Substances</u>. Except in accordance with applicable Environmental Laws, there has been no Release or threatened Release by Seller, or to Seller's knowledge, by any other Person of any Hazardous Substance existing on, beneath or from the surface, subsurface, ground water, sediment, rivers or other bodies of water associated with the Facilities, nor is there or has there been any Release or threatened Release by Seller, or, to the knowledge of Seller, by any other Person, of any Hazardous Substances on, beneath from or in the vicinity of the Facilities currently occurring or, to the knowledge of Seller, occurring at any time in the past.

Gitto Asset Purchase Agreement 3/31/04

(c) Permits. All Permits required by or issued pursuant to any Environmental Law for the ownership, use or operation of the Facilities by Seller or the Compounding Business have been obtained in a timely manner and are presently maintained in full force and effect. Schedule 3.22 contains a true and complete listing of all such Permits. The Facilities and the operations of Seller are in material compliance with all terms and conditions of such Permits. Seller has not received any notice or other communication and has no knowledge of any facts or circumstances concerning any alleged violation of any such Permits.

(f) No Proceedings. There exists no Order, notice of violation, nor any suit, claim, proceeding, citation, directive, summons, investigation, information request or other notice pending or, to the knowledge of Seller, threatened pursuant to any Environmental Law relating to (i) Seller's ownership, lease, occupation or use of the Facilities, or any real property formerly owned, leased, occupied or used by Seller or, to Seller's knowledge, any other present or former owner, tenant, occupant or user of the Facilities, (ii) any alleged violation of, or liability under, any Environmental Law by Seller, or (iii) to Seller's knowledge, the suspected presence, Release or threatened Release of any Hazardous Substance on, under, in or from the surface, subsurface, groundwater, sediment, rivers or other bodies of water associated with the Facilities, or any formerly owned, leased, occupied or used real property nor does there exist any valid basis for any such Order, suit, claim, proceeding, citation, directive, summons investigation, information request, notice of violation, or other notice (collectively, the "*Environmental Claims*").

(g) No Tanks, Asbestos or PCB's. To Seller's knowledge, there are and were no aboveground or underground storage tanks currently or formerly located on the Facilities used or formerly used for the purpose of storing any Hazardous Substance. There is no asbestos-containing building material on the Facilities, and, to Seller's knowledge, no asbestos abatement or remediation work has been performed on the Facilities. To Seller's knowledge, there is no PCB-containing equipment or PCB-containing material located on the Facilities.

(h) Documents. Seller has provided Purchaser with all environmental assessment reports in its possession with respect to the Facilities and with copies of all Permits required to conduct the Compounding Business as presently conducted by Seller.

3.23 Employee Benefit Plans.

(a) Schedule 3.23 contains a true and complete list of all Employee Benefit Plans. There are no Multiemployer Plans.

(b) All obligations of any nature under any Employee Benefit Plan will constitute an Excluded Liability, and Purchaser shall have no obligation or duty with respect thereto.

3.24 Tax Matters. Except as set forth in Schedule 3.24:

(a) Seller has duly and timely filed (and prior to the Closing Date will duly and timely file) true, correct and complete tax returns, reports or estimates, all prepared in accordance with applicable Laws, for all years and periods (and portions thereof), for all jurisdictions (whether federal, state, local or foreign) in which any such returns, reports or estimates were due, and for all such returns, reports and estimates which are required to be filed by any applicable Law on or prior to the Closing Date. All Taxes shown as due and payable on such returns, reports and estimates have been paid (or will be paid prior to the Closing), and there is no current liability for any Taxes due and payable in connection with any such returns. Any charges, accruals and reserves for Taxes provided for on the Financial Statements are adequate. There are no existing Liens for Taxes upon any of the Purchased Assets. Seller has provided to Purchaser copies of all federal, state and foreign tax returns filed by Seller for the past three (3) years. All applicable sales and transfer taxes with respect to the Purchased Assets, to the extent due, were paid when the Purchased Assets were acquired by Seller.

(b) Seller has: (i) withheld all required amounts from its employees, agents, contractors and nonresidents and remitted such amounts to the proper Authorities; (ii) paid all employer contributions and premiums required to be remitted to proper Authorities; and (iii) filed all federal, state, local and foreign returns and reports with respect to withholding taxes, and social security and unemployment Taxes and premiums, all in compliance in all material respects with the withholding provisions of the Code, or any prior provision of the Code and other applicable Laws.

(c) None of the Purchased Assets is tax exempt use property under Code Section 168(h). None of the Purchased Assets is property that Seller is required to treat as being owned by any other Person pursuant to the safe harbor lease provision of former Code Section 168(f)(8).

(d) No portion of the cost of any Purchased Assets was financed directly or indirectly from the proceeds of any tax exempt state or local government obligation described in Code Section 103(a).

(e) Seller has no (and has not previously had any) permanent establishment in any foreign country and Seller does not engage (and has not previously engaged) in a trade or business within the meaning of the Code relating to the creation of a permanent establishment in any foreign country.

(f) Seller is not a foreign person within the meaning of Code Section 1445. Neither the Code nor any other provision of Law requires Purchaser to withhold any portion of the Purchase Price.

(g) Seller is not a partner in a partnership or joint venture that could be treated as a partnership for federal income tax purposes.

(h) Seller has never been a member of any consolidated, combined or unitary group for federal, state, local or foreign Tax purposes.

(i) The tax returns of Seller have not been audited for any tax period ending after December 31, 2000 and there are no current proceedings by or discussions with any Authority relating to any Taxes.

(j) Seller has not consented to the application of Code section 341(f).

3.25 Consents. Except as disclosed on Schedule 3.25, no consent, approval, order or authorization of, or registration, declaration or filing with, any Authority or any other Person is required to be obtained or made by Seller in connection with the execution and delivery of this Agreement or the performance by Seller of its obligations hereunder other than consents which have been obtained and disclosed on Schedule 3.25.

3.26 Licenses and Permits. Subject to the provisions of Section 3.22 and Section 3.30, Schedule 3.26 lists and describes all qualifications, registrations, filings, privileges, franchises, immunities, licenses, permits, authorizations and approvals of Authorities which are used or required in order for Seller to own and/or operate the Compounding Business, including, without limitation, all certificates of occupancy and certificates, licenses and permits relating to building, safety, Environmental Laws, fire and health (collectively, the "Permits"), other than any such qualification, registration, filing, privilege, franchise, immunity, license, permit, authorization and approval of Authority where the failure of Seller to so possess such qualification, registration, filing, privilege, franchise, immunity, license, permit, authorization and approval of Authority would not have a material adverse effect on Seller or the Compounding Business. Except as set forth in Schedule 3.26, each Permit is in good standing, valid and subsisting, and in full force and effect in accordance with its terms.

3.27 Occupational Safety and Health. Except as set forth on Schedule 3.27, Seller has not received any notice, citation, claim, assessment or proposed assessment as to, or alleging, any violation of any federal, state or local occupational safety and health laws by it, nor has Seller, to Seller's knowledge, been subject to any investigation relating to the Compounding Business by any federal, state or local occupational safety and health agency within the three (3) years preceding the date hereof, and no such violation exists, other than any such violation which would not have a material adverse effect on Seller or the Compounding Business. Seller is not a party to any pending dispute with respect to compliance with any federal, state or local occupational safety and health law.

3.28 Insurance. Schedule 3.28 contains a list of the insurance policies, other than those related to employee benefits, that Seller currently maintains with respect to the Compounding Business and its assets and properties and employees as of the date hereof, each of which is in full force and effect and a complete and correct copy of each has been delivered to Purchaser. All insurance premiums currently due with respect to such policies have been paid and Seller is not otherwise in default with respect to any such policy, nor has Seller failed to give any notice or present any claim under any such policy in a due and timely manner. Seller has not received notice of cancellation or non-renewal of any such policy. Such policies are sufficient for compliance with all requirements of law and all agreements to which Seller is a party.

Gitto Asset Purchase Agreement 3/31/04

3.29 <u>Certain Transactions.</u> All purchases and sales or other transactions, if any, between Seller, on the one hand, and any officer, director or employee thereof or Affiliate thereof, on the other hand, within the three (3) years immediately preceding the date hereof have been made on the basis of prevailing market rates and terms such that, from the perspective of Seller, all such transactions have been made on terms no less favorable than those which would have been available from unrelated third parties. Except as set forth on <u>Schedule 3.29</u>, neither any officer, director nor employee of Seller, nor any spouse, child or other relative of any of such persons, owns, or has any interest, directly or indirectly, in any of the real or personal property owned by or leased to Seller or any copyrights, patents, trademarks, trade names or trade secrets owned or licensed by Seller.

3.30 <u>Regulatory Compliance.</u>

(a) Seller has not received any major adverse written notice within the past two years from any Authority (i) regarding the approvability or approval of a Permit concerning, or the labeling of, any products of Seller or (ii) alleging any violation of any Legal Provision by Seller which, in the case of either clause (i) or (ii), individually or in the aggregate has had or would have been a material adverse effect on Seller or the Purchased Assets. <u>Schedule 3.30</u> sets forth (i) all of Seller's regulatory correspondence received from any Authority over the last five years and (ii) all of the Permits issued to Seller by any Authority.

(b) Except as described in <u>Schedule 3.30</u>, no Permit or product of Seller has been denied, placed on hold, withdrawn, suspended or discontinued as a result of any action by any Authority, by Seller or, to the knowledge of Seller, by any licensee or customer of any product of Seller, in the United States or outside the United States (whether voluntarily or otherwise), in each case within the past five years. No proceedings in the United States or outside of the United States of which Seller has knowledge (whether completed or pending) seeking the withdrawal, suspension or seizure of any Permit, or product of Seller are pending against Seller, Seller's products, or, to the knowledge of Seller, any licensee or customer of any product of Seller, nor have any such proceedings been pending at any prior time, in each case which has had or would have a material adverse effect on Seller or the Purchased Assets.

(c) For products that Seller is currently manufacturing or testing, each of Seller's applicable Permits is complete, accurate, and up to date in all material respects, and the subject of each such Permit can be effectively, efficiently, and legally manufactured and tested in material compliance with the current version of each applicable Permit.

(d) Except for instances that have not had and would not have a material adverse effect on Seller, (i) to the knowledge of Seller, during the last five years no officer, employee or agent of Seller, has made an untrue statement of a material fact or fraudulent statement to any Authority, failed to disclose a material fact required to be disclosed to any Authority, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, could reasonably be expected to provide a basis for any Authority to invoke with respect to Seller its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities", set forth in 56 Fed. Reg. 46191 (September 10, 1991) or any similar policy, and (ii) nor has, to the knowledge of Seller, any officer, Employee or agent of Seller, been convicted of any crime or engaged in any conduct for which debarment is mandated by 21 U.S.C. Section 335a(a) or any similar Legal Provision or permitted by 21 U.S.C. Section 335a(b) or any similar Legal Provision.

(e) Seller has not received any written notice within the past two years that any Authority has commenced, or overtly threatened to initiate, any action to enjoin production of any product included within the Purchased Assets.

3.31 <u>Conduct of Compounding Business Since Most Recent Balance Sheet Date.</u> Except as set forth on <u>Schedule 3.31</u>, since the Most Recent Balance Sheet Date:

(a) the business of Seller has been conducted only in the Ordinary Course of Business;

(b) Seller has neither declared any dividends or distributions nor issued or redeemed any equity securities nor made any payments to any of its shareholders or any Affiliate thereof (other than compensation and expense reimbursement payments made in the Ordinary Course of Business consistent with past practices);

18                    Gitto Asset Purchase Agreement 3/31/04

(c) except for supplies purchased, sold or otherwise disposed of in the Ordinary Course of the Business, Seller has not purchased, sold, leased, mortgaged, pledged or otherwise acquired or disposed of any properties or assets;

(d) Seller has not changed the terms of any receivables or cancelled any debts owed to Seller or entered into, changed, modified, cancelled or terminated any agreement or contract involving the payment by (or to) Seller of more than $5,000 in any twelve- month period other than in the Ordinary Course of Business;

(e) Seller has not sustained or incurred any loss or damage (whether or not insured against) on account of fire, flood, accident or other calamity;

(f) Seller has not increased the compensation of any employee, officer, director or consultant other than in the Ordinary Course of Business consistent with past practice and has not granted any unusual or extraordinary bonuses, benefits or other forms of direct or indirect compensation to any employee, officer, director or consultant;

(g) Seller has not adopted, increased, terminated, amended or otherwise modified any plan for the benefit of any employees other than in the Ordinary Course of Business consistent with past practice.

(h) there has been no material adverse change in or with respect to the condition (financial or otherwise), operations, business, prospects, rights, properties, assets or liabilities of Seller;

(i) Seller has not changed any accounting methods or practices (including, without limitation, any change in depreciation or amortization policies or rates); and

(j) Seller has not agreed to take any of the actions described in paragraphs (b), (c), (d), (f), (g) or (i) above and Seller has not taken any other action proscribed by Section 5.1.

3.32 Broker's or Consultant's Fees. Seller has not dealt with any broker, finder or similar consultant in connection with any of the transactions contemplated by this Agreement and no Person is entitled to any commission or finder's fee in connection with the sale of the Purchased Assets to Purchaser.

3.33 Claims Against Insiders. To the knowledge of Seller, Seller does not have any claim against, debt owing by, or cause of action against, any shareholder, officer or director of Seller.

3.34 Disclosure. None of the representations and warranties made by Seller in this Agreement contains or will contain any untrue statement of a material fact, or omits to state any material fact necessary to make the statements contained in this Agreement not misleading. There is no fact known to Seller which (so far as Seller reasonably foresees) materially adversely affects, or in the future may materially adversely affect, individually or in the aggregate, the condition (financial or otherwise), assets, liabilities, business, operations or prospects of Seller or the ability of Seller to consummate the transactions contemplated hereby that has not been set forth herein or heretofore communicated to Purchaser in writing pursuant hereto.

Seller has delivered to Purchaser the following schedules, which are collectively referred to as the "*Seller Schedules*" and which consist of separate schedules, all certified by Gitto and Miller, as officers of Seller, and by Bill Deakin, as complete, true and correct as of the Most Recent Balance Sheet Date in all material respects:

(a)     Schedule 1.1(b) containing a description of all Business Tangible Property;

(b)     Schedule 1.1(c) containing a description of all Business Inventory;

(c)     Schedule 1.1(d) containing a description of all Business Accounts Receivable;

(d)     Schedule 1.1(e) containing a description of all Business Real Property;

(e)     Schedule 1.1(f) containing a description of all Business Contracts;

(f)     Schedule 1.1(g) containing a description of all Business Governmental Authorizations;

(g)     Schedule 1.1(h) containing a description of all Business Intellectual Property;

(h)     Schedule 1.2(a) containing a description of all Excluded Brokerage Operation Assets;

(i)     Schedule 1.2(c) containing a description of all Excluded Contracts;

(j)     Schedule 1.2(d) containing a description of all Miscellaneous Excluded Assets;

(k)     Schedule 1.4 listing, as of the Most Recent Balance Sheet Date, all Trade Payables and all Other Assumed Payables;

(l)     Schedule 3.1 setting forth the items described in Section 3.1, including any conflicts, breaches or defaults arising from the execution, delivery or performance of this Agreement by Seller or Seller Parties under any contract, lease, license, franchise, permit, indenture, mortgage, deed of trust, note agreement or other agreement or instrument to which Seller or Seller Parties are parties to or are bound or any judgment, order or decree, statute, law, ordinance, rule or regulation applicable to Seller or Seller Parties or the property or assets of Seller or Seller Parties or the certificate of incorporation or by-laws of Seller, or any applicable Legal Provisions;

(m)     Schedule 3.5 setting forth the items described in Section 3.5, including any exceptions to good and marketable title to any assets and properties used in the Compounding Business constituting Purchased Assets;

(n)     Schedule 3.13 setting forth the items described in Section 3.13, including a complete list of all material Contracts entered into by Seller or by which Seller is bound identifying, by an asterisk, all Contracts containing a prohibition on assignment;

(o)     Schedule 3.15 setting forth the items described in Section 3.15, including a true and complete list and description of (i) all patents, trademarks, service marks, trade names and copyrights, and pending applications therefore, owned by Seller or in which Seller has any rights or license, (ii) all agreements between each employee and Seller relating to confidential information of Seller, and (iii) all Underwriter's Laboratory Approvals received and held by Seller with respect to compounds manufactured by Seller and all compounds manufactured by Seller during the past five years;

(p)     Schedule 3.17 setting forth the items described in Section 3.17, including a list of all suppliers to Seller and the Compounding Business whose supplies provided to Seller during the most recent calendar year exceeded $25,000;

(q)     Schedule 3.18 setting forth the items described in Section 3.18, including a list of the names, titles and compensation of all current officers, directors and employees of Seller whose compensation from Seller exceeded $40,000 during the most recent calendar year;

(r)     Schedule 3.19 setting forth the items described in Section 3.19, including a list of all written and oral (with a short description thereof) arrangements or contracts relating to employment, compensation, bonuses, severance, pension and other related issues and collective bargaining agreement to which Seller is a party or by which Seller is bound;

(s)     Schedule 3.20 setting forth the items described in Section 3.20, including a list of all items of non-compliance with, or violation of, any applicable Laws, Permits and Orders affecting Seller's properties, the operation of the Compounding Business or the Purchased Assets;

(t)     Schedule 3.21 setting forth the items described in Section 3.21, including a list of all suits, actions, arbitrations, and legal, administrative and other proceedings and governmental investigations, pending or, to Seller's knowledge, threatened, against or, to Seller's knowledge, affecting Seller or the Compounding Business, involving $10,000 or more in dispute or, if determined adversely to Seller, could result in the expenditure or recovery of $10,000 or more by Seller in connection therewith;

(u)     Schedule 3.22 setting forth the items described in Section 3.22, including a list of all Permits required by or issued pursuant to any Environmental Law for the ownership, use or operation of the Facilities by Seller or the Compounding Business;

      (v)     Schedule 3.23 setting forth the items described in Section 3.23, including a list of all Employee Benefit Plans of Seller;

      (w)     Schedule 3.24 setting forth the items described in Section 3.24, including exceptions to the tax compliance representations described therein;

      (x)     Schedule 3.25 setting forth the items described in Section 3.25, including a list of all consents, approvals, orders or authorizations of, or registrations, declarations of filing with, any Authority or any other Person required to be obtained or made by Seller in connection with the execution and delivery of this Agreement or the performance by Seller of its obligations hereunder;

      (y)     Schedule 3.26 setting forth the items described in Section 3.26, including a list and description of all qualifications, registrations, filings, privileges, franchises, immunities, licenses, permits, authorizations and approvals of Authorities which are used or required in order for Seller to own and/or operate the Compounding Business;

      (z)     Schedule 3.27 setting forth the items described in Section 3.27, including a list of any notices, citations, claims, assessments or proposed assessments at to, or alleging, any violation of any federal, state or local occupational safety and health laws by Seller or any investigation relating to the Compounding Business by any federal, state or local occupational safety and health agency within the last three years;

      (aa)     Schedule 3.28 setting forth the items described in Section 3.28, including a list of the insurance policies that Seller currently maintains with respect to the Compounding Business and its assets and properties and employees;

      (bb)     Schedule 3.29 setting forth the items described in Section 3.29, including a list of any ownership or other interest, direct or indirect, of any officer, director or employee of Seller, or any spouse, child or other relative of any such person, in any real or personal property owned by or leased to Seller or any copyrights, patents, trademarks, trade names or trade secrets owned or licensed by Seller;

      (cc)     Schedule 3.30 setting forth the items described in Section 3.30, including all of Seller's regulatory correspondence received from any Authority over the last five years, all Permits issued to Seller by any Authority, and a list any Permits or products of Seller which has been denied, placed on hold, withdrawn, suspended or discontinued within the last five years; and

      (dd)     Schedule 3.31 setting forth the items described in Section 3.31,

     Seller shall cause the Seller Schedules and the instruments and data delivered to Purchaser hereunder to be promptly updated after the date hereof up to and including the Closing Date.

     It is understood and agreed that not all of the Seller schedules have been completed or are available to be furnished by Seller. Seller shall have thirty (30) days from the date hereof (the "*Schedule Delivery Due Date*") to provide the Seller Schedules in full. If Seller cannot, or fails to, deliver all of the Seller Schedules by the Schedule Delivery Due Date, or if Purchaser acting reasonably finds any such schedules or updates provided after the date hereof to be unacceptable according to the criteria set forth below, Purchaser may terminate this Agreement by giving written notice to Seller within fifteen (15) days after the earlier of (x) the Schedule Delivery Due Date or (y) the date Seller Schedules or updates were provided in full (the "*Schedule Approval Date*"). For purposes of the foregoing, Purchaser may consider disclosure on the Seller Schedules to be "*unacceptable*" only if that item would have a material adverse impact on the financial statements comprised of the Most Recent Balance Sheet, taken as a whole.

     3.35 <u>No Other Representations and Warranties</u>. Except for the representations and warranties contained in this agreement, Seller makes no other representation and warranty as to any fact or matter, and no party shall be entitled to rely upon any such other representation or warranty.

          Gitto Asset Purchase Agreement 3/31/04

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into and perform this Agreement, and in consideration of the covenants of Seller contained herein, Purchaser represents and warrants to Seller (which representations and warranties shall survive the Closing (subject to Section 10.1) regardless of any examinations, inspections, audits and other investigations Seller have heretofore made, or may hereafter make, with respect to such representations and warranties) as follows:

4.1 Status of Purchaser. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and, at or prior to the Closing, will be duly qualified to do business in each state where Seller is now qualified to do business. Purchaser has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to use its name and to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, except where the failure to possess any such franchise, license, permit, authorization or approval would not have a material adverse effect on Purchaser.

4.2 Authority of Purchaser. Purchaser has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Neither the execution or delivery of this Agreement by Purchaser nor the performance by Purchaser of its obligations under this Agreement will conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, any contract, lease, license, franchise, permit, indenture, mortgage, deed of trust, note agreement or other agreement or instrument to which Purchaser is a party or is bound, its certificate of incorporation or by-laws or any applicable Law or Order.

4.3 Due Authorization. The execution and delivery by Purchaser of this Agreement, and the performance by Purchaser of its obligations hereunder, have been duly and validly authorized and approved by all necessary action on the part of Purchaser.

4.4 Enforceability. This Agreement is binding upon, and enforceable against, Purchaser in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally and by principles of equity (whether in a proceeding at law or in equity).

4.5 Consents. No consent, approval, order or authorization of, or registration, declaration or filing with, any Authority or any other Person is required to be obtained or made by Purchaser in connection with its execution and delivery of this Agreement or the performance by it of its obligations hereunder.

4.6 Broker's or Consultant's Fees. Purchaser has not dealt with any broker, finder or consultant in connection with any of the transactions contemplated by this Agreement, and no Person is entitled to any commission or finder's fee in connection with the sale of the Purchased Assets to Purchaser.

ARTICLE V
PRE-CLOSING COVENANTS

Seller, Seller Parties and Purchaser covenant and agree that from the date hereof through and including the Closing Date:

5.1 Ordinary Conduct. (a) From the date hereof to the Closing, Seller shall conduct the Compounding Business in the Ordinary Course of Business. Seller shall use all commercially reasonable efforts to preserve and protect its goodwill, rights, properties, assets and business, to keep available to itself and Purchaser the services of its employees, and to preserve and protect its relationships with its employees, officers, advertisers, suppliers, customers, creditors and others having business relationships with it. In addition, from the date hereof to the Closing, Seller shall not do any of the following without the prior written consent of Purchaser, such consent not to be unreasonably withheld or unreasonably delayed:

(i) fail to continue to conduct the Compounding Business of Seller in conformity with the representations and warranties set forth in Section 3.31;

(ii) amend its certificate of incorporation or bylaws;

(iii) incur any liabilities, obligations or indebtedness for borrowed money or guarantee any such liabilities, obligations or indebtedness, or increase (other than increases resulting from the calculation of reserves in the Ordinary Course of Business), or experience any change in any assumptions underlying or methods of calculating, any bad debt, contingency or other reserves;

(iv) permit, allow or suffer any of its assets, including, without limitation, the Purchased Assets, to be subjected to any mortgage, pledge, Lien, encumbrance, restriction or charge of any kind which is not disclosed in this Agreement;

(v) pay, discharge or satisfy any claims, encumbrances, liabilities or obligations (whether absolute, accrued, contingent or otherwise and whether due or to become due) other than the payment when due in the Ordinary Course of Business of liabilities and obligations reflected or reserved against in the Most Recent Balance Sheet or incurred in the Ordinary Course of Business since the date thereof;

(vi) pay, lend or advance any amount to, or sell, transfer or lease any of the Purchased Assets to, or enter into any agreement or arrangement with, any of the officers, directors or equity owners of Seller or any of its Affiliates or any family members, by blood, marriage or adoption, of any of the foregoing;

(vii) acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire any assets (other than Inventory or other assets acquired in the Ordinary Course of Business);

(viii) enter into any Contract, except for Contracts entered into in the Ordinary Course of Business and individually in an amount not in excess of $100,000.00 (other than any confidentiality, non-disclosure, non-competition or similar Contract); provided, however, that Seller shall have the right to enter into Contracts in the Ordinary Course of Business and individually in an amount in excess of $100,000.00 (other than any confidentiality, non-disclosure, non-competition or similar Contract) only if Purchaser does not object to Seller's entering into such Contracts within three Business Days following Purchaser's receipt from Seller of the written notification of Seller's intention to enter into such Contracts;

(ix) make, or commit to make, any capital expenditures except to the extent that Purchaser does not object to such capital expenditures within three Business Days following Purchaser's receipt from Seller of the written notification of Seller's intention to make such capital expenditures;

(x) fail to pay any account payable when due in accordance with its terms unless contested by Seller in good faith;

(xi) make any other material change in the Compounding Business or the operation of Seller; or

(xii) agree, whether in writing or otherwise, to do any of the foregoing.

(b) From the date hereof to the Closing, Seller shall not enter into any licensing or similar arrangement with respect to or affecting the Compounding Business or the Purchased Assets.

(c) From the date hereof to the Closing, subject to the terms and conditions of this Agreement, Seller shall use its reasonable efforts (i) to preserve the Purchased Assets and the Compounding Business intact, (ii) to keep available to Purchaser the services of the employees of the Compounding Business, and (iii) to preserve the goodwill of customers and others having business relations with Seller to the extent such business relations relate to the Purchased Assets.

Gitto Asset Purchase Agreement 3/31/04

5.2 <u>Right of Inspection; Access to Books and Personnel; Oversight of Collections and Expenditures.</u>

(a) Seller shall and shall cause each of Seller's officers, directors, employees, auditors and agents to afford to Purchaser and Purchaser's officers, directors, employees, auditors, agents and lenders the right at any time prior to the Closing, on reasonable notice during normal business hours, access to Seller's employees, auditors, agents, facilities, books and records as Purchaser reasonably shall deem necessary or desirable and subject to such reasonable restrictions as Seller may request to maintain the confidentiality of this Agreement and the transactions contemplated hereby and shall furnish such financial and operating data and other information with respect to Seller as Purchaser may reasonably require. Except as otherwise set forth herein, no such access, examination or review shall in any way affect, diminish or terminate any of the representations, warranties or covenants of Seller set forth herein.

(b) From the date hereof through the Closing, Seller shall provide to Purchaser, on the first Business Day of each week, an accounting for all financial activities of Seller during the preceding calendar week. The accounting provided for pursuant to this Section 5.2(b) shall consist of providing (i) a listing of all receipts and all expenditures of Seller during the period being reported upon, accompanied by (ii) copies of all deposit slips, all checks, all bank drafts and all other evidence of deposits to or withdrawals from any accounts of Seller, and (iii) copies of all invoices, purchase orders and other supporting documentation underlying each deposit to or withdrawal from Seller's accounts. Seller shall also provide to Purchaser, promptly following receipt of the same by Seller, copies of all bank statements, brokerage statements or similar statements relating to all accounts maintained for the benefit of Seller and copies of all vendor's monthly statements relating to Seller's accounts with vendors. The accounting and materials to be provided pursuant to this Section 5.2(b) shall relate to all activities of Seller of any and every nature and is not limited to accounts or activities relating to the Compounding Business.

5.3 <u>Notification of Material Events.</u>

(a) Seller shall promptly notify Purchaser in writing of any event following the date hereof of which Seller is or becomes aware that will or may reasonably be expected to have a material effect, including but not limited to a material adverse effect, on the condition (financial or otherwise), rights, properties, assets or prospects of Seller or the Compounding Business or the performance by Seller of its obligations under this Agreement.

(b) Each of the parties to this Agreement shall promptly notify the other party to this Agreement of (a) the occurrence or non-occurrence of any fact or event (regardless of the time of the occurrence or non-occurrence of such fact or event) which would be reasonably likely (i) to cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing Date or (ii) to cause any material covenant, condition or agreement hereunder not to be complied with or satisfied in all material respects and (b) any failure of any party to this Agreement to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder in any material respect.

5.4 <u>Supplemental Disclosures.</u> Seller shall have the continuing obligation to supplement promptly and amend the Schedules as necessary or appropriate with respect to any matter hereafter arising or discovered which, if existing or known at the date of this Agreement, would have been required to be set forth or described in the Schedules; provided, however, that for the purpose of the rights and obligations of the parties hereunder, any such supplemental or amended disclosure shall not, except as Purchaser may otherwise agree in writing, be deemed to have cured any breach of any representation or warranty made in this Agreement. Notwithstanding the foregoing, if Purchaser elects to proceed with the Closing, Purchaser shall be deemed to have waived the right thereafter to assert any claim pursuant to Article X hereunder with respect to any matter specifically and accurately disclosed by Seller in such supplemental or amended disclosure.

5.5 <u>Exclusivity.</u> Until the earlier to occur of (i) the termination of this Agreement in accordance with Article XI or (ii) the Closing, (a) Seller shall not, and shall not permit or authorize, as the case may be, any of Seller's Affiliates, directors, officers, employees, agents or advisors to, initiate, pursue or encourage (by way of furnishing information or otherwise) any inquiries or proposals, or enter into any discussions, negotiations or agreements (whether preliminary or definitive) with any Person, contemplating or providing for any merger, acquisition, purchase or sale of stock or all or substantially all of the assets or any business combination or change in control of Seller or the Compounding Business, and (b) Seller shall deal exclusively with Purchaser with respect to the sale of the Purchased Assets or the Compounding Business or assets and properties of Seller.

5.6 <u>Publicity</u>. Seller and Purchaser agree that no public release or announcement concerning the transactions contemplated hereby shall be issued by either party without the prior consent (which consent shall not be unreasonably withheld) of the other party, except as such release or announcement may be required by Law or the rules or regulations of any Authority, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of its issuance.

5.7 <u>Preparation of Preliminary Closing Balance Sheet</u>. At least two (2) Business Days prior to the Closing, Seller shall furnish to Purchaser the Preliminary Closing Balance Sheet setting forth Seller's estimated calculation of the adjustments to the Purchase Price as required by Section 1.8, such calculations to include an itemization of the changes in the components of the Purchased Assets from the Most Recent Balance Sheet to the Closing Date, the Trade Payables subject to assumption by Purchaser pursuant to Section 1.4(a) and a list of those Contracts entered into since the date hereof and which Seller requests Purchaser to assume in each case to be satisfactory to Purchaser.

5.8 <u>Power of Attorney; Right of Endorsement, Etc.</u> Effective as of the Closing, Seller hereby constitutes and appoints Purchaser and its successors and assigns the true and lawful attorney of Seller with full power of substitution, in the name of Purchaser or the name of Seller, on behalf of and for the benefit of Purchaser, (a) to collect all Purchased Assets, (b) to endorse, without recourse, checks, notes and other instruments attributable to the Purchased Assets, (c) to defend and compromise all actions, suits or proceedings with respect to any of the Purchased Assets (subject to Section 10.7) and (d) to do all such reasonable acts and things with respect to the Purchased Assets as Purchaser may deem advisable. Seller agrees that the foregoing powers are coupled with an interest and shall be irrevocable by Seller directly or indirectly by the dissolution of Seller or in any other manner. Purchaser shall retain for its own account any amounts lawfully collected pursuant to the foregoing powers and Seller shall promptly pay to Purchaser any amounts received by Seller after the Closing with respect to the Purchased Assets.

5.9 <u>Covenants Not to Compete, Solicit or Disparage</u>.

(a) For the period of three years after the Closing Date, or, with respect to Gitto, the earlier termination, for any reason, of the Gitto Independent Manufacturer's Representative Agreement (the "<u>*Time Covenant*</u>"), Seller Shareholders covenant that none of the Seller Shareholders shall, either individually or as a partner, joint venturer, consultant, shareholder, member or representative of another Person or otherwise, directly or indirectly, participate in, engage in, or have a financial or management interest in, or assist any other Person in any business operation or any enterprise if such business operation or enterprise engages, or would engage, in the Compounding Business anywhere in the world, provided, however, that the foregoing shall not prohibit a Seller Shareholder from owning up to five percent (5%) of a publicly traded company.

(b) During the Time Covenant, each of Seller Shareholders shall not, directly or indirectly, whether for its own account or for the account of any Person (other than Purchaser) that is in competition with Purchaser (A) solicit, recruit, hire, engage in any activity that would cause any Person who is as of the Closing Date, or was during the 12 months prior to the Closing Date, employed by Seller to violate any agreement with Purchaser, endeavor to entice away any such Person from Purchaser, interfere with the relationship of Purchaser with such Person or induce any such Person to reject any employment offer by Purchaser or (B) solicit, entice or induce any Person who is, or was a Customer or Supplier to (i) become a Customer or Supplier of any other Person engaged in any business activity that competes with the Compounding Business, (ii) cease doing business with Purchaser or (iii) otherwise interfere with the relationship of Purchaser with any such person, team, Customer or Supplier. For purposes of this Section 5.9, a "<u>*Customer*</u>" means any Person which has been during the 12-month period prior to the Closing Date a customer, distributor or agent of Seller or shall have been contacted by Seller in the six-month period prior to the Closing for the purpose of soliciting it to become a customer, distributor or agent of Seller; and a "<u>*Supplier*</u>" means any Person which has been during the 12-month period prior to the Closing Date a supplier, vendor, manufacturer or developer of Seller for any product or service or significant component used in any product or service. Seller Shareholders covenant that they will not, directly or indirectly, in any capacity whatsoever, make any statement, written or oral, or perform any other act or omission that is intended to be materially detrimental to the goodwill of the business of Seller, except as compelled by judicial or administrative process.

25

(c) If, during the Time Covenant, Seller Shareholders subject to the aforementioned restrictions are not in compliance with such restrictions, then Purchaser shall be entitled, among other remedies, to compliance by the breaching Seller Shareholder with the terms of such provisions for an additional number of days that equals the number of days during which such noncompliance occurred.

(d) The parties hereby agree that all restrictions and agreements contained in this Section 5.9, including, without limitation, those relating to the Time Covenant, are necessary and fundamental to the protection of the Compounding Business and any objections or reservations to such restrictions or agreements are hereby waived. Seller Shareholders hereby agree that the remedy at law for any breach of this Agreement will be inadequate, and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, the parties agree that upon any Seller Shareholder's breach of this Section 5.9, Purchaser shall be entitled to immediate injunctive relief and may obtain a temporary order restraining any threatened further breach. Nothing in this Agreement shall be deemed to limit Purchaser's remedies at law or in equity for any breach by any Seller Shareholder of any of the provisions of this Agreement that may be pursued by or made available to Purchaser.

(e) Each of the foregoing agreements and covenants is in addition to any other similar agreement and covenant contained in any other document entered into in connection herewith and is not intended in any way, form or fashion to limit the applicability of such other agreement or covenant.

5.10 Post-Closing Confidentiality. From and after the Closing, Seller Parties will, and will cause each of their Affiliates which they control to, hold in strict confidence and not use to the detriment of Purchaser or any of its Affiliates, all information with respect to the Compounding Business and the Purchased Assets. Without limiting the generality of the foregoing, Seller Parties agree, covenant and acknowledge that, from and after the Closing Date, Seller Parties will not, and will cause their Affiliates which they control not to, disclose, give, sell, use, or otherwise divulge any confidential or secret information (including but not limited to any technology, process, trade secrets, know-how, other intellectual property rights, strategies, financial statements or other financial information not otherwise publicly available, forecasts, operations, business plans, prices, discounts, products, product specifications, designs, plans, data or ideas). Notwithstanding the foregoing, Seller Parties may disclose such information (i) if compelled to disclose the same by judicial or administrative process or by other requirements of applicable Law or of any national securities exchange (but subject to the following provisions of this Section 5.10), (ii) if the same currently is, or hereafter is, in the public domain through no fault of Seller Parties, or (iii) if the same is later acquired by Seller Parties from another source and Seller Parties are not aware that such source is under an obligation to another Person to keep such information confidential. If Seller Parties or any of their Affiliates (the "*Disclosing Party*") are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any such information, the Disclosing Party shall provide Purchaser with prompt written notice of any such request or requirement so that Purchaser may seek, at its expense, a protective order or other appropriate remedy and/or waive compliance with the provisions of this Section 5.10. If, in the absence of a protective order or other remedy or the receipt of a waiver by Purchaser, the Disclosing Party nonetheless, based on the advice of counsel, is required to disclose such information to any tribunal, the Disclosing Party, without liability hereunder, may disclose that portion of such information which such counsel advises the Disclosing Party it is legally required to disclose.

5.11 Performance of Contracts. With respect to each Contract, Seller shall duly perform and comply with all covenants, agreements and conditions required thereby to be performed or complied with by it prior to or on the Closing Date.

5.12 Employees. Upon the Closing, Seller shall terminate the employment of each employee, other than the Seller Shareholders and Charles Gitto (the "*Employees*"). The Purchaser shall have the right, but not the obligation, to offer employment to all the Employees on such terms as Purchaser, in its sole discretion, shall determine.

5.13 Allocation for Tax Purposes. The parties shall cooperate in good faith to agree on the allocation of the Purchase Price prior to the Closing and, subsequent to the Closing, shall file all federal, state and local tax returns consistent with such allocation. The parties shall complete and separately file Form 8594 with their federal income tax returns for the tax year in which the Closing occurs in accordance with such allocation, and no party hereto shall have any liability to the other arising out of any challenge to such tax allocation by any federal or state taxing authority so long as the party does not take a position inconsistent with such allocation in any tax filing or administrative or judicial proceeding.

Gitto Asset Purchase Agreement 3/31/04

5.14 <u>Hi-Tech Agreement</u>. Seller shall use its reasonable best efforts to enter into an agreement (the "*Hi-Tech Agreement*") with Hi-Tech Environmental Products, LLC ("*Hi-Tech*") pursuant to which Seller will sell, transfer and convey to Hi-Tech all of the inventory of products originally purchased by Seller from Hi-Tech (the "*Hi-Tech Inventory*") and held by Seller at Closing and for which Hi-Tech shall cancel certain indebtedness from Seller to Hi-Tech, evidenced by a series of promissory notes (the "*Hi-Tech Notes*"), in an amount equal to the original sales price of the Hi-Tech Inventory returned by Seller to Hi-Tech. Any portion of the Hi-Tech Notes attributable to Hi-Tech Inventory used by Seller (and, therefore, not returned to Hi-Tech) and not cancelled pursuant to the Hi-Tech Agreement will be treated as Assumed Liabilities payable by Purchaser in accordance with Section 1.4 hereof.

5.15 <u>Real Estate Purchase Agreement</u>. Seller will use its reasonable best efforts to cause Charles Gitto to enter into, and Charles Gitto will enter into, an agreement, substantially in the form attached hereto as <u>Exhibit C</u> (the "*Real Estate Purchase Agreement*"), pursuant to which Charles Gitto will sell, transfer and convey to Purchaser at Closing, free and clear of all liens, claims and encumbrances, all right, title and interest in the Purchased Real Estate for a purchase price of $3,300,000.

5.16 <u>Miller Consulting Agreement</u>. Miller and Purchaser shall enter into a consulting agreement, substantially in the form attached hereto as <u>Exhibit D</u> (the "*Miller Consulting Agreement*"), pursuant to which Miller shall provide ongoing consulting services to Purchaser on the terms set forth therein.

5.17 <u>Gitto Independent Manufacturer's Representative Agreement</u>. Gitto and Purchaser shall enter into an independent manufacturer's agreement, substantially in the form attached hereto as <u>Exhibit E</u> (the "*Gitto Independent Manufacturer's Representative Agreement*"), pursuant to which Gitto shall act as an independent manufacturer's representative of Purchaser.

5.18 <u>Assumed Contracts</u>. If after the date hereof and prior to the Closing Date, Purchaser determines that a Contract not listed on Schedule 1.1(f) shall constitute an Assumed Contract, Purchaser shall have the right, in its sole and absolute discretion, to assume such Contract and to treat such Contract as an Assumed Contract without any adjustment of the Purchase Price. Seller shall use its reasonable best efforts to obtain any necessary consent for the assignment of such Contract to Purchaser.

5.19 <u>Minimum Purchaser Financing</u>. Purchaser will use its reasonable best efforts to secure financing, from and after the date hereof, in an amount not less than $51,700,000 minus the Trade Payables reflected on the Most Recent Balance Sheet (the "*Minimum Purchaser Financing*") in order to finance the payment of the Cash Purchase Price Component, the purchase price of the Purchased Real Estate pursuant to the Real Estate Purchase Agreement and the assumption of the Other Assumed Payables. The Minimum Purchaser Financing may take the form of debt, equity or a combination of debt and equity financing, including the assumption of Other Assumed Payables, received subsequent to the date hereof and in form acceptable to Purchaser.

ARTICLE VI
CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS

6.1 <u>Obligations to be Satisfied on or Prior to Closing Date</u>. The obligation of Purchaser to purchase the Purchased Assets under this Agreement is subject to the satisfaction (or waiver by Purchaser), on or prior to the Closing Date, of the following conditions:

(a) <u>Accuracy of Representations and Warranties</u>. Each of the representations and warranties made by Seller and Seller Parties in this Agreement that is qualified as to materiality shall be true, correct and complete in all respects and those that are not so qualified shall be true, correct and complete in all material respects as of the date hereof and on the Closing Date as though made on such date.

(b) <u>Compliance with Agreement</u>. Seller shall have performed or complied in all material respects with the covenants, agreements and obligations required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

(c) <u>Investigation</u>. Each of Purchaser and Purchaser's agents shall have been afforded access to Seller's books and records, officers, employees, agents, facilities and personnel, as provided in Section 5.2.

(d) <u>Consents</u>. All consents, approvals, orders, authorizations, registrations, declarations, agreements and filings of any Person and Authorities set forth on <u>Schedule 3.25</u> shall have been obtained or made by Seller in a form reasonably satisfactory to Purchaser and delivered to Purchaser and shall be in full force and effect as of the Closing Date, and no such authorizations, agreements and consents shall impose any burdensome or, in Purchaser's reasonable determination, unsatisfactory conditions or requirements on Purchaser.

(e) <u>No Adverse Proceedings</u>. No Law shall have been enacted or promulgated, and no investigation, action, suit or proceeding shall have been threatened or instituted against Seller, Seller Parties or Purchaser as of the Closing Date, which, in any such case, in the reasonable judgment of Purchaser, challenges, or might result in a challenge to, the consummation of the transactions contemplated hereby, or which claims, or might give rise to a claim for, damages against Purchaser as a result of the consummation of such transactions.

(f) <u>No Material Adverse Change</u>. There shall have occurred no material adverse change in or with respect to the condition (financial or otherwise), business, rights, prospects, properties or assets or supplier, customer or employee relationships of Seller or the Compounding Business since the Most Recent Balance Sheet Date.

(g) <u>Schedules</u>. All amendments or supplements to the Schedules made by Seller pursuant to Section 5.4 shall be reasonably acceptable to Purchaser.

(h) <u>Closing Documents</u>. Seller shall have delivered all reports, agreements, certificates, instruments, opinions and other documents required to be delivered by Seller on the Closing Date pursuant to Section 8.3, and the form and substance of all such reports, agreements, certificates, instruments, opinions and other documents shall be reasonably satisfactory to Purchaser.

(i) <u>UCC, Tax Lien and Judgment Search Results</u>. Purchaser shall have obtained, at Seller's sole cost and expense, a report, in form and substance satisfactory to Purchaser, as to the results of an examination of financing statements filed under the Uniform Commercial Code, and tax lien and judgment records, in each office in each such jurisdiction as Purchaser shall require, and such report shall indicate no material security interests, tax liens, judgments or other Liens not previously disclosed in writing to Purchaser.

(j) <u>Environmental Matters</u>. Purchaser shall have completed such environmental audits and investigations, at Purchaser's sole cost and expense, as Purchaser may require with respect to the properties and operations of Seller, and such audits and investigations shall not have uncovered any condition or conditions which could have a material adverse effect on the Compounding Business or properties of Seller.

(k) <u>Hi-Tech Agreement</u>. Seller and Hi-Tech shall have executed and delivered to each other the Hi-Tech Agreement and, pursuant to the Hi-Tech Agreement, Seller shall have returned to Hi-Tech, or made arrangements satisfactory to Purchaser to return to Hi-Tech, the Hi-Tech Inventory and Hi-Tech shall have cancelled the principal amount of the Hi-Tech Notes equal to the purchase price of the Hi-Tech Inventory returned by Seller.

(l) <u>Real Estate Purchase Agreement</u>. Charles Gitto shall have executed and delivered to Purchaser the Real Estate Purchase Agreement and, pursuant to the Real Estate Purchase Agreement, Charles Gitto shall have sold, transferred and conveyed to Purchaser the Purchased Real Estate free and clear of all liens, claims and encumbrances.

(m) <u>Miller Consulting Agreement</u>. Miller shall have executed and delivered to Purchaser the Miller Consulting Agreement.

(n) <u>Gitto Independent Manufacturer's Representative Agreement</u>. Gitto shall have executed and delivered to Purchaser the Gitto Independent Manufacturer's Representative Agreement.

(o) <u>Purchaser Financing</u>. Purchaser shall have secured the Minimum Purchaser Financing.

Gitto Asset Purchase Agreement 3/31/04

(p) Financial Statements. Seller shall have delivered to Purchaser (i) audited financial statements of the Compounding Business and audited financial statements relating to the Purchased Real Estate purchased pursuant to the Real Estate Purchase Agreement at and for the periods ended December 31, 2002 and 2003, and (ii) unaudited financial statements of the Compounding Business and relating to the Purchased Real Estate at and for the interim periods from January 1, 2004 to the end of the last fiscal quarter ending prior to the Closing Date and for the same period in the prior fiscal year, which financial statements shall be prepared in accordance with GAAP and in accordance with the requirements of SEC Regulation S-X, in general, and Rule 3-05 of Regulation S-X in particular.

6.2 Procedure for Failure to Satisfy Conditions. In the event that any of the conditions precedent set forth above in Section 6.1 have not been satisfied, Purchaser shall notify Seller in writing indicating its election to (a) waive such condition precedent, (b) terminate this Agreement pursuant to Section 11.1, or (c) close the transactions contemplated by this Agreement, reserving its rights and remedies, without waiving such conditions precedent. In lieu of the foregoing, Purchaser and Seller may agree to consummate the transactions contemplated by this Agreement on such additional terms as are agreed to by Purchaser and Seller in writing. If, despite Seller's commercially reasonable best efforts, a third party that is not an Affiliate of Seller (the "*Nonconsenting Third Party*") refuses to grant any consent necessary for Purchaser to assume Seller's rights and obligations under a Contract listed on Schedule 1.1(f) hereof, Seller shall promptly notify Purchaser of its inability to obtain such consent and shall designate Purchaser as its agent for purposes of obtaining such consent. If Purchaser elects to close the transactions contemplated under this Agreement in the absence of such consent, then Purchaser shall indemnify Seller for any liability of Seller to the Nonconsenting Third Party under that Contract that arises after the Closing Date or is attributable to the period following the Closing Date or from Purchaser's decision to close in the absence of such consent.

ARTICLE VII
CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS

7.1 Obligations to Be Satisfied on or Prior to Closing Date. The obligations of Seller to sell the Purchased Assets under this Agreement are subject to the satisfaction (or waiver by Seller), on or prior to the Closing Date, of the following conditions:

(a) Accuracy of Representations and Warranties. Each of the representations and warranties made by Purchaser in this Agreement that is qualified as to materiality shall be true, correct and complete in all respects and those that are not so qualified shall be true, correct and complete in all material respects as of the date hereof and on the Closing Date as though made on such date.

(b) Compliance with Agreement. Purchaser shall have performed or complied in all material respects with the covenants, agreements and obligations required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c) No Adverse Proceedings. No Law shall have been enacted or promulgated, and no investigation, action, suit or proceeding shall have been threatened or instituted against Seller or Purchaser as of the Closing Date, which, in any such case, in the reasonable judgment of Seller, challenges, or might result in a challenge to, the consummation of the transactions contemplated hereby, or which claims, or might give rise to a claim for, damages against Seller as a result of the consummation of such transactions.

(d) Closing Documents. Purchaser shall have delivered all reports, agreements, certificates, instruments, opinions and other documents required to be delivered by it on the Closing Date pursuant to Section 8.4, and the form and substance of all such certificates, instruments, opinions and other documents shall be reasonably satisfactory to Seller.

7.2 Procedure for Failure to Satisfy Conditions. In the event that any of the conditions precedent set forth above in Section 7.1 have not been satisfied, Seller shall notify Purchaser in writing indicating its election to (a) waive such condition precedent, (b) terminate this Agreement pursuant to Section 11.1 or (c) close the transactions contemplated by this Agreement, reserving their rights and remedies, without waiving such condition precedent. In lieu of the foregoing, Purchaser and Seller may agree to consummate the transactions contemplated by this Agreement on such additional terms as are agreed to by Purchaser and Seller in writing.

Gitto Asset Purchase Agreement 3/31/04

ARTICLE VIII
CLOSING

8.1 Time and Place. The Closing shall take place at 10:00 a.m. on the Closing Date at the offices of Purchaser, 5 Hutton Centre Dr., Suite 700, Santa Ana, California 92707 or at such other time and place as Seller and Purchaser may mutually agree. The parties hereto agree to use commercially reasonable efforts to close the transactions contemplated herein within sixty (60) days from the date hereof.

8.2 Closing Transactions. All documents and other instruments required to be delivered at the Closing shall be regarded as having been delivered simultaneously, and no document or other instrument shall be regarded as having been delivered until all have been delivered.

8.3 Deliveries by Seller to Purchaser. At the Closing, Seller shall deliver or cause to be delivered to Purchaser (except insofar as the conditions related to such delivery have been waived by Purchaser):

(a) all such certificates, assignments and other documents and instruments of sale, assignment, conveyance and transfer, as Purchaser or its counsel may reasonably deem necessary or desirable to effect the transfer of the Purchased Assets to Purchaser;

(b) the certificate of incorporation of Seller, as amended, certified as of a date not earlier than twenty (20) days prior to the Closing Date by the Secretary of State of the State of Massachusetts;

(c) a certificate of the Secretary or an Assistant Secretary of Seller certifying to: (i) the bylaws, as amended, of Seller; (ii) resolutions of the board of directors of Seller authorizing and approving the execution, delivery and performance by Seller of this Agreement and any agreements, instruments, certificates or other documents executed by Seller pursuant to this Agreement; and (iii) incumbency and signatures of the officers of Seller;

(d) certificates of good standing, dated as of a recent date, for Seller from any state where Seller is required to be qualified to do business and bring down certificates of good standing in each of such jurisdictions dated the Closing Date;

(e) a certificate executed by Seller dated as of the Closing Date, certifying that all representations and warranties of Seller herein contained that are qualified as to materiality were true, correct and complete in all respects when made and are true, correct and complete in all respects as of the Closing Date as if made thereon (and to the extent that any representation or warranty herein contained refers to "the date hereof," such date shall be deemed to be the Closing Date) and those not so qualified were true, correct and complete in all material respects when made and are true, correct and complete in all material respects as of the Closing Date as if made thereon (and to the extent that any representation or warranty herein contained refers to "the date hereof," such date shall be deemed to be the Closing Date), and that Seller has performed or complied in all material respects with all of the covenants and obligations required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date;

(f) an executed original of each consent required to be obtained pursuant to Section 6.1(d);

(g) all amendments or supplements to the schedules made by Seller pursuant to Section 5.4;

(h) the Real Estate Purchase Agreement, including instruments conveying the Purchased Real Estate to Purchaser as provided for in the Real Estate Purchase Agreement;

(i) the Miller Consulting Agreement;

(j) the Gitto Independent Manufacturer's Representative Agreement; and

(k) such other instruments and documents as are required by any other provisions of this Agreement to be delivered on the Closing Date by Seller to Purchaser.

Gitto Asset Purchase Agreement 3/31/04

The foregoing shall not be construed to require Seller to use other than commercially reasonable best efforts to deliver or cause to be delivered the documents and instruments set forth in Section 8.3(f), Section 8.3(h), Section 8.3(i), Section 8.3(j) and Section 8.3(k); provided, however, that notwithstanding the foregoing, the obligations of Purchaser to purchase the Purchased Assets is subject to the delivery of each of the documents and instruments set forth in this Section 8.3.

8.4 <u>Deliveries by Purchaser to Seller</u>. At the Closing, Purchaser shall deliver or cause to be delivered to Seller (except insofar as the conditions related to such delivery have been waived by Seller):

(a) the Cash Purchase Price Component in accordance with Section 1.3(a); provided, however, that Purchaser may pay a portion, or all, of the Cash Purchase Price Component directly to creditors of Seller in payment of amounts owing by Seller at Closing;

(b) the duly executed Assumption Agreement in accordance with Section 1.3(b);

(c) a certificate executed by an officer of Purchaser, dated as of the Closing Date, certifying that all representations and warranties of Purchaser herein contained that are qualified as to materiality were true, correct and complete in all respects when made and are true, correct and complete in all respects as of the Closing Date as if made thereon and those not so qualified were true, correct and complete in all material respects when made and are true, correct and complete in all material respect as of the Closing Date as if made thereon, and that Purchaser has performed or complied in all material respects with all of the covenants and obligations required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date;

(d) the Real Estate Purchase Agreement;

(e) the Miller Consulting Agreement;

(f) the Gitto Independent Manufacturer's Representative Agreement; and

(g) such other instruments and documents as are required by any other provisions of this Agreement to be delivered on the Closing Date by Purchaser to Seller.

The foregoing shall not be construed to require Purchaser to use other than commercially reasonable best efforts to deliver or cause to be delivered the documents and instruments set forth in Section 8.4(d), Section 8.4(e), Section 8.4(f) and Section 8.4(g); provided, however, that notwithstanding the foregoing, the obligations of Seller to sell the Purchased Assets are subject to the delivery of each of the documents and instruments set forth in this Section 8.4.

8.5 <u>Determination of Final Purchase Price</u>.

(a) 60 days after the Closing Date, Purchaser shall deliver to Seller a certificate (the "<u>*Final Purchase Price Certificate*</u>") executed by Purchaser setting forth the calculation, in the manner reflected in <u>Exhibit F</u> attached hereto, of:

(i) the "<u>*Final Purchase Price*</u>", which shall be computed based on the Preliminary Closing Balance Sheet adjusted (A) up to reflect the increase, if any, in book value of Purchased Assets actually acquired at Closing as compared to the Preliminary Closing Balance Sheet, (B) down to reflect the decrease, if any, in book value of Purchased Assets actually acquired at Closing as compared to the Preliminary Closing Balance Sheet and (C) down to reflect the book value of Business Accounts Receivable acquired hereunder but remaining uncollected at the date of the Final Purchase Price Certificate (the "<u>*Uncollected Business Accounts Receivable*</u>");

(ii) the Trade Payables actually assumed at Closing (the "<u>*Final Assumed Trade Payables*</u>");

(iii) the Other Assumed Payables actually assumed at Closing (the "<u>*Final Other Assumed Payables*</u>");

Gitto Asset Purchase Agreement 3/31/04

(iv) the "*Final Net Assets Acquired*", which shall be computed based on the Final Purchase Price, less (A) the Final Assumed Trade Payables, and (B) the Final Other Assumed Payables;

(v) the "*Final Settlement Payment*", which shall be computed by subtracting the Preliminary Closing Net Assets from the Final Net Assets Acquired;

(vi) the "*Net Due to Seller on Final Settlement*", which shall be computed as the excess, if any, of the Final Net Assets Acquired over Preliminary Closing Net Assets; and

(vii) the "*Net Due to Purchaser on Final Settlement*", which shall be computed as the excess, if any, of the Preliminary Closing Net Assets over Final Net Assets Acquired.

For purposes hereof, the "*Preliminary Closing Net Assets*" shall be computed based on the Preliminary Closing Date Purchase Price, less (A) the Preliminary Closing Date Assumed Trade Payables, (B) the Preliminary Closing Date Other Assumed Payables, and (C) the Holdback.

(b) If Seller delivers written notice (the "*Disputed Items Notice*") to Purchaser within 10 days after receipt by Seller of the Final Purchase Price Certificate, stating that Seller objects to any items on the Final Purchase Price Certificate, specifying the basis for such objection and setting forth Seller's proposed modification to the Final Purchase Price, Seller and Purchaser shall attempt to resolve and finally determine and agree upon the Final Purchase Price as promptly as practicable.

(c) If Seller and Purchaser are unable to agree upon the Final Purchase Price within 10 days after delivery of the Disputed Items Notice, Seller and Purchaser will select an independent accounting firm to resolve the disputed items and make a determination of the Final Purchase Price. Such determination will be made within 30 days after such selection and will be binding upon the parties. The fees, costs and expenses of the accounting firm so selected will be borne by the party whose positions generally did not prevail in such determination, or if the accounting firm determines that neither party could be fairly found to be the prevailing party, then such fees, costs and expenses will be borne 50% by Seller and 50% by Purchaser.

(d) If Seller does not deliver the Disputed Items Notice to Purchaser within 10 days after receipt by Seller of the Final Purchase Price Certificate, the Final Purchase Price specified in the Final Purchase Price Certificate will be conclusively presumed to be true and correct in all respects and will be binding upon the parties.

(e) Not later than three Business Days after the Final Purchase Price is finally determined in accordance with this Section 8.5 (the "*Final Settlement Date*"), Purchaser shall pay to Seller any Net Due to Seller on Final Settlement and Seller will pay to Purchaser any Net Due to Purchaser on Final Settlement.

## ARTICLE IX
## OTHER AGREEMENTS

9.1 Further Assurances. At any time and from time to time from and after the Closing, Seller and Purchaser shall, at the request of the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments and other documents and perform or cause to be performed such acts and provide such information, as may reasonably be required to evidence or effectuate the sale, conveyance, transfer, assignment and delivery to Purchaser of the Purchased Assets or for the performance by Seller or Purchaser of any of their other respective obligations under this Agreement.

9.2 Access to Records After Closing. From and after the Closing Date, each party hereto and its representatives shall have reasonable access to inspect and copy all books and records relating to Seller or the Compounding Business that the other parties hereto or their respective Affiliates may retain after the Closing Date. Such access shall be afforded by the party maintaining such records upon receipt of reasonable advance notice and during normal business hours. Nothing contained in this Section 9.2 shall require Purchaser or Seller to retain any books or records longer than such books or records would otherwise have been retained in the Ordinary Course of Business but for the transactions contemplated by this Agreement; provided, however, that if the party maintaining such records shall desire to dispose of any of such books and records, such party shall, prior to such disposition, give the other party hereto a reasonable opportunity, at such other party's expense, to segregate and remove such books and records as such other party may select.

32                              Gitto Asset Purchase Agreement 3/31/04

9.3 <u>Collection of Receivables</u>. From and after the Closing, Purchaser shall have the right and authority to collect for its own account all Accounts Receivable and other items that are included in the Purchased Assets and to endorse with the name of Seller, as applicable, any checks or drafts received with respect to any such Accounts Receivable or other items and Seller agrees promptly to deliver to Purchaser any cash or other property received directly or indirectly by it with respect to such Account Receivables and other items, including any amounts payable as interest. 120 days after the Closing Date (the "<u>*Receivable Settlement Date*</u>"), Purchaser shall (a) advise Seller as to the amount, if any, of Uncollected Business Accounts Receivable remaining outstanding and unpaid at the Receivable Settlement Date, (b) assign all such Uncollected Business Accounts Receivable to Seller without recourse and (c) pay to Seller an amount equal to the amount collected by Purchaser with respect to the Uncollected Business Accounts Receivable from the Final Settlement Date to the Receivable Settlement Date. From and after the Closing, through the Receivable Settlement Date, Seller agrees that if it receives any payments with respect to any Business Accounts Receivable, Seller shall promptly, and in any case within fourteen (14) days after receipt thereof by Seller, remit such amounts to Purchaser.

9.4 <u>Third Party Consents</u>. To the extent that Seller's rights under any Assumed Contract may not be assigned without the consent of another Person which has not been obtained as of the Closing Date, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Purchaser's rights under the Purchased Assets such that Purchaser would not in effect acquire the benefit of all such rights, then, Seller, to the maximum extent permitted by law and the Purchased Assets, shall act after the Closing Date as Purchaser's agent in order to obtain for it the benefits thereunder and shall cooperate with Purchaser in any other arrangement designated to provide such benefits to Purchaser.

ARTICLE X
INDEMNIFICATION

10.1 <u>Survival of Representations, Warranties and Indemnity</u>. The representations and warranties of the parties hereto contained in Articles III and IV and the indemnification obligations contained in this Article X shall survive the Closing and expire two years following the Closing Date; provided, however, that Purchaser's indemnification obligations pursuant to Section 10.4(a) shall not expire and shall survive the Closing indefinitely; and provided, further, that any claims which involve fraud or intentional misrepresentation shall survive the Closing indefinitely; and provided, further, that if at the stated expiration of any indemnification obligation there shall be pending any indemnification claim by a Person pursuant to which notice has been given pursuant to Section 10.7, such Person shall continue to have the right to seek such indemnification with respect to such claim notwithstanding such expiration.

10.2 <u>Indemnification by Seller and Seller Shareholders</u>. Seller and Seller Shareholders shall jointly and severally indemnify, defend and hold harmless Purchaser, its members, officers, directors, employees and agents after the Closing Date from and against any loss, liability, obligation, Lien, damage, cost and expense (including reasonable legal and accounting fees incurred in defending or prosecuting any claim for any such liability, loss or damage) ("<u>*Purchaser Losses*</u>") arising out of or resulting from:

(a) the untruth or inaccuracy as of the date hereof or on the Closing Date of any representation or warranty of Seller or Seller Shareholders contained in this Agreement or the Schedules hereto (or in any document, writing, or certificate delivered by Seller under Article VIII of this Agreement);

(b) any Excluded Liability;

(c) whether or not disclosed by Seller or Seller Shareholders in this Agreement or on Schedule 3.22, any obligation or liability of Seller or Seller Shareholders related to any actual or alleged violation or liability arising under any Environmental Laws, including, without limitation, any Release or threatened Release of Hazardous Substances occurring prior to, or if as a result of Seller's activities, present, or if, not as a result of Seller's activities, to the extent present on, the Closing Date, and any Environmental Claims arising out of events or circumstances occurring prior to or continuing on the Closing Date;

(d) any obligation or liability arising from claims, proceedings or causes of action arising from product warranty or product liability claims with respect to products, materials or services produced, invoiced, sold, performed or shipped by Seller on or prior to the Closing Date;

32                                    Gills Asset Purchase Agreement 11/26/04

(e) any action, suit or proceeding pending on the Closing Date, notwithstanding disclosure thereof in this Agreement or on the Most Recent Balance Sheet or any subsequent claim, action, suit or proceeding arising out of or relating to such pending matters; or

(f) the failure by Seller or Seller Shareholders to perform any of their covenants or obligations hereunder.

10.3 Limits on Indemnification by Seller and Seller Shareholders. The amount of liability of Seller and Seller Shareholders for the Purchaser Losses shall be subject to the following limitations:

(a) Seller and Seller Shareholders shall have no liability under Section 10.2(a), (c), (d) or (e) until the aggregate amount of all Purchaser Losses for which Seller and Seller Shareholders would, but for this Section 10.3(a), be liable exceeds $25,000 (the "*Indemnity Basket*"), in which event Seller and Seller Shareholders shall, subject to Section 10.3(b), be jointly and severally liable for the total amount of all Purchaser Losses.

(b) The Indemnity Basket shall not be applicable to Purchaser Losses (i) arising or resulting from the untruth or inaccuracy of the representations made in Sections 3.1 3.2, 3.22 or 3.24, (ii) arising or relating to any breach or violation of any agreement or covenant contained in this Agreement or other documents contemplated hereby, or (iii) arising or resulting from Seller's violation of bulk sales laws.

10.4 Indemnification by Purchaser. Purchaser shall indemnify, defend and hold harmless Seller, its directors, officers, employees and agents after the Closing Date from and against any liability, obligation, loss, Lien, cost, damage and expense (including reasonable legal and accounting fees incurred in defending or prosecuting any claim for any such liability, loss or damage) arising out of or resulting from:

(a) the untruth or inaccuracy as of the date hereof or on the Closing Date of any representation or warranty of Purchaser contained in this Agreement (or in any document, writing or certificate delivered by Purchaser under this Agreement), or the failure by Purchaser to perform any of its covenants or obligations hereunder;

(b) any liability of Seller assumed by Purchaser hereunder and/or pursuant to the Assumption Agreement; or

(c) the operation of Purchaser and conduct of Purchaser's business following the Closing, including, without limitation, any loss, liability, obligation, Lien, damage, cost or expense arising from products produced or processed by Purchaser after the Closing.

10.5 Specific Breaches. The breach of a specific representation, warranty, or agreement by Seller or Purchaser, as applicable, shall be determined independently of any other representation, warranty or agreement made by Seller or Purchaser, as applicable, whether or not, apart from such specific representation, warranty or agreement, the transactions provided for in this Agreement prove to be more favorable to Purchaser or Seller, as applicable, and whether or not the facts and circumstances covered by any one or more of the other representations, warranties or agreements made by Seller or Purchaser, as applicable, prove to be more favorable than so represented and warranted.

10.6 Cross-indemnification for Broker's, Consultant's or Finder's Fees. Subject to the provisions of Section 3.31 and Section 4.6, Purchaser and Seller each agree to indemnify and hold harmless the other from and against any and all losses, liabilities, obligations, Liens, damages, costs and expenses of any kind or character arising from any claims for broker's, consultant's or finder's fees or commissions or other similar fees in connection with the transactions covered by this Agreement, insofar as such claims shall be based upon alleged arrangements or agreements made by such party or on its behalf, which indemnity expressly shall survive any termination of this Agreement or any Closing hereunder.

Gitto Asset Purchase Agreement 3/31/04

10.7 <u>Procedure for Indemnification</u>.

(a) If any Person shall claim indemnification (the "<u>Indemnified Party</u>") hereunder for any claim other than a third party claim, the Indemnified Party shall promptly give written notice to the other party from whom indemnification is sought (the "<u>Indemnifying Party</u>") of the nature of the claim in detail and amount of the claim. If an Indemnified Party shall claim indemnification hereunder arising from any claim or demand of a third party (a "<u>Third-Party Claim</u>"), the Indemnified Party shall promptly give written notice (a "<u>Third-Party Notice</u>") to the Indemnifying Party of the basis for such claim or demand, setting forth the nature of the claim or demand in detail and the amount of the claim.

(b) In the event that an Indemnifying Party which receives notice of an indemnification claim contests its liability for such indemnification claim, such party shall send written notice to the Indemnified Party of its dispute of indemnification within 15 days thereof. If the parties are unable to resolve such dispute of indemnification within 60 days after the date of the notice of dispute, the Indemnified Party may bring an action against the Indemnifying Party to enforce such indemnification claim.

(c) The Indemnifying Party shall have the right to compromise or, if appropriate, defend at its own cost and through counsel of its own choosing, any claim or demand giving rise to any such claim for indemnification. In the event the Indemnifying Party undertakes to compromise or defend any such claim or demand, it shall promptly (and in any event, no later than fifteen (15) days after receipt of a Third-Party Notice) notify the Indemnified Party in writing of its intention to do so. The Indemnified Party shall fully cooperate with the Indemnifying Party and its counsel in the defense or compromise of such claim or demand. After the assumption of the defense by the Indemnifying Party, the Indemnified Party shall not be liable for any legal or other expenses subsequently incurred by the Indemnifying Party, in connection with such defense (unless the Indemnifying Party disputes its liability for such indemnification claim and an arbitration pursuant to Section 12.12 determines that the Indemnifying Party is not liable to indemnify the Indemnified Party), but the Indemnified Party may participate in such defense at its own expense. No settlement of a Third-Party Claim defended by the Indemnifying Party shall be made without the written consent of the Indemnified Party, such consent not to be unreasonably withheld. The Indemnifying Party shall not, except with the written consent of the Indemnified Party, consent to the entry of a judgment or settlement of a Third-Party Claim which does not include as an unconditional term thereof, the giving by the claimant or plaintiff to the Indemnified Party of an unconditional release from all liability in respect of such Third-Party Claim.

10.8 <u>Payment</u>. Except for Third-Party Claims being defended in good faith by the Indemnifying Party in accordance with Section 10.7, the Indemnifying Party shall satisfy its obligations hereunder within fifteen (15) days after receipt of notice of a claim, unless the Indemnifying Party has contested its liability for indemnification pursuant to Section 10.7(b) in which case no payment shall be due from the Indemnifying Party unless its liability therefore is established by final nonappealable court order or judgment and fifteen (15) days have passed since the entry of such order or judgment. Any amount not paid to the Indemnified Party by such date shall bear interest at a rate equal to the prime as announced by Bank of America, N.A., or, if Bank of America, N.A. ceases to exist, any other major New York bank reasonably selected by the Indemnified Party.

10.9 <u>Reduction for Insurance and Taxes</u>. The amount of any payment to any Indemnified Party pursuant to this Article X shall be reduced by the amount of any insurance proceeds actually received by or on behalf of the Indemnified Party in reduction of the related indemnifiable loss. An Indemnified Party which subsequently receives insurance proceeds in respect of the related indemnifiable loss shall pay to the Indemnifying Party the amount of such actually received insurance proceeds. Where any tax benefit is available to the Indemnified Party with respect to an indemnifiable event, the amount of any payment with respect to such indemnifiable loss shall be reduced dollar for dollar by the amount of such tax benefit actually received:

10.10 <u>Remedies Exclusive</u>. The remedies provided in this Article X shall be the exclusive remedies of the parties hereto after the Closing in connection with any breach of a representation or warranty, non-performance, partial or total, of any covenant or agreement contained herein or any other matter relating to the transactions contemplated hereby. Purchaser agrees to pursue all claims for Purchaser Losses solely against Seller as provided in this Agreement. Nothing contained herein, however, shall preclude a party from seeking injunctive relief or specific performance, under circumstances where such relief might be appropriate, provided that the moving party shall not be entitled to ancillary relief in the nature of damages or fee awards unless specifically so provided for herein.

10.11 No Consequential Damages. The Indemnifying Party shall not be liable to the Indemnified Party for consequential, enhanced, punitive or special damages or the like unless such damages are included in a Third-Party Claim and the Indemnified Party is liable to the third party claimant for such damages.

10.12 Bulk Sales. Notwithstanding anything herein to the contrary, Seller and Seller Shareholders will indemnify and hold harmless Purchaser and the other Purchaser Indemnities from and against any and all Losses resulting from or arising out of any noncompliance or alleged noncompliance by Purchaser or Seller with bulk sales laws.

ARTICLE XI<br>TERMINATION

11.1 Rights to Terminate. This Agreement may be terminated at any time prior to the Closing only as follows:

(a) by mutual written consent of Seller and Purchaser;

(b) by Seller if Purchaser is in material breach of any representation, warranty or covenant under this Agreement (and Seller is not then in material breach of any representation, warranty or covenant);

(c) by Purchaser if Seller is in material breach of any representation, warranty or covenant under this Agreement (and Purchaser is not then in material breach of any representation, warranty or covenant);

(d) by Seller or by Purchaser if, at or before the Closing Date, any condition set forth herein for the benefit of Seller or Purchaser, respectively, shall not have been timely met and cannot be met on or before the Closing Date and has not been waived;

(e) by Purchaser in the manner described in Section 3.34; or

(f) by Purchaser or Seller if the Closing shall not have occurred on or before 90 days after the date of this Agreement.

Each party's right of termination hereunder is in addition to any of the rights it may have hereunder.

11.2 Effects of Termination. In the event of termination of this Agreement as permitted by Section 11.1, this Agreement shall become void and of no further force and effect, except for the following provisions, which shall remain in full force and effect: (a) Sections 3.32 and 4.6 relating to brokers or consultant's fees, (b) Section 5.6 relating to publicity, (c) this Section 11.2, and (d) Article XII. Nothing in this Section 11.2 shall be deemed to release any party from any liability for any breach by such party of the terms and provisions of this Agreement or misrepresentations made herein. Further, notwithstanding any provision herein to the contrary, nothing in this Agreement shall be deemed to impair the right of Purchaser to compel specific performance by any other party of its obligations under this Agreement. Notwithstanding any provision herein to the contrary, Seller and Seller Parties will have no rights, and hereby waive any rights, to compel specific performance by Purchaser and, in the event of termination, Purchaser liability to Seller and any Seller Parties hereunder, if any, shall in no event exceed the Escrow Amount and Seller's remedies shall be limited to rights with respect to the Escrow Amount on the terms and subject to the limitations and conditions set forth in the Escrow Agreement.

ARTICLE XII<br>MISCELLANEOUS PROVISIONS

12.1 Notices. All notices or other communications required or permitted by this Agreement shall be in writing and shall be deemed to have been duly received (a) if given by telecopier, when transmitted and the appropriate telephonic confirmation received if transmitted on a business day and during normal business hours of the recipient, and otherwise on the next Business Day following transmission, (b) if given by certified or registered mail, return receipt requested, postage prepaid, three Business Days after being deposited in the U.S. mails and (c) if given by courier or other means, when received or personally delivered, and, in any such case, addressed as follows:

36

(i)    if to Purchaser:

VitroTech Corporation
5 Hutton Centre Dr.
Suite 700
Santa Ana, California 92707
Attention: Jess Rae Booth, President
Telephone: (714) 708-4700
Facsimile: (714) 708-4701

and

Michael W. Sanders, Attorney at Law
20333 S.H. 249, Suite 600
Houston, Texas 77070
Telephone: (832) 446-2599
Facsimile: (832) 446-2424

(ii)    if to Seller:

c/o Gary Gitto
Po Box 583    ]
[Lunenburg MA 01462
Telephone: (978)635-5317
Facsimile: ( )[    ]

with a copy to:

[    ]
[    ]
[    ]
Attention: [    ]
Telephone: ( ) [    ]
Facsimile: ( ) [    ]

or to such other addresses as may be specified by any such Persons to the other Persons, pursuant to notice given by such Person in accordance with the provisions of this Section 12.1.

12.2 Assignment. No party may assign or transfer any or all of its rights or obligations under this Agreement without the prior written approval of the other party; provided, however, that Purchaser may assign or transfer all (but not less than all) of its rights and obligations under this Agreement (a) to any Person that is wholly-owned, directly or indirectly, by Purchaser or is an Affiliate of Purchaser or (b) after the Closing, to any Person to whom Purchaser sells all or substantially all the Purchased Assets, provided further, that at any time Purchaser may collaterally assign its rights hereunder to any Person or Persons providing financing to Purchaser in connection with the transactions contemplated hereby.

12.3 Benefit of the Agreement. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except as set forth in Article X with respect to indemnification of indemnified parties hereunder, nothing in this Agreement shall confer any rights upon any Person other than the parties hereto and their respective successors and assigns.

12.4 Exhibits and Schedules. The Exhibits and Schedules hereto shall be construed with and as an integral part of this Agreement to the same effect as if the contents thereof had been set forth verbatim herein. References in this Agreement and in the Schedules are made for convenient reference only, and all matters disclosed in any Schedule shall be deemed to be disclosed in each Schedule.

12.5 Headings. The headings used in this Agreement are for convenience of reference only and shall not be deemed to limit, characterize or in any way affect the interpretation of any provision of this Agreement.

    Gitto Asset Purchase Agreement 3/31/04

12.6 <u>Entire Agreement</u>. This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and no other representations, promises, agreements or understandings regarding the subject matter hereof shall be of any force or effect unless in writing, executed by the party to be bound thereby and dated on or after the date hereof.

12.7 <u>Modifications and Waivers</u>. No change, modification or waiver of any provision of this Agreement shall be valid or binding unless it is in writing, dated subsequent to the date hereof and signed by Purchaser and Seller. No waiver of any breach, term or condition of this Agreement by any party shall constitute a subsequent waiver of the same or any other breach, term or condition.

12.8 <u>Counterparts</u>. This Agreement may be executed in counterparts (including by facsimile transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.9 <u>Severability</u>. In case any one or more of the provisions contained herein for any reason shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

12.10 <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA (EXCLUSIVE OF THE CONFLICT OF LAW PROVISIONS THEREOF).

12.11 <u>Expenses</u>. Other than as specifically provided in this Agreement, each party hereto shall pay all of its own costs and expenses incurred or to be incurred in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

12.12 <u>JURISDICTION; WAIVER OF JURY TRIAL; VENUE</u>.

(a) EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY CALIFORNIA STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN ORANGE COUNTY, CALIFORNIA, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH CALIFORNIA STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT IN THE COURTS OF ANY OTHER JURISDICTION.

(b) EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(c) EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY CALIFORNIA STATE OR FEDERAL COURT SITTING IN ORANGE COUNTY, CALIFORNIA. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Gitto Asset Purchase Agreement 3/31/04

12.13 <u>Seller Acknowledgement</u>. Seller acknowledges that the representations and warranties contained in this Agreement and in any document or instrument delivered to Purchaser pursuant hereto or in connection herewith shall not be deemed waived or otherwise affected by any investigation by Purchaser, its officers, directors, employees, counsel, accountants, advisors, representatives and agents.

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement the date first written above.

GITTO/GLOBAL COPORATION

By: _____
Title: PRESIDENT

VITROTECH CORPORATION

By: _____
Name: Jess Rae Booth
Title: Chief Executive Officer

"GITTO PARTIES"

_____
GARY GITTO

_____
FRANK MILLER

_____
CHARLES GITTO, JR.

# EXHIBIT 28

```
<DOCUMENT>
<TYPE>10QSB/A
<SEQUENCE>1
<FILENAME>v06361.txt
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-QSB/A

(Mark One)

|X|  QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF
1934

For the quarterly period ended June 30, 2004

|_|  TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE EXCHANGE ACT

For the transition period from _____ to_____

Commission File No. 0-49692

VITROTECH CORPORATION
--------------------------------------------------
(Exact name of small business issuer as specified in its charter)

Nevada                                              88-0504050
-----------------------------------       ---------------------------------
(State or other jurisdiction of                     (IRS Employer
incorporation or organization)                  Identification No.)

5 Hutton Centre Drive, Suite 700
Santa Ana, CA 92707
---------------------------------
(Address of principal executive offices)

(714) 708-4700
-------------------------
Issuer's telephone number)

-----------------------------------------------------------------
(Former name, former address and former fiscal year,
if changed since last report)

Check whether the issuer (1) filed all reports required to be filed by Section
13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter
period that the registrant was required to file such reports), and (2) has been
subject to such filing requirements for the past 90 days. Yes |X|   No |_|

State the number of shares outstanding of each of the issuer's classes of common
equity, as of the latest practicable date:

As of August 27, 2004, the Registrant had 150,701,665 shares of common stock
outstanding.

Transitional Small Business Disclosure Format (Check one): Yes |_|  No |X|

```
<PAGE>
```

VITROTECH CORPORATION

FORM 10-QSB

TABLE OF CONTENTS

PART I - FINANCIAL INFORMATION

    ITEM 1. FINANCIAL STATEMENTS

        Condensed Consolidated Balance Sheet June 30, 2004 (restated)....... 4

        Condensed Consolidated Statements of Operations for the Three
            and Six Months Ended June 30, 2004 (restated) and 2003........... 5

        Condensed Consolidated Statement of Stockholders' Deficit
            for the  Six Months Ended June 30, 2004 (restated)............... 6

        Condensed Consolidated Statements of Cash Flows for the
            Six Months Ended June 30, 2004 (restated) and 2003.............. 7

        Notes to Condensed Consolidated Financial Statements................ 8

    ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION........17

    ITEM 3. CONTROLS AND PROCEDURES.........................................22

PART II - OTHER INFORMATION

ITEM 2. CHANGES IN SECURITIES.................................  ......22

ITEM 3. DEFAULTS UPON SENIOR SECURITIES......................  ......23

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.......  ......23

ITEM 5. OTHER INFORMATION....................................  ......23

ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K.....................  ......23

SIGNATURES

CERTIFICATIONS

EXPLANATORY NOTE This amended quarterly report on Form 10-QSB/A is being filed
to amend the financial statements appearing in Part I, Item 1, the Management's
Discussion and Analysis in Part I, Item 2, the Controls and Procedures
disclosure in Part I, Item 3, the Exhibits filed herewith under Part II, Item 6
and to include Part II, Item 5 disclosure. The Form 10-QSB, as originally filed,
was mistakenly filed prior to completion of the outside accountant's review and
review by outside legal counsel. As of this filing, the accountants have
completed their review of the attached financial statements that appear in Item
1. All disclosures in this amendment, other than those noted above, are as of
the date of the original filing and have not been updated.

                                      2

<PAGE>

             REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM


Board of Directors and Audit Committee
Vitrotech Corporation
Santa Ana, California



We have reviewed the accompanying condensed consolidated balance sheet of
Vitrotech Corporation of June 30, 2004, and the related condensed consolidated
statements of operations, stockholders' deficit and cash flows for the three and
six months ended June 30, 2004 and 2003. These interim financial statements are
the responsibility of the Company's management.

We conducted our review in accordance with the standards of the Public Company
Accounting Oversight Board (United States). A review of interim financial
information consists principally of applying analytical procedures and making
inquiries of persons responsible for financial and accounting matters. It is
substantially less in scope than an audit conducted in accordance with the
standards of the Public Company Accounting Oversight Board, the objective of
which is the expression of an opinion regarding the financial statements taken
as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should
be made to the accompanying interim financial statements for them to be in
conformity with U.S. generally accepted accounting principles.


/s/ Stonefield Josephson, Inc.
CERTIFIED PUBLIC ACCOUNTANTS

Los Angeles, California
August 27, 2004


                                      3

<PAGE>

                    PART I - FINANCIAL INFORMATION

ITEM 1.  FINANCIAL STATEMENTS

                          VITROTECH CORPORATION
                  CONDENSED CONSOLIDATED BALANCE SHEET
                       (Unaudited and restated)
                             June 30, 2004

ASSETS

Current assets:
    Accounts receivable, net of allowance
       for doubtful accounts of $385,164           $     108,412
    Cost of materials                                  1,245,758
    Advances receivable                                    5,000
    Prepaid expenses                                     123,857
    Debt issue costs - current portion                   189,706
                                                   -------------
Total current assets                                   1,672,733

Property and equipment, net                              153,852
Receivable from related party                            447,964
Deposits                                                  75,939

```
Debt issue costs, net of current portion                            44,934
                                                               -------------

Total assets                                                  $  2,395,422
                                                               =============
```

LIABILITIES AND STOCKHOLDERS' DEFICIT

```
Current liabilities:
    Cash Overdraft                                            $     61,380
    Accounts payable                                             1,720,545
    Advances from related parties                                1,131,492
    Due to related parties - material and advances                954,336
    Accrued interest                                               253,640
    Accrued expenses                                               182,598
    Capital leases payable - current portion                        15,248
    Notes payable - current portion                              5,934,659
                                                               -------------
Total current liabilities                                       10,253,898

Capital leases payable, net of current portion                      42,101
Notes payable, net of current portion                            1,937,000
                                                               -------------

Total liabilities                                               12,232,999

Commitments and Contingencies                                          --

Stockholders' deficit
    Common stock, $.001 par value, authorized 500,000,000
      shares; 147,176,665 shares issued and outstanding          147,177
    Additional paid-in capital                                  16,202,369
    Accumulated deficit                                        (26,187,123)
                                                               -------------
Total stockholders' deficit                                     (9,837,577)
                                                               -------------

Total liabilities and stockholders' deficit                  $  2,395,422
                                                               =============
```

See accompanying notes to condensed consolidated financial statements.

4

<PAGE>

VITROTECH CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)
For the Six and Three Months Ended June 30, 2004 and 2003

<TABLE>
<CAPTION>

| | Six Months Ended June 30, | | Three Months Ended June 30, | |
|---|---|---|---|---|
| | 2004 (restated) | 2003 | 2004 (restated) | 2003 |
| <S> | <C> | <C> | <C> | <C> |
| Net Revenue | $     133,770 | $   1,772,125 | $     (92,100) | $    893,861 |
| Cost of goods sold (related party) | 112,794 | 666,154 | 3,298 | 375,087 |
| Gross profit | 20,976 | 1,105,971 | (95,398) | 518,774 |
| Selling, general and administrative expenses | 5,125,985 | 2,942,782 | 2,861,847 | 1,831,190 |
| Research and development expense | 127,516 | 259,665 | 83,887 | 106,994 |
| Total | 5,253,501 | 3,202,447 | 2,945,734 | 1,938,184 |
| Loss before other income (expense) | (5,232,525) | (2,096,476) | (3,041,132) | (1,419,410) |
| Other income (expense): | | | | |
| Interest expense | (445,925) | (807,689) | (240,036) | (430,861) |
| Debt issue costs | (188,140) | (268,105) | (94,421) | (169,431) |
| Interest income | 900 | 8,513 | 203 | 4,503 |
| Total other expense | (633,165) | (1,067,281) | (334,254) | (595,789) |
| Net loss before taxes | (5,865,690) | (3,163,757) | (3,375,386) | (2,015,199) |
| Income taxes | -- | -- | -- | -- |
| Net loss | $  (5,865,690) | $  (3,163,757) | $  (3,375,386) | $  (2,015,199) |

Net loss per share

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Basic and diluted | $ | (0.04) | $ | (0.06) | $ | (0.02) | $ (0.04) |

Weighted average shares outstanding
Basic and diluted     141,147,852     49,581,954     147,043,860     49,584,000

</TABLE>

See accompanying notes to condensed consolidated financial statements.

5

<PAGE>

VITROTECH CORPORATION
CONDENSED CONSOLIDATED STATEMENT OF STOCKHOLDERS' DEFICIT
(Unaudited)
For the Six Months Ended June 30, 2004

<TABLE>
<CAPTION>

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Balance, December 31, 2003 | 118,698,047 | $ 118,698 | $ 11,396,865 | $(20,321,433) | $ (8,805,870) |
| Issuance of common stock for conversion of notes payable (Unaudited) | 801,953 | 802 | 1,238,498 | -- | 1,239,300 |
| Issuance of common stock for acquisition of Star Computing Limited (Unaudited) | 20,000,000 | 20,000 | (20,000) | -- | -- |
| Net deficit of operations not transferred (Unaudited) | -- | -- | (314,623) | -- | (314,623) |
| Issuance of common stock for cash (Unaudited) | 5,333,332 | 5,333 | 1,994,667 | -- | 2,000,000 |
| Offering costs paid in cash (Unaudited) | -- | -- | (8,194) | -- | (8,194) |
| Issuance of common stock from the exercise of warrants (Unaudited) | 2,343,333 | 2,344 | 1,755,156 | | 1,757,500 |
| Issuance of warrants for services rendered (Unaudited) | | | 160,000 | | 160,000 |
| Net loss (Unaudited and restated) | | | | (5,865,690) | (5,865,690) |
| Balance, June 30, 2004 (Unaudited and restated) | 147,176,665 | $ 147,177 | $ 16,202,369 | $(26,187,123) | $ (9,837,577) |

</TABLE>

See accompanying notes to condensed consolidated financial statements.

6

<PAGE>

VITROTECH CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)
For the Six Months Ended June 30, 2004 and 2003

<TABLE>
<CAPTION>

| | Six Months Ended June 30, | |
|---|---|---|
| | 2004 (restated) | 2003 |
| <S> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net loss | $(5,865,690) | $(3,163,757) |
| Adjustments to reconcile net loss to net cash used by operating activities: | | |
| Depreciation | 27,532 | 60,720 |
| Warrants issued for services rendered | 160,000 | 0 |
| Change in allowance for bad debts | 173,740 | 582,400 |
| Change in assets and liabilities: | | |
| (Increase) decrease in assets | | |
| Accounts receivable | (25,048) | (521,762) |
| Cost of materials | (130,378) | (343,239) |
| Receivables from related parties | (129,790) | (308,087) |
| Prepaid expenses | (78,302) | (15,555) |
| Deposits | | |
| Change in debt issue costs | 24,701 | (32,644) |
| | 117,115 | 437,976 |
| Increase (decrease) in liabilities | | |
| Accounts payable | 807,946 | (401) |

```
        Due to related parties - material and advances      882,031      (358,425)
        Accrued interest                                   (140,297)      372,872
        Accrued expenses                                     96,787      204,969
                                                         -----------   -----------
Net cash used in operating activities                    (4,079,653)   (3,084,933)
                                                         -----------   -----------


CASH FLOWS USED FOR INVESTING ACTIVITIES:
    Property and equipment                                  (57,029)      (84,309)
                                                         -----------   -----------

CASH FLOWS FROM FINANCING ACTIVITIES:
    Proceeds from issuance of common stock and exercise of
warrants                                                  3,749,307     1,922,093
    Proceeds from notes and loans payable                   357,300     3,061,000
    Payments of notes payable                                    --    (1,582,470)
    Payments on capital lease obligations                   (19,974)      (13,834)
                                                         -----------   -----------
Net cash provided by financing activities                 4,086,633     3,386,789
                                                         -----------   -----------


Net deficit of operations not transferred                 (314,623)     (217,547)
                                                         -----------   -----------

Net change in cash                                         (364,672)           --
Cash, beginning of year                                     303,292          500
                                                         -----------   -----------
Cash, end of period                                    $   (61,380)   $      500
                                                       ===========    ===========

Supplemental cash flow information:
    Cash paid for interest                             $   514,779    $  775,522
                                                       ===========    ===========
    Cash paid for income taxes                         $        --    $       --
                                                       ===========    ===========
</TABLE>
```

Non-cash investing and financing activities

During the six months ended June 30, 2004, the Company converted notes payable totaling $1,239,300 to common stock.

See accompanying notes to condensed consolidated financial statements.

7

<PAGE>

VITROTECH CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
June 30, 2004

1.   ORGANIZATION

VitroTech Corporation ("VitroTech" or the "Company"), a Nevada corporation, originally incorporated under the name Star Computing Limited ("Star"), was formed on July 16, 2001. The Company is engaged in the materials technology business which includes, but is not limited to, the mining, processing, marketing and sale of a family of proprietary amorphous aluminosilicate (the "Mineral") based products designed to improve performance and quality of a broad array of manufacturing applications.

On February 3, 2004, pursuant to the terms of a Stock Purchase Agreement (the "Stock Purchase Agreement"), Star acquired 100% of VitroCo Incorporated (formerly, VitroCo Materials LLC) ("VitroCo") in exchange for 15,000,000 shares (60,000,000 shares after giving effect to a March 2004 4:1 stock split) of Star common stock and also acquired 100% of the stock of VitroTech Corporation ("VitroTech Delaware") in exchange for 14,875,000 shares (59,500,000 shares after giving effect to the March 2004 4:1 stock split) of Star common stock (the "Exchange"). In conjunction with the Exchange, 6,043,496 shares (24,173,984 shares after giving effect to the March 2004 4:1 stock split) of Star common stock held by Star shareholders were redeemed for $22,500, resulting in 20,000,000 shares outstanding immediately prior to the exchange. Immediately following the Exchange, the pre-Exchange shareholders of VitroCo and VitroTech Delaware held approximately 85.7% of our common stock and the pre-Exchange shareholders of Star held approximately 14.3% of our common stock.

The Exchange has been accounted for as a recapitalization of Star with VitroCo as the acquirer (a "reverse acquisition"). On this basis, subsequent to the Exchange and going forward, the historical financial statements presented herein, prior to the Exchange on February 3, 2004, are those of VitroCo and the historical shareholders' equity as of February 3, 2004, has been presented to reflect the equivalent number of shares issued in the Exchange.

VitroCo's principal operating subsidiary, prior to and in conjunction with the Exchange, acquired the principal operations and assets, and assumed certain liabilities, of Hi-Tech Environmental Product, LLC ("Hi-Tech").

Following the Exchange, the Company assumed as our principal operations the operations of VitroCo, and changed the name, effective April 1, 2004, to VitroTech Corporation.

2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Interim Financial Information - The unaudited condensed consolidated financial
statements have been prepared by the Company pursuant to the rules and
regulations of the Securities and Exchange Commission. The information furnished
herein reflects all adjustments (consisting of normal recurring accruals and
adjustments) which are, in the opinion of management, necessary to fairly
present the operating results for the respective periods. Certain information
and footnote disclosures normally presented in annual consolidated financial
statements prepared in accordance with accounting principles generally accepted
in the United States of America have been omitted pursuant to such rules and
regulations. The condensed consolidated financial statements should be read in
conjunction with the description of business and management's plan of
operations, contained in the Company's Annual Report on Form 10-KSB for the year
ended December 31, 2003, and the Company's financial statement information
contained in the Company's Form 8-K/A, Amendment No. 2, dated February 3, 2004, as amended on
May 3, 2004 as well as the Company's quarterly report Form 10-QSB for the
quarter ended March 31, 2004.

Basis of presentation - The consolidated financial statements of VitroTech as of
June 30, 2004 include the accounts of the Company and its wholly-owned
subsidiaries VitroCo, VitroTech Delaware and VitroCo Processing Incorporated
("VitroCo Processing"). VitroTech Delaware was incorporated on September 10,
2003, and had only minimal operations to date. VitroCo Processing was
incorporated in Nevada on March 22, 2004, and had no operations. All significant
inter-company accounts and transactions have been eliminated in consolidation.
The consolidated results of operations for the six months ended June 30, 2004
are not necessarily indicative of the results that may be expected for the year
ending December 31, 2004, or for any future period.

8

<PAGE>

As reflected in the accompanying financial statements, the Company has incurred
significant losses, has negative cash flows from operations and negative working
capital. These matters raise substantial doubt about the Company's ability to
continue as a going concern.

In view of the matters described in the preceding paragraph, the continued
operations of the Company is dependent upon the Company's ability to raise
capital and generate positive cash flows from operations. The financial
statements do not include any adjustments relating to the recoverability and
classification of recorded asset amounts or amounts and classifications of
liabilities that might be necessary should the Company be unable to continue its
existence. Management's intentions are as follows:

     o     Following the Exchange through July 2004, VitroTech raised
           approximately $4.1 million in equity capital.

     o     Management is actively pursuing raising additional capital.

Cash and Cash Equivalents - The Company considers all highly liquid debt
instruments purchased with an initial maturity of three months or less to be
cash equivalents.

Revenue Recognition - The Company recognizes revenue upon shipment of mineral
products to customers, provided that the other conditions of sale as established
by the Securities and Exchange Commission's Staff Accounting Bulletin ("SAB")
No. 104, are satisfied:

     o     Persuasive evidence of an arrangement exists,
     o     Delivery has occurred, upon shipment when title passes, or services
           have been rendered,
     o     The seller's price to the buyer is fixed or determinable, and
     o     Collectibility is reasonably assured.

The Company evaluated reporting revenue in accordance with EITF 99-19 and
determined that it was appropriate to report revenue on a gross basis (versus
net basis) because the Company acts as a principal in its sales transactions
and, among other factors:

     o     is the primary obligor in the arrangement
     o     has latitude in establishing price
     o     determines the product specifications, and
     o     significantly changes the product

Cost of Materials - Cost of materials, which consists of mining, processing and
transportation costs, is stated at cost. The Company incurs all costs associated
with the mining, processing and transportation of the Mineral from the time the
Mineral is removed from the earth through all processing and warehousing. The
mineral products are shipped FOB warehouse to customers. The actual acquisition
cost of the Mineral is recorded as cost of goods sold and as a payable when the
product is shipped, but is not due to be paid to the affiliates until after the
sale proceeds are collected from the Company's customers. Mineral inventory held
for sale by the Company is, in fact, consigned raw mineral inventory owned by
the Company's affiliates that has been mined, processed and transported at the
Company's sole expense. The cost of the acquisition of the consigned raw mineral
inventory is not recorded by the Company in the accompanying financial
statements until the Company has sold the material to the customer. The Company

had capitalized $1,245,758 of costs as of June 30, 2004 associated with the consigned inventory, excluding the cost of acquisition of the Mineral. The amount of costs above that are associated with finished goods totaled $978,387 as of June 30, 2004. The remaining costs were associated with "in process" inventory.

Property and Equipment - Property and equipment are recorded at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the estimated useful lives of three to seven years. Maintenance and minor replacements are charged to expense as incurred. Gains and losses on disposals are included in the results of operations

Long-Lived Assets - In accordance with the Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets", the Company reviews its long-lived assets, including intangible assets, for impairment whenever events or changes in circumstances indicate that the related carrying amount may not be recoverable. Estimated losses are included in the results of operations.

9

<PAGE>

Research and Development Costs - Research and development costs are charged to expense as incurred. Equipment used in research and development with alternative uses is capitalized. Research and development costs include internal costs and payments to universities, consultants and laboratories for research on minerals, polymers, paint and coatings, and product processing techniques.

Fair Value of Financial Instruments - The carrying values of cash, accounts receivable, accounts payable and accrued expenses, none of which are held for trading, approximate fair value because of the immediate or short-term maturity of these financial instruments. The carrying amounts for the Company's long-term notes approximate fair value because current interest rates and terms offered to the Company are at current market rates.

Use of Estimates - The preparation of the Company's financial statements in conformity with generally accepted accounting principles requires the Company's management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Management has estimated the allowance for doubtful accounts, the liability for contingent interest on notes payable, and the price increase for Mineral costs payable to affiliates. Actual results could differ from those estimates.

Concentrations of Credit Risk - Financial instruments that potentially subject the Company to concentrations of credit risk consist of temporary cash investments and trade receivables. At times, the Company's cash account balances may be in excess of the maximum amount insured by the FDIC. Three customers accounted for approximately 94% of sales for the six months ended June 30, 2004. Three customers accounted for approximately 93% of accounts receivable at June 30, 2004.

Income Taxes - The Company accounts for income taxes in accordance with the provisions of Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" ("SFAS 109"), which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial statement and the tax basis of assets and liabilities using enacted rates in effect for the periods in which the differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

Basic and Diluted Loss Per Share - The Company uses SFAS No. 128, "Earnings Per Share" for calculating the basic and diluted loss per share. Basic loss per share is computed by dividing net loss attributable to common stockholders by the weighted average number of common shares outstanding. Diluted loss per share is computed similar to basic loss per share except that the denominator is increased to include the number of additional common shares that would have been outstanding if the potential common shares had been issued and if the additional common shares were dilutive. At June 30, 2004 and 2003, the outstanding number of potentially dilutive common shares totaled approximately 3,465,000 and 0 shares, respectively. However, as the Company has net losses, their effect is anti-dilutive and has not been included in the diluted weighted average earnings per share as shown on the Consolidated Statements of Operations.

Recently Issued Accounting Pronouncements:

In January 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities" (an interpretation of Accounting Research Bulletin (ARB) No. 51, Consolidated Financial Statements). Interpretation 46 addresses consolidation by business enterprises of entities to which the usual condition of consolidation described in ..RB-51 does not apply. The Interpretation changes the criteria by which one company includes another entity in its consolidated financial statements. The general requirement to consolidate under ARB-51 is based on the presumption that an enterprise's financial statement should include all of the entities in which it has a controlling financial interest (i.e.,

majority voting interest). Interpretation 46 requires a variable interest entity to be consolidated by a company that does not have a majority voting interest, but nevertheless, is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. A company that consolidates a variable interest entity is called the primary beneficiary of that entity. In December 2003, the FASB concluded to revise certain elements of FIN 46, primarily to clarify the required accounting for interests in variable interest entities. FIN-46R replaces FIN-46, that was issued in January 2003. FIN-46R exempts certain entities from its requirements and provides for special effective dates for entities that have fully or partially applied FIN-46 as of December 24, 2003. In certain situations, entities have the option of applying or continuing to apply FIN-46 for a short period of time before applying FIN-46R. In general, for all entities that were previously considered special purpose entities, FIN 46 should be applied for registrants who file under Regulation SX in periods ending after March 31, 2004, and for registrants who file under Regulation SB, in periods ending after December 15, 2004. The Company has relationships with various LLC's, that are related parties, that were established prior to 2003. The Company completed the process of evaluating if these entities are Variable Interest Entities in accordance with this pronouncement and have concluded the Company is in compliance.

10

<PAGE>

In December 2003, the Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin ("SAB") No. 104, "Revenue Recognition." SAB 104 supersedes SAB 101, "Revenue Recognition in Financial Statements." SAB 104's primary purpose is to rescind accounting guidance contained in SAB 101 related to multiple element revenue arrangements, superseded as a result of the issuance of EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables." Additionally, SAB 104 rescinds the SEC's Revenue Recognition in Financial Statements Frequently Asked Questions and Answers ("the FAQ") issued with SAB 101 that had been codified in SEC Topic 13, Revenue Recognition. Selected portions of the FAQ have been incorporated into SAB 104. While the wording of SAB 104 has changed to reflect the issuance of EITF 00-21, the revenue recognition principles of SAB 101 remain largely unchanged by the issuance of SAB 104, which was effective upon issuance. The adoption of SAB 104 did not impact the consolidated financial statements.

3.   PROPERTY AND EQUIPMENT

Property and equipment at June 30, 2004 consisted of the following:

| | |
|---|---|
| Machinery and equipment | $ 130,227 |
| Computer equipment | 112,668 |
| Office equipment | 57,521 |
| | --------- |
| | 300,416 |
| Accumulated depreciation | (146,564) |
| | --------- |
| | $ 153,852 |
| | ========= |

4.   PURCHASE COMMITMENTS - RELATED PARTIES

The Company has entered into purchase agreements with Enviro Investment Group, LLC ("EIG"), Red Rock Canyon Mineral, LLC ("Red Rock") and Valley Springs Mineral, LLC ("Valley Springs"), (all "Affiliated Mineral Entities").

The EIG agreement provides for the purchase of all of the Mineral owned by EIG. This agreement expires on March 31, 2017 and establishes minimum annual purchase requirements by the Company at certain prices per pound. The agreement was amended to require a minimum purchase amount by the Company of $125,000 per year, from January 1, 2003 through the term of the original agreement. The agreement states that the Company is responsible for all costs associated with removing the Mineral from the property, as well as all costs related to processing and transportation of the Mineral. Pursuant to the terms of the EIG Mining Agreement, the Company may not sell or distribute products that are competitive with the Mineral, other than Mineral from the Red Rock Canyon Property, the Valley Springs Property or a property under common ownership with EIG or those properties, until such time as the Company has purchased and paid for at least 75% of the Mineral located on the EIG Property. Additionally, pursuant to the EIG Mining Agreement, the Company granted EIG a non-terminable worldwide, non-exclusive royalty free and paid up perpetual license to utilize all of the Company's technologies relating to the Minerals from and after a default by the Company under the EIG Mining Agreement or the termination, for any reason, of the EIG Mining Agreement.

As of June 30, 2004, the Company owed EIG $680,460, all of which relates to the purchase obligation. This amount includes the cost of Mineral sold to customers but not yet paid for and the increased Mineral purchase payment due when the customer's payment is received. Interest is not charged on this obligation. Purchases from EIG were $70,456 and $266,855 for the six months ended June 30, 2004 and 2003, respectively.

Under the Red Rock Canyon Mining Agreement, the Company is obligated to pay to Red Rock amounts per pound of Mineral excavated and sold from the Red Rock Canyon Property and is subject to cumulative minimum purchase requirements. Both the per pound payment and the minimum purchase requirements with respect to the

Red Rock Canyon Property are identical to the requirements established for the EIG Property. However, any Mineral purchased from any Affiliated Mineral Entity shall be credited against the minimum requirement. The Red Rock Canyon Mining Agreement includes non-compete and license provisions identical to those pertaining to the EIG Property. The Company is also obligated to advance to Red Rock all amounts necessary to secure the rights relative to the Red Rock Property, all of which amounts will be treated as advances against per pound payment obligations. This has not been completed as of yet.

11

<PAGE>

Under the Valley Springs Mining Agreement, the Company is obligated to pay to Valley Springs amounts per pound of Mineral excavated and sold from the Valley Springs Property and is subject to cumulative minimum purchase requirements. Both the per pound payment and the minimum purchase requirements with respect to the Valley Springs Property are identical to the requirements established for the EIG Property. However, any Mineral purchased from any Affiliated Mineral Entity shall be credited against the minimum requirement. The Valley Springs Mining Agreement includes non-compete and license provisions identical to those pertaining to the EIG Property. The Company is also obligated to advance to Valley Springs all amounts necessary to secure the rights relative to the Valley Springs Property (including the payments to the land owners), all of which amounts will be treated as advances against per pound payment obligations. Under this provision no amount has been paid.

The Valley Springs Property has not previously been mined but is zoned for mining. The Company is processing the Valley Springs property for the owners to obtain mining permits and entitlement approval is expected by December 31, 2004. There is no guaranty that the Company will be successful in obtaining mining entitlements. Closing on the acquisition of mining rights to the Valley Springs property from the present landowner has not, as of August 2004, occurred.

The Company incurs all costs associated with the mining, processing and transportation of the Mineral from the time the Mineral is removed from the earth through all processing and warehousing. All costs are capitalized and shown as cost of materials on the balance sheet. The actual acquisition cost of the Mineral is recorded as cost of goods sold and as a payable when the product is shipped to its customer, but is not due to be paid to the Affiliated Mineral Entities until after the sale proceeds are collected from the Company's customers. Mineral inventory held for sale by the Company is, in fact, consigned raw mineral inventory owned by the Affiliated Mineral Entities that has been mined, processed and transported at the Company's sole expense. The cost of the acquisition of the consigned raw mineral inventory is not recorded by the Company in the accompanying financial statements until the Company has sold the material to the customer.

The Company does not have title or risk of loss on the cost of Minerals that are consigned by the Affiliated Mineral Entities.

5. NOTES PAYABLE

Notes payable at June 30, 2004 consisted of the following:

| | |
|---|---:|
| Private Offering - 9/1/99 Memorandum | $   608,428 |
| Private Offering - 3/19/01 Memorandum | 1,659,187 |
| Private Offering - 4/22/02 Memorandum | 2,967,044 |
| Private Offering - 2/24/03 Memorandum | 1,937,000 |
| Other notes payable | 700,000 |
| | 7,871,659 |
| Less: current portion | 5,934,659 |
| Non-current portion | $ 1,937,000 |

Notes payable mature as follows:

| | |
|---|---:|
| 2004 | $ 5,934,659 |
| 2005 | 1,937,000 |
| Total | $ 7,871,659 |

Private Offering - 9/1/99 Memorandum

12

<PAGE>

In September 1999, the Company initiated a $5,000,000 private offering of promissory notes with an interest rate of 10% per annum. The original maturity date of these notes was December 31, 2001. The balance in the amount of $608,428 of these notes was due and payable at December 31, 2002, for which the Company is in default. The Company is required to make ongoing interest payments under the same terms and conditions as the original $5,000,000 private offering. No formal demand has been made by the note holders and all note holders have continued to receive interest payments. The notes also provide for contingent interest equal to $0.15 per pound on the first one billion pounds of the Company's products sold and collected. The contingent interest will be shared pro rata by the total notes issued and shall be paid quarterly in arrears. As of

June 30, 2004, all amounts for interest and contingent interest have been paid
or accrued.

Private Offering - 3/19/01 Memorandum

In March 2001, the Company initiated a $5,000,000 private offering of promissory
notes with an interest rate of 10% per annum. Accrued interest in the amount of
$279,354 that was due on December 31, 2002 was converted to principal. The notes
matured on December 31, 2003, but were extended at the Company's option to
December 31, 2004. The notes also provide for contingent interest equal to $0.10
per pound on the first five hundred million pounds of the Company's products
sold and collected. The contingent interest will be shared pro rata by the total
notes issued and shall be paid quarterly in arrears. As of June 30, 2004, all
amounts for interest and contingent interest have been paid or accrued.

Private Offering - 4/22/02 Memorandum

In April 2002, the Company initiated a $5,000,000 private offering of promissory
notes with an interest rate of 10% per annum. During 2002, $1,448,044 of notes
was issued. The offering concluded in February, 2003 after an additional
$1,519,000 of notes were issued, for a total amount raised of $2,967,044. The
notes mature on December 31, 2004 but may be extended by the Company to December
31, 2005. The notes also provide for contingent interest equal to $0.07 per
pound on the first five hundred million pounds of the Company's products sold
and collected. The contingent interest will be shared prorata by the total notes
issued and shall be paid quarterly in arrears. As of June 30, 2004, all amounts
for interest and contingent interest have been paid or accrued. These notes can
be extended twelve months at the Company's option if interest for the fourth
quarter of 2004 be paid by 11/30/04

Private Offering - 2/24/03 Memorandum

In February 2003, the Company initiated a $5,000,000 private offering of
promissory notes with an interest rate of 10% per annum. During 2003, $1,542,000
of notes was issued. During the six months ended June 30, 2004, the Company
issued $395,000 of additional notes, and received $357,300 in cash, net of
offering costs of $37,700. The notes mature on December 31, 2005 but may be
extended by the Company to December 31, 2006. The notes also provide for
contingent interest equal to $0.07 per pound on the first five hundred million
pounds of the Company's products sold and collected. The contingent interest
will be shared prorata by the total notes issued and shall be paid quarterly in
arrears. As of June 30, 2004, all amounts for interest and contingent interest
have been paid or accrued. These notes can be extended twelve months at the
Company's option if interest for the fourth quarter of 2005 be paid by 11/30/05

Other Notes Payable

The Company has notes payable to others, aggregating $700,000, with an interest
rate of 10%, plus contingent interest based on product sales, due December 31,
2004. As of June 30, 2004, all amounts for interest and contingent interest have
been paid or accrued.

6. ADVANCES FROM RELATED PARTIES

As of June 30, 2004 The Company has advances from related parties in the amount
of $1,131,492. This amount is comprised of $100,000 from John Keller and
$1,031,492 from Elgin Investments. Both advances are unsecured , non interest
bearing and due on demand.

7. COMMON STOCK

During the six months ended June 30, 2004, the Company issued the following
shares of common stock (see Note 11 - Subsequent Events):

                                    13
<PAGE>

     o    Issued 801,953 shares for conversion of notes payable for a net
          amount of $1,239,300. During 2003, $1,021,998 of principal was
          assumed by Value Tech, LLC, Value Tech II, LLC, and Value Plus, LLC
          (collectively "Value Entities") , for which the note holders agreed
          to the assumption. For the assumption the Value Entities were issued
          membership interest of the Company in an equal amount of the debt
          they assumed.

     o    Issued 20,000,000 shares for acquisition of Star Computing Limited.

     o    Issued 5,333,332 shares in a private placement for $2,000,000,
          before fees of $8,194.

     o    Issued 2,343,333 shares upon exercise of warrants totaling
          $1,757,500.

8. WARRANTS

During February 2004, the Company completed a private placement of 5,333,332
shares of common stock at a price of $0.375 per share for $2 million. The
Company also issued to the investors warrants to purchase an aggregate of
5,333,332 shares of common stock at an exercise price of $0.75 per share. The

warrants are exercisable at any time until February 11, 2009.

In April 2004, the Company issued to a financial advisor 125,000 warrants, exercisable for five years, to purchase shares of the Company's common stock at $1.55 per share. The Company has accounted for the issuance of these warrants using the fair value method pursuant to SFAS 123 using the Black-Scholes option pricing model. The fair value of $160,000 which was expensed for these options was estimated at the date of grant using a Black-Scholes option pricing model with the following weighted-average assumptions for 2004: risk-free interest rate of 4.25%; dividend yields of 0%; volatility factors of the expected market price of the Company's common stock of 100%; and a weighted average expected life of the option of 5 years.

The Black-Scholes option valuation model was developed for use in estimating the fair value of traded options which have no vesting restrictions and are fully transferable. In addition, option valuation models require the input of highly subjective assumptions including the expected stock price volatility. Because the Company's employee stock options have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of employee stock options.

The table below summarizes warrants outstanding as of June 30, 2004:

|  |  |
|---|---|
| Warrants outstanding at December 31, 2003 | -- |
| Granted | 5,458,333 |
| Exercised at $0.75 per share | (2,343,333) |
| Cancelled | -- |
| Warrants outstanding and exercisable at June 30, 2004 | 3,115,000 |

## 9. COMMITMENTS

The Company has entered into purchase commitments for the Mineral. These commitments are described in NOTE 4 - PURCHASE COMMITMENTS - RELATED PARTIES.

The Company leases its office and warehouse facilities under operating leases that expire through 2010.

## 10. REVENUES

During the quarter ended June 30, 2004 revenue was $(92,100) directly due to a significant credit memo and refund of $149,500 to a customer and only $57,400 of revenue generated in the quarter. This refund was a voluntary buy back of material and not a contractual obligation.

14

<PAGE>

## 11. PROPOSED ACQUISITIONS

Gitto|Global Compounding Operations

The Company, in March 2004, entered into an Asset Purchase Agreement with Gitto|Global Corporation ("Gitto") and its shareholders and an affiliate of Gitto pursuant to which the Company agreed to purchase certain assets used in, and comprising, Gitto's compounding division for aggregate consideration of approximately $51 million consisting of cash and assumption of certain liabilities. Completion of the purchase transaction is subject to satisfactory completion of due diligence, delivery of certain schedules, satisfaction of various terms and conditions, successful completion of an audit of Gitto's financial statements and the Company's securing financing in the full amount of the purchase price. The Agreement has been amended on multiple occasions to extend the closing date from May 31, 2004 to September 15, 2004.

In July 2004, the Company issued and deposited in escrow 3,000,000 shares of its common stock for the benefit of Gitto in full satisfaction of its obligation to deposit $2 million pursuant to the Asset Purchase Agreement. The shares deposited in escrow were pledged to satisfy certain banking requirements of Gitto and subject to Gitto's agreement to deposit in escrow a note payable to the Company in the amount of $2.25 million to be delivered to the Company in the event the shares are not returned to the Company.

On August 27, 2004, the Company notified Gitto Global Corporation of its election to terminate the Asset Purchase Agreement pursuant to the Company's rights under the Agreement. In conjunction with the termination of the Gitto Asset Purchase Agreement, the Company made demand for the return of 3,000,000 shares of its common stock issued in escrow for the benefit of Gitto or, in the event Gitto fails to deliver the shares, the delivery of a subordinated promissory note in the amount of $2,250,000 deposited by Gitto in escrow for delivery in the event the shares are not returned.

Indian Hill Processing Facility

In April 2004, we entered into an agreement to acquire from Indian Hill Processing, LLC, the Indian Hill Processing Facility for $864,000, of which $464,000 is payable at closing with the balance accruing interest at 10% per annum and payable in monthly payment of $30,000 subject to acceleration in the

event of receipt of funding to the pay the balance. Commencement of operation of the Indian Hill Processing Facility will require the purchase and installation of processing equipment at an estimated cost of $1,250,000. Acquisition and installation of equipment and commencement of operation of the Indian Hill Processing Facility is not expected to occur for a number of months and the closing may be delayed until 2005.

## 12. SUBSEQUENT EVENTS

In July 2004 Michael Handelman was hired to be the Chief Financial Officer. As part of his compensation package options to purchase 50,000 shares were granted under the 2004 Option Plan. The options vest over three years

In July 2004, the Company entered into a convertible debenture agreement for receipt of $300,000. As part of the transaction, the Company issued 525,000 to the note holder. The note calls for an interest rate of 8% per annum, with all interest and principal due October 12, 2004.

In June 2004 Gary Denman was appointed to the Board of Directors of the Company. Dr. Denman is currently a private consultant working with Defense-related companies and agencies. Dr. Denman is a member of the AT&T Government Markets Advisory Board and a Member of the Air Force Scientific Advisory Board. Prior to these affiliations, Dr. Denman was President and Chief Executive Officer of GRC International, Inc. (GRCI) and a Director of GRCI. Dr. Denman joined GRCI as a Senior Vice President in 1995 and became Chief Operating Officer in 1997. Dr. Denman was also a member of the board of directors of Southern Research Institute. He was awarded options to purchase 60,000 shares and is fully vested.

In August 2004, the Company received a loan of $250,000 from an unaffiliated third party. The terms of the note are still being negotiated. In connection with the loan, the Company will issue 25, 000 shares as a broker fee to a third party.

15

<PAGE>

On August 26, 2004, Jess Rae Booth advised the Company's directors that he would be resigning as Chairman and Chief Executive Officer effective on the earlier of December 15, 2004 or the hiring of a successor Chief Executive Officer.

## 13. Restatement

Restatement Of The Three-Month and Six-Month Periods Ended June 30, 2004

The financial statements for the three-month and six-month periods ended June 30, 2004 have been restated to include an accrued liability for general and administrative expense. Additionally, the company corrected the presentation of related party advances from accounts payable and accrued expenses to prominently disclose as a separate line item on the balance sheet. The effect of these changes to the June 30, 2004 financial statements are as follows:

<TABLE>
<CAPTION>

| Statement of Operations: | For the Three Months Ended June 30, 2004 | | |
|---|---|---|---|
| | Reported | Adjustments | Restated |
| <S> | <C> | <C> | <C> |
| Net Loss | $ (3,263,930) | $ (111,456) | $(3,375,386) |
| Basic and diluted loss per share | $ (0.02) | | $ (0.02) |
| Basic and diluted loss per share | $ (0.02) | | $ (0.02) |

<CAPTION>

| Statement of Operations: | For the Six Months Ended June 30, 2004 | | |
|---|---|---|---|
| | Reported | Adjustments | Restated |
| <S> | <C> | <C> | <C> |
| Net Loss | $ 5,754,234) | $ (111,456) | $(5,865,690) |
| Basic and diluted loss per share | $ (0.04) | | $ (0.04) |
| Basic and diluted loss per share | $ (0.04) | | $ (0.04) |

<CAPTION>

| Statement of Operations: | June 30, 2004 | | |
|---|---|---|---|
| | Reported | Adjustments | Restated |
| <S> | <C> | <C> | <C> |
| Accounts payable and accrued expenses | $ 3,176,820 | $ (1,020,037) | $ 2,156,783 |
| Advances from related parties | $ 0 | 1,131,492 | $ 1,131,492 |
| Stockholders' deficit | $ (9,726,121) | (111,456) | $(9,837,577) |

</TABLE>

16

<PAGE>

ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

This Form 10-QSB quarterly report of VitroTech Corporation (the "Company") for the six months ended June 30, 2004, contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, which are intended to be covered by the safe harbors created thereby. To the extent that there are statements that are not recitations of historical fact, such statements constitute forward-looking statements that, by definition, involve risks and uncertainties. In any forward-looking statement, where the Company expresses an expectation or belief as to future results or events, such expectation or belief is expressed in good faith and believed to have a reasonable basis, but there can be no assurance that the statement of expectation or belief will be achieved or accomplished.

Certain factors that could cause actual results or events to differ materially from those anticipated are set forth in our Form 8-K/A for the year ended December 31, 2003 under the caption "Risk Factors That May Affect Future Results" within "Management's Discussion and Analysis or Plan of Operations" and elsewhere herein and in our other reports filed from time to time with the Securities and Exchange Commission.

Readers are cautioned not to place undue reliance on the forward-looking statements contained herein, which speak only as of the date hereof. The Company believes the information contained in this Form 10-QSB to be accurate as of the date hereof. Changes may occur after that date, and the Company will not update that information except as required by law in the normal course of its public disclosure practices.

Additionally, the following discussion regarding the Company's financial condition and results of operations should be read in conjunction with the financial statements and related notes contained in Item 1 of Part 1 of this Form 10-QSB, as well as the financial statements in Item 7 of Part II of the Company's Form 10-KSB for the fiscal year ended December 31, 2003 and the financial statements filed with the Company's Form 8-K/A, Amendment No. 2, dated February 3, 2004, as amended May 3, 2004, as well as the Company's quarterly report Form 10-QSB for the quarter ended March 31, 2004.

OVERVIEW

On February 3, 2004, we completed a reverse merger (the "Exchange") pursuant to which Star Computing Limited acquired 100% of the stock of VitroCo, Inc. and VitroTech Corporation in exchange for shares of common stock representing approximately 85.7% of our common stock. Following the Exchange, and through June 30, 2004, we (1) assumed as our principal plan of operations the business of VitroCo, (2) terminated the prior operations of Star Computing, (3) changed our name from Star Computing Limited to VitroTech Corporation, (4) carried out a 4-for-1 stock split, (5) sold, for $2 million, 5,333,332 shares of our common stock (after giving effect to the stock split) and 5,333,332 common stock purchase warrants exercisable at $0.75 per share (after giving effect to the stock split), and (6) issued 2,343,333 shares of common stock for $1,757,500 pursuant to the exercise of warrants.

The Exchange has been accounted for as a recapitalization of Star with VitroCo as the acquirer (a "reverse acquisition"). On this basis, subsequent to the Exchange and going forward, the historical financial statements presented herein, prior to the Exchange on February 3, 2004, are those of VitroCo and the historical shareholders' equity, as of February 3, 2004, have been presented to reflect the equivalent number of shares issued in the Exchange.

Readers should review the "Plan of Operations" discussion in the "Management's Discussion and Analysis or Plan of Operation" in our Form 10-KSB for the year ended December 31, 2003 for an overview of our principal revenue sources and principal operating expenses and factors effecting our revenues and expenses.

During the first half of 2004, we implemented the Plan of Operations described in our Form 10-KSB. We also devoted substantial management time and financial resources to consummation of the Exchange, capital raising efforts, investor relations programs, implementation of policies, procedures and systems designed to facilitate our functioning as a publicly held company, establishing of expanded distribution channels and evaluation of various acquisition strategies with the intent of enhancing our production and distribution capabilities. We also continued our ongoing efforts to close on the acquisition of rights relating to the Mineral on the Valley Springs Property. Pursuant to those efforts, our counsel has advised that the primary term of the agreement to acquire the Mineral on the Valley Springs Property had expired and that any party thereto could terminate the agreement. Notwithstanding the lapse of the term to close, the parties continue to pursue the transaction and we continue to believe that we will secure the rights with respect to the Valley Springs Property on the terms described in our Form 8-K/A.

17

<PAGE>

All of the undertakings described above resulted in our experiencing substantially higher operating expenses and reduced focus on sales during the six months ended June 30, 2004 as compared to the same period in 2003.

CRITICAL ACCOUNTING POLICIES

The Company's discussion and analysis of its financial condition and results of operations are based upon the Company's financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The Company believes certain critical accounting policies affect its more significant judgments and estimates used in the preparation of its financial statements. The following describes the critical accounting policies used in reporting our financial condition and results of operations.

Revenue Recognition - We recognize revenue upon shipment of mineral products to customers, provided that the other conditions of sale as established by the Securities and Exchange Commission's Staff Accounting Bulletin ("SAB") No. 104 are satisfied:

- o    Persuasive evidence of an arrangement exists,

- o    Delivery has occurred, upon shipment when title passes, or services have been rendered,

- o    The seller's price to the buyer is fixed or determinable, and

- o    Collectibility is reasonably assured.

We evaluated reporting revenue in accordance with EITF 99-19 and determined that it was appropriate to report revenue on a gross basis (versus net basis) because we act as a principal in sales transactions and, among other factors:

- o    are the primary obligor in the arrangement

- o    have latitude in establishing price

- o    determine the product specifications, and

- o    significantly change the product

Cost of Materials - Cost of materials, which consists of mining, processing and transportation costs, is stated at cost. We incur all costs associated with the mining, processing and transportation of the Mineral from the time the Mineral is removed from the earth through all processing and warehousing. The mineral products are shipped FOB warehouse to customers. The actual acquisition cost of the Mineral is recorded as cost of goods sold and as a payable when the product is shipped, but is not due to be paid to the affiliates until after the sale proceeds are collected from our customers. Mineral inventory held for sale is, in fact, consigned raw mineral inventory owned by our affiliates that has been mined, processed and transported at our sole expense. The cost of the acquisition of the consigned raw mineral inventory is not recorded in the accompanying financial statements until we have sold the material to the customer. We had capitalized $1,245,758 of costs as June 30, 2004 associated with the consigned inventory, excluding the cost of acquisition of the Mineral. The amount of costs above that are associated with finished goods totaled $978,387 as of June 30, 2004. The remaining costs were associated with "in process" consigned inventory.

We evaluate our cost of material periodically to determine if there is any impairment in the value of such material costs. If an impairment is found to exist, we reduce the carrying amount of the cost of material to an amount determined to be market value. We review a number of factors in evaluating potential impairment of our cost of material including market prices and our ability to recover the cost of materials through the sale of Mineral. As of June 30, 2004, we determined that no impairment had occurred with respect to our cost of materials.

Impairment of Long-Lived Assets - We review all long-lived assets on a regular basis to determine if there has been an impairment in the value of those assets. If, upon review, it is determined that the carrying value of those assets may not be recoverable, we will record a charge to earnings and reduce the value of the asset on the balance sheet to the amount determined to be recoverable.

For purposes of evaluating recoverability of long-lived assets, the recoverability test is performed using undiscounted cash flows of the individual assets compared to the related carrying value. If the undiscounted operating income is less than the carrying value, the amount of the impairment, if any, will be determined by comparing the carrying value of each asset with its fair value. Fair value is generally based on a discounted cash flow analysis.

Based on our review of our long-lived assets, during the six months ended June 30, 2004, we recorded no impairments of our long-lived assets.

18

<PAGE>

Valuation of Accounts Receivable - We review all of our accounts receivable on a regular basis to determine the collectability of each account based on age,

response to collection efforts, and other factors. We establish a reserve for those accounts where collection seems doubtful. If a determination is made that the customer will definitely not pay, the amount is written off against the reserve.

Based on our review at June 30, 2004, the current reserve for uncollectible accounts receivable is adequate.

RESULTS OF OPERATIONS

The condensed consolidated financial statements of VitroTech as of June 30, 2004 include the accounts of the Company and its wholly-owned subsidiaries VitroCo, VitroTech Delaware and VitroCo Processing Incorporated ("VitroCo Processing"). VitroTech Delaware was incorporated on September 10, 2003, and had only minimal operations to date. VitroCo Processing was incorporated in Nevada on March 22, 2004, and had no operations. All significant inter-company accounts and transactions have been eliminated in consolidation. The June 30, 2003 financial statements reflect the operating results of certain assets and operations of Hi-Tech Environmental Products, LLC which were acquired by VitroCo in contemplation of the Exchange.

Revenue. Revenue for the six months ended June 30, 2004 was $133,770, a decrease of $1,638,355, or 92.5%, compared with $1,772,125 during the same period in the prior year. The reduction in revenues for the period was principally attributable to (1) the development and implementation of a revised sales and marketing strategy during the period and (2) a reduced focus on end-user sales to small and medium sized customers during the current period. For the quarter ended June 30, 2004, revenue was $(92,100) down $985,961 from the same quarter ended June 30, 2003 of $893,861 or 110.3%. The negative revenue for the quarter ended June 30, 2004 was directly due to a credit memo and refund of $149,500 which was only offset by $57,400 of revenue generated in the quarter.

The revised sales and marketing strategy developed during the quarter is designed to focus our efforts on three clearly defined channels, consisting of application specific sales, joint venture/strategic partnerships and acquisitions. Application specific sales entails identification of certain product applications and industries where we have developed a data base of proven performance enhancement and hiring a team of professionals with experience in the target industry to target potential customers operating in those target applications and industries. Joint venture/strategic partnership sales entails the establishment of joint venture or partnership relationships with key suppliers to the plastics industry, including resin manufacturers, masterbatchers and specialty compounders, to develop performance products in partnership with those suppliers wherein our product is added "up stream" of the end-users at the resin manufacturing stage, masterbatch production stage or compounding stage. Acquisitions entail identification and planned acquisition of companies operating within the plastics industry where we can gain customers, capabilities and distribution channels and enhance profitability by introduction of our products in the acquired businesses' operations. While the development and implementation of our revised sales and marketing strategy is expected to require more time and entail greater expense than maintaining our prior direct sales model, which transition was a substantial cause of our decline in sales for the quarter, we believe that our revised strategy will better position us to gain broad market acceptance, grow sustainable recurring sales and service customers.

The change in focus on sales during the period reflected the investment of substantial time, money and resources by our sales and marketing team in development and ongoing implementation of the revised sales and marketing strategy and the devotion of substantial management and financial resources to completion of the Exchange, capital raising efforts and implementation of procedures and processes to facilitate functioning as a publicly held company and to facilitate anticipated growth.

Cost of Sales and Gross Margins. Cost of goods sold totaled $112,794 during the current period as compared to $666,154 during the same period in 2003, a decrease of 83.1%. Cost of goods sold during the current period included $61,594 of direct cost of mineral and $51,200 of processing and related costs. Cost of goods sold during the same period in 2003 included $266,885 of direct cost of mineral and $399,269 of processing and related costs. Cost of goods sold as a percentage of sales was 84.3% during the current period as compared to 37.6% in the 2003 period. The decline in cost of goods sold was attributable to the reduction in sales volume during the period. The increase in cost of goods sold as a percentage of sales was partially attributable to the payment of a higher per pound price for mineral during 2004 compared to 2003. Under the terms of our mineral purchase agreements, we paid $0.75 per pound for mineral mined and sold during 2003. During 2004, we paid $0.875 per pound for mineral. Additionally,

19

<PAGE>

the reduced gross margin percentage in 2004 reflects a change in the product mix and the associated cost of manufacturing the product. As a result of this change in product focus, our target gross margin percentage is 48% in future periods. For the quarter ended June 30, 2004, Cost of Goods Sold was $3,298 as compared to $375,087 for the same period ended June 30, 2003, a reduction of $371,789 or 99.12%, directly caused by the reduction in sales for the quarter.

The decrease in sales combined with the increase in our per pound cost of materials resulted in a reduction in our gross margins from $1,105,971 in the

2003 period to $20,977 during the six months ended June 30, 2004.

Selling, General and Administrative Expense. Selling, general and administrative expenses ("SG&A") increased to $5,125,985 in the six months ended June 30, 2004, compared with $2,942,782 in the prior year, an increase of 74.2%. The increase in SG&A is primarily attributable to costs associated with business development (consulting fees, sales staffing and travel), legal and accounting fees associated with the reverse merger, investor relations programs associated with becoming a public company and costs associated with implementation of our revised sales and marketing strategy, including investigation, due diligence and other costs associated with identification of acquisition candidates. Additionally during 2004, we began paying a royalty of $1.00 per pound of mineral sold and collected to Hi-Tech Environmental Products. Hi-Tech royalties totaled $42,740 during the quarter. For the quarter ended June 30, 2004 SG&A was $2,861,847 as compared to $1,831,190 for the same period ended June 30, 2003, an increase of $1,030,657 or 56.3%

Research and Development Expense. Research and development expense for the six months ended June 30, 2004 was $127,516, compared with $259,665 for the same period in the prior year, a decrease of 49.1%. The higher R&D expense in the prior year reflected payments to universities for product research that has been completed. For the quarter ended June 30, 2004, R&D was $83,887 as compared to $106,994 for the same period ended June 30, 2003,a reduction of $23,107 or 21.6%

Interest Expense. Interest expense decreased $361,764, or 44.8% in the first six months of 2004 compared to the same period in 2003. Notes payable totaled $7,871,659 and $9,675,604 at June 30, 2004 and 2003, respectively. The decrease in interest expense reflects the decrease in notes payable as a result of debt conversions to equity and assumption of notes payable for equity. For the quarter ended June 30, 2004, interest was $240,036 as compared to $430,861 for the same period ended June 30, 2003,a reduction of $190,285 or 44.3%

FINANCIAL CONDITION

Liquidity and Capital Resources. At June 30, 2004, we had a cash overdraft of $61,380 and a working capital deficit of $8,581,165 as compared to a pro forma cash balance of $303,292 and a pro forma working capital deficit of $7,515,964 at December 31, 2003.

As discussed in the footnotes to the financial statements included herewith and in the financial statements included in our Form 8-K/A dated May 3, 2004 and Form 10-QSB for the quarter ended March 31, 2004 our losses, negative cash flows from operations and negative working capital raise substantial doubt about our ability to continue as a going concern.

In view of the matters described in the preceding paragraph, our continued operations are dependent upon our ability to raise capital and generate positive cash flows from operations. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or amounts and classifications of liabilities that might be necessary should we be unable to continue our existence.

    o      During the six months ended June 30, 2004, we issued 5,333,332 shares in a private placement for $2,000,000, before fees of $8,194 and we issued 2,343,333 shares of common stock upon the exercise of warrants, for proceeds of $1,757,500

20

<PAGE>

In order to support our operations and capital commitments through December 31, 2004, we estimate that we will require $9,500,000 from operating cash flow, infusions of additional equity or debt or other sources. Additionally, we will likely require substantial additional capital to support the acquisition component of our revised sales and marketing strategy. We are continuing in our efforts to secure the necessary capital to support our operations and our acquisition strategy. In order to facilitate our capital raising efforts we have engaged, and expect to engage in the future, investment banking firms and financial advisors to assist in the evaluation and financing of our operations and prospective acquisitions. We presently have no firm commitments from third parties to provide such financing and there can be no assurance that we will receive such financing. Should we be unable to secure needed financing we may be unable to fully implement our planned operations and acquisitions, we may be required to curtail our operations in part or in whole.

Notes Payable. At June 30, 2004, our notes payable totaled $7,871,659, of which $5,934,659 represented current maturities reflected in our working capital deficit. $608,468 of those notes payable were in default at June 30, 2004. The balance of the notes, in the amount of $1,937,000, mature December 31, 2005, but may be extended by the Company to December 31, 2006.

Capital Expenditures and Commitments. We periodically purchase equipment and related items to support operations. During the quarter ended June 30, 2004, we purchased $33,612 of equipment. In addition to our needs for capital to support operations and routine capital expenditure requirements, we require capital to fund our proposed acquisition of, and commencement of processing operations at, the Indian Hill Processing Facility. Completion of the proposed acquisition of the Indian Hill Processing Facility will require a cash payment at closing of $464,000. The balance of the purchase price, in the amount of $400,000, will bear interest at 10% per annum and will be payable in monthly installments of

$30,000, subject to mandatory prepayment to the extent that we secure additional capital. Commencement of operation of the Indian Hill Processing Facility will require the purchase and installation of processing equipment at an estimated cost of $1,250,000. Acquisition and installation of equipment and commencement of operation of the Indian Hill Processing Facility is not expected to occur for a number of months and the closing may be delayed until 2005.

The Company, in March 2004, entered into an Asset Purchase Agreement with Gitto Global Corporation ("Gitto") and its shareholders and an affiliate of Gitto pursuant to which the Company agreed to purchase certain assets used in, and comprising, Gitto's compounding division for aggregate consideration of approximately $51 million consisting of cash and assumption of certain liabilities. Completion of the purchase transaction is subject to satisfactory completion of due diligence, delivery of certain schedules, satisfaction of various terms and conditions, successful completion of an audit of Gitto's financial statements and the Company's securing financing in the full amount of the purchase price. The Agreement has been amended on multiple occasions to extend the closing date from May 31, 2004 to September 15, 2004.
In July 2004, the Company issued and deposited in escrow 3,000,000 shares of its common stock for the benefit of Gitto in full satisfaction of its obligation to deposit $2 million pursuant to the Asset Purchase Agreement. The shares deposited in escrow were pledged to satisfy certain banking requirements of Gitto and subject to Gitto's agreement to deposit in escrow a note payable to the Company in the amount of $2.25 million to be delivered to the Company in the event the shares are not returned to the Company.

On August 27, 2004, the Company notified Gitto Global Corporation of its election to terminate the Asset Purchase Agreement pursuant to the Company's rights under the Agreement. In conjunction with the termination of the Gitto Asset Purchase Agreement, the Company made demand for the return of 3,000,000 shares of its common stock issued in escrow for the benefit of Gitto or, in the event Gitto fails to deliver the shares, the delivery of a subordinated promissory note in the amount of $2,250,000 deposited by Gitto in escrow for delivery in the event the shares are not returned.

Operating Leases. At June 30, 2004, we, and our subsidiaries, were obligated under leases covering our executive offices, warehouses and other facilities. Such leases contain minimum rent provisions which provided for the payment of minimum aggregate annual rental payments of approximately $293,882 in 2004.

Contractual Obligations. Our only material contractual obligations requiring determinable future payments on our part are various notes payable and our leases relating to our executive offices and other facilities, each of which is described above.

OFF-BALANCE SHEET ARRANGEMENTS

We had no off-balance sheet arrangements or guarantees of third party obligations at June 30, 2004.

21

<PAGE>

INFLATION

We believe that inflation has not had a significant impact on our operations since inception.

ITEM 3.   CONTROLS AND PROCEDURES

We maintain disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e) and 15d-15(e)) that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding the required disclosure.

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by SEC Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report.

Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding the required disclosure.

Subsequent to filing our original report, our independent accountants,

Stonefield Josephson, Inc., reported to management and the Audit Committee that they had not completed their review procedures with respect to the report and that certain payroll tax liabilities had not been properly accrued. Stonefield Josephson also advised management and the Audit Committee that it considered this situation to be a material weakness. In response to the report of our independent accountants, our management determined to restate our consolidated financial statements as of and for the quarter and six months ended June 30, 2004, to properly record the underaccrued payroll tax liability.

In conjunction with the decision to restate our financial statements, management re-evaluated our disclosure controls and procedures with respect to proper payroll tax liability accrual and proper authorizations to be obtained and procedures to be followed in connection with filing of reports with the SEC. Subsequent to June 30, 2004, we took steps to identify, rectify and prevent the recurrence of the circumstances that resulted in our underaccrual of payroll tax liability and inadvertent filing of the Form 10-QSB prior to completion of the outside accountant's review, including establishment of new procedures designed to avoid a recurrence, education of accounting and management personnel and increasing emphasis on process compliance. We believe these enhancements to our system of internal controls and our disclosure controls and procedures will be adequate to provide reasonable assurance that the control objectives will be met.

PART II - OTHER INFORMATION

ITEM 2.  CHANGES IN SECURITIES

Sales of Unregistered Securities

22

<PAGE>

In April 2004, we issued an aggregate of 2,343,333 shares of common stock to accredited investors upon the exercise of outstanding warrants for which we received $1,757,500 in exercise proceeds.

The issuance of all shares of our common stock and warrants described above was pursuant to the exemption from registration provided by Section 4(2) of the Securities Act of 1933, as amended and related state private offering exemptions. All of the investors were Accredited Investors as defined in the Securities Act who took their shares for investment purposes without a view to distribution and had access to information concerning the Company and our business prospects, as required by the Securities Act.

In addition, there was no general solicitation or advertising for the purchase of our shares. All certificates for our shares contain a restrictive legend. Finally, our stock transfer agent has been instructed not to transfer any of such shares, unless such shares are registered for resale or there is an exemption with respect to their transfer.

No commissions were paid in connection with the issuances described above.

ITEM 3.  DEFAULTS UPON SENIOR SECURITIES

We are in default on $608,428 of original principal on our 9/1/99 private offering promissory notes. These notes were due and payable on December 31, 2002. We are required to make ongoing interest payments under the same terms and conditions as the original notes. The required interest has been paid or accrued through June 30, 2004.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The Company had obtained the written consent of a majority of its stockholders of record as of April 15, 2004 to approve an amendment to the Company's Articles of Incorporation to authorize the issuance of up to 50,000,000 shares of Preferred Stock.

In April of 2004, the Company's Board of Directors adopted and approved, and by means of the Written Consent the shareholders adopted and approved, a stock option plan for the Company, the VitroTech Corporation 2004 Stock Option Plan (the "2004 Option Plan"), under which stock options awards may be made to employees, directors and consultants of the Company.

ITEM 5.  OTHER INFORMATION

On August 26, 2004, Jess Rae Booth advised the Company's directors that he would be resigning as Chairman and Chief Executive Officer effective on the earlier of December 15, 2004 or the hiring of a successor Chief Executive Officer.

On August 27, 2004, the Company notified Gitto|Global Corporation of its election to terminate the Asset Purchase Agreement pursuant to the Company's rights under the Agreement. In conjunction with the termination of the Gitto Asset Purchase Agreement, the Company made demand for the return of 3,000,000 shares of its common stock issued in escrow for the benefit of Gitto or, in the event Gitto fails to deliver the shares, the delivery of a subordinated promissory note in the amount of $2,250,000 deposited by Gitto in escrow for delivery in the event the shares are not returned.

ITEM 6.  EXHIBITS AND REPORTS ON FORM 8-K

(a)          Exhibits

```
<TABLE>
<CAPTION>
       Exhibit No.                          Description
     ---------------    --------------------------------------------------------------
<S>                     <C>
       10.1             Asset Purchase Agreement, dated March 31, 2004,
                        between VitroTech Corporation, Gitto Global
                        Corporation, Gary Gitto, Frank Miller and Charles
                        Gitto.
       10.2             First Amendment, dated May 27, 2004, to Gitto Asset Purchase Agreement
       10.3             Second Amendment, dated July 9, 2004, to Gitto Asset Purchase Agreement
       10.4             Third Amendment, dated July 28, 2004, to Gitto Asset Purchase Agreement.
       10.5             Fourth Amendment, dated August 12, 2004, to Gitto Asset Purchase Agreement
       31.1             Section 302 Certification of CEO
       31.2             Section 302 Certification of CFO
       32               Section 906 Certifications
</TABLE>
```

(b) Reports on Form 8-K

  None

                                     23

<PAGE>


                                SIGNATURES


In accordance with the requirements of the Exchange Act, the registrant caused
this report to be signed on its behalf by the undersigned, thereunto duly
authorized.


Date: August 27, 2004              VITROTECH CORPORATION

                                   By: /s/ Jess Rae Booth
                                   Jess Rae Booth
                                   President and CEO


                                   By: /s/ Michael Handelman
                                   Michael D. Handelman
                                   Chief Financial Officer


                                     24


</TEXT>
</DOCUMENT>

**EXHIBIT 29**



**Bank of America**
**Merrill Lynch**

Bank of America, N.A.

February 11, 2011

Hon. F. Dennis Saylor, IV
Harold D. Donohue Federal Building & Courthouse
595 Main Street
Worcester, MA 01608

Re:    <u>Frank Miller</u>

Dear Judge Saylor:

At the request of legal counsel for Frank Miller, and in advance of the upcoming sentencing of Mr. Miller, I write to inform the Court of the cooperation and assistance that Mr. Miller furnished to Bank of America, N.A., as successor by merger to LaSalle Business Credit, LLC (the "Bank"). The Bank is providing this letter pursuant to a Settlement Agreement it entered into with Mr. Miller, a copy of which his attached.

As you may know, after the fraudulent scheme at Gitto Global was discovered in or around September of 2004, the Bank initiated a series of lawsuits to protect its interests, including: (a) *LaSalle Business Credit LLC v. Gary C. Gitto, et al.*, Docket No. 04-12227-DPW (D. Mass.) (the "Gitto Lawsuit"); and (b) *LaSalle Business Credit LLC v. Vitrotech Corp., et al.*, Docket No. 05-12150-DPW (D. Mass.) (the "Booth Lawsuit").

Mr. Miller furnished assistance to the Bank in both of those lawsuits. I did not have any interactions directly with Mr. Miller or his counsel; those matters were handled by the Bank's outside counsel, including its lead outside lawyers on these matters, Eric S. Rein. I have spoken with Mr. Rein about Mr. Miller's cooperation and reviewed documents that reflect some of what Mr. Miller did. Based on those discussions and my review of those documents, I can confirm that Mr. Miller did assist the Bank in the following ways:

- Shared a substantial number of documents with the Bank (over 10 Banker's boxes) at or around the outset of the litigation on a voluntary basis, without requiring the Bank to make formal discovery requests and without raising other objections;

- Suggested additional facts witnesses for depositions in the Gitto Global Lawsuit and encouraged those individuals to cooperate with the Bank;

- Reviewed deposition testimony from witnesses in both Lawsuits, and provided specific information to rebut testimony from witnesses, including additional documents that Mr. Miller located and furnished to the Bank's outside counsel;



♻ Recycled Paper



**Bank of America**
**Merrill Lynch**

Bank of America, N.A.

Hon. F. Dennis Saylor
February 11, 2011
Page 2 of 2

- Furnished additional information by submitting to an telephone interview by our outside counsel on July 20, 2006, wherein Mr. Miller provided additional details relating to the Bank's then-recently filed complaint in the Booth Lawsuit and potential liability of others;

- Agreed to the Bank's request to submit to a deposition the Booth Lawsuit without invoking constitutional rights against testifying; and

- Provided sworn deposition testimony in the Booth Lawsuit on April 2, 2009, answering all questions put to him during the deposition.

On the Bank's behalf, I request that the Court consider Mr. Miller's cooperation and assistance in sentencing him.

Please feel free to contact me if you need more information about any of this.

Very truly yours,

Thomas G. Hirsh
Assistant General Counsel

cc:   Michael B. Galvin, Esq.



# EXHIBIT 30

MEMORANDUM

**TO:**    Substantial Assistance Committee
           U.S. Attorney's Office, District of Massachusetts

**FROM:**  Thomas E. Dwyer, Jr., Esq.
           Michael B. Galvin, Esq.

**DATE:**  February 15, 2011

**RE:**    United States v. Frank Miller, *et al.*
           Dkt No. 08-40026-FDS (D. Mass.)

## I.   Introduction

We submit this memorandum and the attached supporting materials to explain how our client, Frank Miller, has provided substantial assistance within the meaning of U.S.S.G. § 5K1.1, and thus is entitled to a departure under that provision. To the extent that additional information is needed, please let us know and we will furnish it promptly.

Miller has earned credit for substantial assistance. Miller's assistance has included:

- Being "first in" by initially bringing this entire matter to the attention of law enforcement in mid-September of 2004 – within just days after efforts to sell the company (and avoid the loss) broke down and four years before indictments were returned and six years before other key individuals offered began "cooperating;"

- Preserving documents and materials – hard copies of numerous documents, imaging key individual's computer hard drives – during risky late-night copying sessions during the company's final days when others were actively concealing or destroying documents to ensure that criminally culpable individuals did not avoid prosecution;

- At the very outset, furnishing authorities with an "insider's view" of what your Office has characterized as a highly complex case, which benefitted your Office in many ways, including a more complete understanding of how the scheme operated and identifying several additional facts witnesses who could have given testimony that rebutted the expected defenses of other defendants;

- Meeting with the AUSA assigned to this matter and investigating agents not just at the outset, but also repeatedly during the course of the investigation, and thereby furnishing additional information and documents upon request of authorities that we feel contributed significantly to the decision to bring charges against at least one criminally-culpable individual; and

> • Encouraging others to fully and truthfully share whatever information they knew about the scheme with law enforcement by telling family members and friends to do so, giving the names and addresses of other witnesses who furnished useful information, voluntarily waiving the underlying attorney-client privilege and publicizing his cooperation with law enforcement.

The memorandum is organized as follows. First, we briefly describe the legal standard for substantial assistance credit. Second, we describe in detail how Miller has complied with each of the five factors listed in § 5K1.1, explaining how Miller's assistance in this case was useful, significant reliable, timely and not without risk to him and his family. Third, we explain why it is not appropriate to deny Miller substantial assistance credit for the reason that AUSA Holik has given to us – that Miller is more culpable than other defendants. Because that has nothing to do with Miller's cooperation against others, and is instead aimed at manipulating the length of Miller's sentence, we do not believe that is a valid or appropriate basis to deny Miller substantial assistance credit. Even if it is an appropriate consideration, we do not think it should be relied on where Miller was not more culpable than Charles N. Gitto, Jr. or Gary Gitto, both of whom took substantially more money from the company than Miller did. Finally, even if the Committee has reservations about aspects of Miller's assistance, the proper way to address that in these circumstances is to recommend a smaller § 5K1.1 departure for him – something that can easily be done here given Miller has an Offense Level of 32 (121 to 151 months) and is facing a very lengthy sentence in any event.

## II.    Substantial Assistance Under U.S.S.G. § 5K1.1

U.S.S.G § 5K1.1 was promulgated pursuant to 28 U.S.C. § 994, whereby Congress directed that the Sentencing Commission to:

> assure that the guidelines reflect the general appropriateness of imposing a lower sentence than would otherwise be imposed ... to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.

28 U.S.C. § 994(n). The Sentencing Commission implemented that directive through § 5K1.1, which authorizes a sentencing court to depart from the guidelines based on a defendant's substantial assistance, and provides the following five factors to consider in assessing such assistance:

> (1)    the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2)    the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3)    the nature and extent of the defendant's assistance;

(4)    any injury suffered, or any danger or risk of injury to the
defendant or his family resulting from his assistance;

(5)    the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a). Although the statute is written to suggest these factors should guide the sentencing judge's discretion in how much of a departure is warranted, courts have recognized that these same factors "are instructive" for prosecutors as well in assessing a defendant's assistance. United States v. Davis, 115 F. Supp.2d 101, 106 (D. Mass. 2000) (Saris, J.). See United States v. Anonymous Defendant, 629 F.3d 68, 75 (1st Cir. 2010) (listing same factors as appropriate ones to guide § 5K1.1 assessments) Accordingly, we have organized this memorandum to explain why Miller has satisfied each of those five factors.

## III.    Miller's Substantial Assistance

### A.    Factors Nos. 1 & 3: Significance and Usefulness of Miller's Assistance / Nature and Extent of His Cooperation

#### 1.    Miller Reports the Offense to Law Enforcement

We do not believe that it is disputed that Miller brought this entire matter to the attention of this Office and law enforcement. He did that over six years ago, in mid September 2004. Given the passage of time and the substantial work your Office has performed since then, it is perhaps understandable to lose focus on how this matter originated here. However, in assessing Miller's assistance, we believe those event are worthy of careful review.

In doing so, it is helpful to view Miller's decision to report this matter in its context: your Office alleges that there was a widespread scheme perpetrated by numerous individuals inside and outside Gitto/Global Corporation, a plastics compounding business that was located in Lunenburg, MA that at times employed 70 to 80 people. The scheme, according to your Office's account, began "prior to 1998" and "grew to gigantic proportions" by 2000, by which time it "implicated virtually every department at Gitto/Global plus secretarial staff." See Gov't Version of Offense, at 1, 3. It was committed against at least five secured lenders (see Indictment, ¶¶ 11-15), one after of another of which abruptly stopped doing business with Gitto/Global, a telltale sign they too knew what was transpiring, yet failed to report the matter to law enforcement. Your Office indicted two outsiders to Gitto/Global – the firm's outside Certified Professional Accountant and another outside consultant – and conducted a sweeping investigation, which we suggest showed knowledge of the fraud by a whole host of others, including other bankers, third party investors, accountant employees, lawyers, consultants, family members and friends. For years, none of them reported anything to law enforcement. Not one word. Nothing.

Frank Miller did. In a two-hour meeting on September 17, 2004 with three representatives of this Office (AUSAs Kotlier, Holik and Bookbinder) and one representative of the Federal Bureau of Investigation (SA Grady), Miller broke the silence, confessed to the overbilling scheme that would be charged in the Indictment, implicated himself and others in that scheme, told investigators by name those who would corroborate what he was telling them and

pledged his full, complete and unwavering cooperation to law enforcement from thereon.  By bringing the matter to law enforcement, Miller not only irrevocably sealed his own fate, but also ensured the full and complete extent of the wrongdoing would invariably be investigated, exposed and prosecuted.

While we feel that we have not had a complete or final discussion yet on Miller's cooperation, AUSA Holik has suggested that Miller's decision to report this matter came too late – by then, the house of cards was about to collapse, the matter was about to be referred to law enforcement anyway.[1]  That, of course, is speculation.  It belied by at least two facts: (1) the scheme had continued for over six years prior to then; and (2) none of the many other criminally culpable individuals came forward to report the wrongdoing at this time, behavior that makes little sense if it was so clear cut that federal law enforcement was about to swoop in.

The continued silence of the many other knowledgeable insiders was instead undoubtedly influenced by their past experience, where Gitto/Global had repeatedly faced not entirely dissimilar financial problems, yet had always wiggled out of the jam by finding some other lender to become involved and thereby keeping the scheme afloat.  That is precisely the tack the Gittos were urging Miller to take in late August and early September 2004, which included a threatening voice mail from Gary Gitto to Frank Miller on September 16, 2004 telling him he'd better get back to Gitto/Global.  If Miller had not chosen the path to law enforcement, it is not at all clear that the then-current bankers at LaSalle would not have made the same choice that their predecessors apparently had; opting to extend credit and keep silent until other financing could be brought in.  That LaSalle faced even larger losses than prior lenders may have given LaSalle extra incentive to allow Gitto/Global a work out.

Rather than being without any other option, the evidence shows that Miller's decision to report this matter was directly tied to the breakdown in negotiations with Vitrotech, the California-based company that had entered into an agreement earlier in 2004 to acquire Gitto/Global for over $50 million – more than enough to repay LaSalle, Clinton Savings Bank and Gitto/Global's other creditors.  Selling the company and repaying creditors was precisely what Frank Miller and the Gittos had been advised to do by Michael Angelini, a respected attorney and long-time counsel to the Gittos and Gitto/Global, after the fraud was revealed to Angelini in mid-2002.

For many months prior to the breakdown of Vitrotech's agreement to purchase Gitto/Global, Miller had poured enormous amounts of his own time, effort and money into making the Vitrotech deal go through.  When Vitrotech definitively pulled the plug about September 10, 2004, Miller was crushed – physically spent, mentally anguished and more financially strapped than ever.  He also knew that the Gittos would insist that he continue to work with them to devise with yet another stop-gap solution to their financial problems.  Miller made the decision that he was not going to continue to do that – to stop the lying, cheating or

---

[1]  AUSA Holik has also indicated that it was the lawyers at this law firm – and not Miller – who deserve credit for reporting this matter to law enforcement.  We do not understand that, or understand how crediting lawyers would properly incentive future cooperators.  Miller was making the decisions and deserves the credit.  To the extent the point is that Miller was not sincere in his efforts to cooperate (then or subsequently), we address that point below.

stealing; not to roll this mess over to yet another lender. Miller made the decision to come clean by reporting to law enforcement what he and the others had been doing. He decided to assist.

### 2.   Miller's Preservation of Records

For days leading up to his initial meeting with law enforcement, Miller took a number of steps to ensure that documents memorializing what happened at Gitto/Global would make it to law enforcement. For example, from approximately 7 pm to 12-midnight on September 13, 2004, Frank and his wife, Maria Miller, secretly copied documents from the offices of other key Gitto/Global personnel, including Charles Gitto, Gary Gitto and their assistant, Helen Kozak, Janice Chaissen, Bill Deakin, Rita Bartlett and Nancy Gitto. Among the documents that Miller preserved were Equitech documents showing that Gary Gitto had doctored expense reports and submitted fake expenditures, which supported the separate money laundering charges that were alleged against Gary Gitto only. See Indictment, ¶¶ 47-48. Miller stayed late the very next night as well to permit a forensic computer technician to access Gitto/Global computers, who imaged half a dozen or so computer hard drives, including those utilized by Gary Gitto, Kozak, Deakin, the firm's accounting system as well as his own hard drive and his wife's hard drive. Miller informed law enforcement about the steps he had taken at the meeting on September 17th, and made all of those materials immediately available to law enforcement, producing over 23,500 pages of documents to this Office within days and offering the imaged hard drives as well.

### 3.   Risks to Miller's Personal Safety/Well Being

Miller opted to do all that despite substantial personal risks in doing so. Charles and Gary Gitto were thugs, who have criminal records that include then-recent violent physical attacks against two Leominster, MA police officers,[2] committed violent acts at Gitto/Global and nurture and relished in their associations with individuals with known criminal records. Charles and Gary had physically fought others at Gitto/Global, including fights between each other in

---

[2] See, e.g., Matt O'Brien, Plastics Executives Arrested, Sentinel & Enterprise, Dec. 9, 2003, attached at Tab A. According to newspaper reports, Leominster police officers attempted to respond to Gary Gitto's residence after a nighttime 911 hang up / domestic incident call, but were blocked from entering the residence by the then-71 year old Charles Gitto, who had threatened to "call (Police) Chief Peter Roddy" if the police dispatcher did not call off the officers. Id. Upon entering the residence to conduct a well-being check, Gary Gitto charged one of the officers "like a bull," forcing the second officer "hit [Gary] with his baton and sprayed [Gary] with pepper spray before he could subdue him." Id. (emphasis added). Charles Gitto "was screaming at police and trying to intervene" in a scene described as "utter chaos." Nonetheless, the next day, Steve Panagiotes, a lawyer who was representing them and is married to Charles Gitto's daughter, publicly blamed the police for "storm[ing] the house like a militia," and noted that the Gittos had "paid for one of the hospital wings" where one of the officers was treated for his injuries and had employed hundreds of people. Id. Sure enough, the charges against Charles and Gary Gitto were eventually continued without a finding and scheduled to be dismissed after the Gittos served a probationary period and paid restitution of over $13,000 to Leominster for lost wages of its injured officers. See Emily Young, Gittos Get Probation, Sentinel & Enterprise, Jan. 25, 2005, attached at Tab B.

their offices that were witnessed by many.[3]  Miller did not need to speculate what the Gittos might do to him if he cooperated against them – Charles and Gary had directly threatened him before, including Charles Gitto's threat to "put a bullet" in Miller's head if he did not cooperate with them until a buyer could be located during a prior financial crisis. Miller conducted the copying late at night to avoid being detected by the Gittos or other employees, and despite knowing that Charles and Gary lived not far away, frequently drove by the plant at night and might catch them.

Miller's concerns about records were well founded.  Just a day or two after the Millers swept Gitto/Global's offices making hard and electronic copies to furnish to the government, multiple Gitto/Global employees observed documents from the offices of Charles and Gary Gitto being packed into boxes, then delivered to the home of Charles Gitto and/or the office of Gary Gitto's lawyer.  The Gittos refused to produce at least most of those materials in connection with any of the parallel civil claims.  See LaSalle Business Credit, LLC v. Gary C. Gitto, et al., No. 04-cv-12227-DPW (D. Mass.) Dkt Nos. 123, 128, 136 & order dated 12/3/04 (refusing to compel production of materials from Charles and Gary Gitto, who objected that doing so would tend to incriminate them); In re. Gitto/Global Corp., No. 04-45386-JBR (Bank. D. Mass.) Dkt No. 773 (Ch. 11 Examiner stating that none of the documents delivered to Charles Gitto's residence had been returned).  As far as we know, those materials were never produced.

Miller's deep concern for the personal safety of himself, his wife and family was also reflected by his reluctance to appear personally at the U.S. Attorney's Office on September 17, 2004.  After we voiced those concerns to AUSA Kotlier, the location of the meeting was moved to our offices in order to avoid Miller being observed walking into the Courthouse.  For several nights before and after the September 17th meeting, Miller did not return to his home in Bolton, MA, instead staying in a hotel and hired private security for protection for several days.

4.   **Miller's Continued Cooperation with Law Enforcement**

---

[3]  During the investigation, Hitachi employee Kevin Boisvert told investigators that, in response to complaints about apparent kickback with Gary Gitto, his boss threatened him, including by threatening to tell Gary Gitto, who would "blackball your ass" and "have you rolled over," which Boisvert interpreted as a threat against his life.  See 4/7/05 Boisvert 302, attached at Tab C at 3. A longtime Gitto/Global employee and consultant, John Moritz, testified that "[i]t was just scary if you didn't please [Charles Gitto]," explaining that he had witnessed Charles "come to blows" both with Gary and another Gitto/Global employee. 7/28/05 John Moritz depo. at 90[14 to 17], attached at Tab D. Moritz also received a threatening voice mail from Charles Gittos after Gitto/Global went into bankruptcy because he refused "to commit fraud" on their behalf, (id. at 36[7] to 41[10]), and acknowledged that his wife was "afraid" for Moritz's safety if he cooperated with federal authorities against them. See 2/22/05 Moritz 302 Memo, attached at Tab E, ¶ 41. Finally, William Deakin testified that Gary Gitto had threatened "to kick [Deakin's] ass up and down the driveway" if he bounced another of Gary Gitto's checks, and acknowledged that he was "concerned" about Gary Gitto's reactions if Gary Gitto found out that Deakin had "told the truth" about Gary Gitto's conduct.  See 11/16/2005 Deakin depo., attached at Tab F at 481[18-24], 484[3] to 485[6].

Miller's cooperation with law enforcement did not end there. During the extensive investigation that ensued, Miller served as a resource to law enforcement, who repeatedly tapped into his knowledge and experience on a variety of topics. Miller met or spoke by conference call with the AUSA and/or investigators on this matter for four additional dates; May 24, 2005, August 1, 2006, and February 28 and 29, 2008, each of those is described in more detail below. If Miller was not assisting in these sessions, we wonder why he was called to them.

### i.   May 24, 2005

On this date, AUSA Holik and two investigators (SAs Grady and Hannon) interviewed both Frank and Maria Miller in separate sessions. Based on our communications with AUSA Holik in advance, we understood the meeting would cover: (a) legal representation of Michael Angelini and Bowditch & Dewey; (b) Gitto/Global's dealings with Vitrotech; (3) communications with other potential investors, including Alfred Arcidi, the Alpine Group, Watermill Ventures, Pear Tree; and (d) issues related to Gitto/Global's equipment. We discussed those topics with Miller in advance, and Miller was able to locate additional documents related to them, copies of which were furnished at the outset of the interview. See 5/24/05 Miller 302, attached at Tab G at 1.

As reflected in the 302, Miller furnished information on all of those topics, waiving any attorney client privilege and voluntarily sharing all of the information he had. Id. at 1.[4] Miller conveyed that he raised the issue of the Gitto Global principals taking too much money out of the company with Angelini, who attempted to counsel them against that. Gary Gitto threatened "to rip Miller's tongue out" if he complained to Angelini again about how much money was being spent. Id. at 3. At some point, they also revealed to Angelini the overstatement of receivables and inventory at the company, which caused Angelini to advise them those activities were illegal and should cease and that his firm could no longer represent Gitto/Global in connection with banking and refinancing. Id. at 3-4.

During this meeting, Miller also described in detail efforts to sell Gitto/Global to a private investors, and the discussions that were had with respect to the company's finances. In connection with potential sales, Miller told investigators that the company's financial problems were not concealed from potential investors and instead were openly discussed in meetings attended by Charles and/or Gary Gitto. Miller gave the investigators names of people who could confirm that. 5/24/05 Miller 302 at 4-8 (providing names of multiple third party investors, including ). Subsequent interviews of those individuals (at least the ones who gave truthful statements) confirmed what Miller had said. See, e.g., 1/17/06 Proctor 302, attached at Tab H, at 2 (confirming he was informed, in Charles Gitto's presence, that "$160 million in sales and twenty million in account receivables" was "BS"); 1/17/06 Karol 302, attached at Tab I, at 2

---

[4]   Miller's voluntary waiver of the privilege is yet another indicator that he was the one who was attempting to provide full and complete information to this Office. Miller's decision to waive stands in stark contrast to opposite decisions made by Charles and Gary Gitto, neither of whom agreed to do so, according to statements in public filings, which resulted in a key person who unquestionably witnessed important events at the core matters being investigated by this Office being prevented from sharing what he knew.

(confirming he was informed in Charles Gitto's presence that there were "fifteen million in false receivables"). That type of information was devastating to the Gittos' primary defense that they were not knowledgeable about the fraud,[5] and the government would not have had it but for Miller's cooperation.

### ii.   August 1, 2006

The government asked to speak with Miller again in the Summer of 2006 – a request that was prompted, at least in part, by Miller's discovery of additional documents that implicated Lou Pellegrini, Gitto/Global's outside accountant. Based on conversations that undersigned counsel had with counsel for Pellegrini and others, we understood that Pellegrini – like others – was denying liability and instead attempting to shift the blame entirely on Frank Miller. In response to that, and in response to specific requests made to undersigned counsel by counsel representing LaSalle, Miller searched an old computer that he had handed down to his daughter and located emails between him and Pellegrini, wherein Pellegrini made admissions that he understood what he was doing for Gitto/Global was wrong inasmuch as it could cost him his license as a certified public accountant. See copy of emails, attached at Tab K. Because the emails were sent from Pellegrini's personal email account to Miller's personal email account, we do not believe this Office had received those documents previously, or would have had any other way of obtaining them if Miller had not preserved and produced them, as he did so on July 18, 2006. See Galvin email to Holik, attach at Tab K.

Within days of the receipt of those additional documents, AUSA Holik asked us to schedule another meeting with Miller, which he promptly agreed to, this time by conference call since Miller was residing and working in California. The AUSA also told us that the focus of this particular session was Pellegrini and JJ Chemical Distributors, another of the sham companies used to circulate funds. See Galvin / Holik emails, Tab L.

For over an hour, Miller answered all questions on that topic put to him by AUSA Holik and two investigators (SAs Grady and Hudson) who participated in this session. Among other things, Miller explained what he thought Pellegrini knew about the use of sham companies to support the receivables fraud, including Direct Wood and JJ Chemical – that Pellegrini eventually knew about those frauds and knowingly assisted in perpetuating them, that the receivables fraud was previously operated through a prior company (Direct Wood) that was owned by Gary Gitto and had lending relationships with other banks, and that Pellegrini eventually agreed to perform a certified audit for 2003 for Gitto Global over his strong reservations after Charles or Gary Gitto threatened Pellegrini into doing so, in part by calling the loan that Gary Gitto had extended to Pellegrini. See 8/1/06 Miller 302, attached at Tab M. Miller explained that Charles and Gary Gitto had originally hired Pellegrini; that Pellegrini did not perform thorough or complete audits; and was overpaid for the accounting services he did render.

---

[5]   See Paul Burton, Examiner's Report Alleges Massive Fraud by Gitto Officials, The Deal (Nov. 11, 2005), attached at Tab J(quoting Gary Gitto's lawyer claiming "the wrongdoing was accomplished not by anyone named Gitto ... but by Frank Miller ... without the knowledge of Gary Gitto or his father, Charles").

### iii.   February 28 & 29, 2008

In late January 2008, the government requested that Miller meet with them once more. AUSA Holik asked that this meeting be conducted in person, and Miller voluntarily flew from California to Boston to attend this session. AUSA Holik told us that one of the purposes of the meeting was to further discuss Pellegrini – that her Office had not come to a conclusion about charging him – and that there would be other topics as well.

For most of the day on February 28 and a portion of the day on February 29, 2008, Miller met with AUSA Holik and two other government agents who had not participated in prior Miller meetings, Thomas Zappala, an Auditor for this Office and SA Lamoreaux. See 2/28 & 2/29/08 Miller 302, attached at Tab N. Again, Miller answered all questions put to him during a lengthy interview that covered a wide range of topics, including: (a) the decision to replace the firm's prior accountant with Pellegrini; (b) the origin of the receivables fraud and its growth over time; (c) Miller's own knowledge of, and participation in the frauds; (d) Direct Wood and the ability to increase the amount of false sales; (e) Pellegrini's suspicions of wrongdoing and Gary Gitto's insistence that he could control Pellegrini; (f) the transition of the receivables fraud from Direct Wood to JJ Chemical; (g) the equipment fraud on Wells Fargo (including Miller's knowledge of, and participation in, that wrongdoing); (h) the deception of bank auditors; (i) Guarantee Bank's apparent discovery of the fraud and decision to terminate its relationship with Gitto/Global; (j) efforts to obtain other financing and sell the company to private investors; (k) the decision to utilize Clinton Savings Bank and how they dealt with that Bank once it became suspicious of Gitto Global's dealings; and (l) Miller's insistence that he did not take Pellegrini's stationery or sign his name to the 2003 certified audit. Id.

Counsel for Miller met with and discussed the information that Miller was providing during breaks from the questioning. At no time were we informed that the information that Miller was providing was not useful or that he was not assisting the government's efforts. Indeed, prior to the start of the second day of questioning, undersigned counsel specifically raised United States v. Frank J. Russo, Dkt No. 07-cr-10127-WGY (D. Mass.), a white collar sentencing case handled by AUSA Holik earlier that week where the defendant had received a very lengthy sentence (18 years, 5 months), even though Russo had accepted responsibility, pleaded guilty and attempted to cooperate. AUSA Holik informed Galvin that the cases were not alike for several reasons, including the fact that Miller, unlike Russo, had brought this matter to the attention of law enforcement. She added that Miller, like Russo, had "a Guideline problem," but that what Miller had done, and what he could continue to do, could alleviate that.[6]

Undersigned counsel also spoke with AUSA Holik at the conclusion of the meeting on February 29th. Again, she gave no indication that she believed that anything that Miller had told her was false or that the information he had furnished was not of assistance to the government.

---

[6] To be clear, AUSA Holik did not expressly promise that the government would file a 5K1.1 motion, nor did Galvin understand that she could commit to that. What Galvin took from the discussion was that, at this date (Miller's final meeting with investigators), AUSA Holik had not concluded that Miller was not un-entitled to a substantial assistance departure, and instead if he kept doing what he had been doing, AUSA Holik would recommend one.

5.    Other Assistance to Law Enforcement

After February 29, 2008, undersigned counsel spoke from time-to-time with AUSA Holik about this matter. Among other things, we provided information showing that the Millers had put hundreds of thousand of dollars into Gitto/Global in the Summer of 2004 to pay for the completion of the Vitrotech audit and complete the sale process. We also pointed to evidence that had been previously furnished showing that while Miller was putting money into the company, the Gittos were increasing the already-substantial sums of money they had been taking from the company.

6.    The Overall Impact of Miller's Cooperation

We feel that Miller's cooperation had an enormous impact on this matter for several reasons. Miller not only brought this matter to this Office, but he also helped the government to assemble what was an overwhelming case in this complex, multi-defendant matter. Everyone who remained a defendant by the time of trial pleaded out; no one challenged the government's ability to prove the case against them beyond reasonable doubt. While that is a testament to the hard work and dedication of the staff of this Office and the law enforcement who ably assisted them, we also believe those efforts were helped in meaningful ways by Miller. He not only brought the case to this Office, but he worked as a highly knowledgeable insider to develop information in many areas – helping the government develop specific information that disproved defenses that were being asserted by other defendants and being available to testify for the government as a witness against any defendant who opted for trial.

The impact of Miller's assistance is perhaps clearest in two instances: First, with respect to the decision to charge Pellegrini, a decision we know the government wrestled with for some time. Based on our conversations with Pellegrini's counsel, and our subsequent review of the 6/7/06 Pellegrini 302, we know that Pellegrini's was telling the government a diametrically opposite version of the underlying events – that Pellegrini was unaware of the receivables fraud at Gitto Global, that he did not know the sham companies used to perpetrate that fraud were not legitimate, that he did not catch errors and oversights performed by members of his staff, and that he did not sign the FYE 2003 certified audit. As explained above, Miller provided substantial evidence that undermined Pellegrini's positions, including the e-mails sent from personal email accounts where Pellegrini admits he knew what he was doing was wrong. Without Miller, the government would not have had those emails. Nor at the time of the charging decisions were made (prior to 9/10/08) were there other witnesses who could have rebutted Pellegrini's claims as effectively as Miller – certainly, the government could not count at that time on calling Gary Gitto, who at that time was still locked in denial mode and blaming all wrongdoing on Miller.

Second, with respect to Charles and Gary Gitto, Miller furnished assistance by helping to disprove their defense that Miller – aided only by his wife – was responsible for Gitto/Global's large-scale fraud. As preposterous as that defense now seems, it was the one that they and their lawyers spun for years, even getting other fact witnesses to adopt that view. From the start, Miller insisted that was not true, and he remained available to testify against them if necessary. As also mentioned above, Miller furnished the names third party witnesses, some of whom contradicted the Gittos claims that they were uninvolved in the company's finances, and

witnesses who confirmed the problems with the inventory and receivables were discussed in the Gittos' presence. In those ways, Miller helped to kick the legs out of the Gittos' "Miller-did-it" defense.

**B.    Factor No. 2: The Truthfulness, Reliability and Completeness of Information Provided By Miller**

The information that Miller has furnished – on whole and in detail – has been truthful, reliable and complete. That is proven by the fact that basic receivables and inventory fraud charged in the Indictment was the same one that Miller described during his very first meeting with the law enforcement on September 17, 2004, where Miller disclosed:

> GITTO GLOBAL has a $27 million line of credit with LASALLE BANK in Chicago. This loan is asset based and is partially activated by the amount of the receivables due GITTO GLOBAL. *... The GITTOS and MILLER have activated this Line of Credit to the amount of $27 million dollars. The have accessed this Line of Credit in part by forming shell companies and inflating their receivables. These inflated receivable reports are either faxed of e-mailed to LASALLE BANK on an almost daily basis.*

9/17/04 Miller 302, attached at Tab O at 3 (emphasis added). Miller also disclosed the "inventory fraud" perpetrated against LaSalle, that Gitto Global's "financial statements" submitted to LaSalle "were also false," and that he "was the primary day to day contact person with [Gitto Global's] accounting department." Id. at 2, 3 & 6. Miller confessed to his own guilt in subsequent sessions:

> MILLER stated he is aware he participated in acts of deliberate fraud in the form of lying to banks for many years.

2/28 & 2/29/08 Miller 302, Tab N at 2.

As noted above, Miller never refused to answer a question put to him and remained willing to talk with law enforcement at any time. Miller also did whatever he could to get others to take that same approach, including: (a) his wife, Maria Miller, who voluntarily met with the government at least twice; (b) his brother, Martin Miller, who voluntarily met with the government once; (c) Deakin. See 10/4/04 Deakin 302, at 5 (Miller informed him "just to tell the truth" to investigators). During his meetings, Miller gave the names of many others who could assist the investigation by confirming what he told them or disproving allegations being made by Charles or Gary Gitto. See 9/17/04 Miller 302 at 6 (identifying Deakin, Bartlett, Childs, Chaisson); 5/24/05 Miller 302 at 5, 7-9 (identifying, among others, Arciti, Elbaum, Martin Miller, Karfunkel, Kennedy, Procter, Karol). Miller also waived any underlying privilege with Angelini. Id. at 1.

AUSA Holik has suggested the way Miller sometimes explains the story was difficult for her to accept completely because of his tendency to emphasize that others were to blame as well. We do not view broad blame to be inconsistent with the government's overall view that there were many, many people who were culpable. Miller firmly believes the Gittos were more

responsible than he was because, to a very large extent, it was the Gittos uncontrolled spending and insatiable need for more money that drove him and others where they routinely lied to banks, auditors and others in order keep Gitto/Global going.

At least once, AUSA Holik pointed specifically to one statement in the thirty-six page total of Miller 302s where she claims that Miller wrongly blamed Deakin for originating the receivables fraud scheme. See 2/28 & 2/29/08 Miller 302 at 1-2. Miller should not be disqualified for 5K1.1 credit based on that single statement in light of his many years of cooperation. At no point did Miller ever claim that Deakin was at fault and Miller was not for concocting all this; Miller was always clear that primary responsibility for all of the fraud fell on Charles Gitto, Gary Gitto and him. As even Deakin conceded, he did have a primary roll in the actual submission of the false borrowing base certificates. Undersigned counsel's notes and memory of Miller's point in that and other meetings with the government was that once the fraudulent scheme was begun by the Gitto/Global principals, Deakin (and others) would sometimes suggest specific ways to implement and carry out the scheme differently or more efficiently, as Deakin and others admitted during their meetings with investigators and testimony at depositions in the civil cases.

### C.   Factor No. 4:  Risk of Injury to Miller or His Family

The substantial risk to personal safety that Frank Miller faced is addressed above at pages 5-6. We additionally point out that after the collapse of Gitto Global and the public reports of Miller's cooperation with federal authorities, the Millers left their home and moved to California, in part to minimize the chance that they would have any contact with Charles Gitto, Gary Gitto or the families or friends.

### D.   Factor No. 5: Timeliness of Miller's Assistance

As noted above, Miller began cooperating within days of having the Vitrotech deal finally fall through – a sale of the company that would have permitted LaSalle, Clinton Savings and Gitto/Global's other creditor to be repaid, something that Miller's prior legal counsel had strongly recommended. Given the business had a profitable core, it was not unreasonable for Miller to pursue the sale option before bringing the matter to law enforcement and Vitrotech seemed like a serious buyer down to the very bitter end.

Since then, Miller has done everything that could reasonably be asked of him: he took immediate steps to preserve records; he met early and regularly with this Office (9/17/04, 5/24/05, 8/1/06 & 2/28 & 2/29/08); Miller searched for and located additional documents as warranted during the course of the investigation and promptly produced those materials to this Office. Miller also took a number of steps to assist LaSalle Bank, including over ten Bankers boxes of documents with them, furnishing names of additional fact witnesses to its counsel, submitting to interviews by LaSalle and waiving his right not to testify in civil litigation and testifying at LaSalle's request in the lawsuit against Vitrotech's former CEO Jess Rae Booth. LaSalle Bank (now Bank of America) has written a letter to Judge Saylor acknowledging Miller's assistance to the Bank, a copy of which is attached at Tab P.

Miller should not be shut out from substantial assistance credit based on timing where Miller's cooperation began *six years earlier* than Gary Gitto's assistance (see 6/29/10 Gary Gitto 302, attached at Tab Q), and the government apparently believes that cooperation starting at that point does not disqualify him for § 5K1.1 credit. See Gary Gitto Plea Agreement, Dkt No. 92, ¶ 9 (standard cooperation provision).

### E.     Other Factors:  Miller's Culpability

The primary reason AUSA Holik has cited for refusing to recommend § 5K1.1 credit is her belief that Miller is the most culpable of the defendants – a view she first expressed after the indictments were returned and in post-indictment plea negotiations over whether she would recommend a 5K1.1 departure.

### 1.     Culpability is Not an Appropriate Factor to Consider

Even if it were true, Miller's level of culpability is not a proper basis to withhold a § 5K1.1 departure.  Culpability is not a factor listed in U.S.S.G. § 5K1.1(a)(1)-(5); and both the language of that Guideline and the accompanying commentary make clear that "substantial assistance" credit is to be based on "the investigation or prosecution of *another person* who has committed an offense." See U.S.S.G. § 5K1.1 & comment. n.2 (emphasis added).  It is well established that, despite the "open-ended nature" of § 5K1.1's list of factors,  it is not acceptable to "consider any datum ... when passing upon a section 5K1.1 motion;" but instead the focus is properly restricted to "factors ... [that] can fairly be said to touch upon the degree, efficacy, timeliness and circumstances of a defendant's cooperation." United States v. Mariano, 983 F.2d 1150, 1156 (1st Cir. 1993). See also United States v. McVay, 447 F.3d 1348, 1355-56 (11th Cir. 2006) (holding that court committed reversible error by considering factors unrelated to defendant's assistance in evaluating departure under § 5K1.1 and citing numerous cases in support).

Moreover, denying Miller substantial assistance credit based on his "culpability" is a form of sentencing manipulation not permitted by prosecutors in deciding whether to file a § 5K1.1 motion. See Davis, 115 F. Supp.2d at 106 (Saris, J.) (recognizing that "manipulating the length of a defendant's sentence is an improper consideration when deciding whether to file a downward departure motion"); See also United States v. Stockdale, 45 F.3d 1257, 1261 (8th Cir. 1995) ("The desire to dictate the length of a defendant's sentence for reasons other than his or her substantial assistance is not a permissible basis for exercising the government's power under § 3553(e))").

### 2.     Miller is Not Most Culpable

Even if it were somehow proper to assess cooperation through culpability, AUSA Holik's assessment is wrong for several reasons. First, her claim that Miller is most blameworthy is seriously eroded by the comprehensive financial analysis of Craig R. Jalbert, CIRA of Verdolino & Lowey, P.C., a financial services firm initially hired initially by the Ch. 11 Bankruptcy Examiner and subsequently by LaSalle Bank in the parallel civil RICO case to study where LaSalle's money went from mid-2002 to September 2004. After months of study, Jalbert issued

a report in April 2006, a copy of which is attached at Tab R,[7] which concluded that Gary Gitto and Charles Gitto together took over 80% of the excess funds from Gitto/Global ($4,838,903.32), while Miller took far less – under 20% -- of the funds ($957,514.33). Id. at 6, 8 & 9. It makes no sense that Miller is more culpable – or more deserving of a longer prison sentence – for the fraud that profited the Gittos over *four times more* than Miller.

Second, we continue to have significant doubts about any of the Gittos acceptance of responsibility in this matter. In our view, the timing of Gary Gitto's plea deal and the subsequent dismissal of the charges against his father are not unrelated.[8] Those events occurred within weeks of each other – Gary Gitto changing his plea on 10/1/10; the government dismissing all charges against Charles Gitto on 11/3/10, without any contested hearing. Our view is affected by Miller's long-held belief that Charles Gitto would attempt to defend himself in this matter by claiming that he suffers from Alzheimer's disease. See 2/28 & 2/29/08 Miller 302 at 9. It is likewise affected by what we have heard from members of the Leominster community since it was publicly reported that the government was dismissing the charges against Charles Gitto. Since then, several individuals have informed us that Charles Gitto has been spotted frequently driving, eating out. carrying on conversations and socializing. People who have had direct interaction with Charles Gitto – including a repairman – have reported to us that Charles Gitto fully understands what is happening around him. One of his former employees, who also worked in a Level-4 nursing home for years and made frequent assessments of Alzheimer's patients, spoke with Charles Gitto just weeks ago and believes that he is not suffering from any serious mental impairment. See Affidavits and Reports re. Charles Gitto, attached at Tab S.

Third, we continue to believe there are marked differences in the level, extent and utility of cooperation furnished in this matter. As explained above, Miller put in substantial efforts to cooperate with both the government and the civil plaintiffs, saving documents, meeting with them on numerous occasions, searching for and locating additional witnesses and materials, etc. Despite the substantial fraud, LaSalle (now Bank of America) has submitted a letter attesting to Miller's assistance and cooperation in the civil litigation. See Tab P. We doubt very much that a similar letter will be forthcoming for Gary Gitto, who fought the civil charges for years, refused to affirmatively procedure documents or be deposed, utilized the civil process to obtain a discovery advantage in the criminal case, then ultimately settled as part of his father's settlement with the Bank. Indeed, we are dumbstruck how Gary Gitto has a chance of earning substantial assistance credit in this matter after he falsely and publicly denied wrongdoing for so wrong and

---

[7] Jalbert's Report is supported by eight large binders of financial records, which we have not included with this memorandum, but will deliver if requested.

[8] To the extent the government has any information – including, not limited to, any notes, memos, correspondence of any type – reflecting any linkage between those two events, we request immediate production of those materials as potentially exculpatory evidence. This request specifically also includes: (1) any information reflecting any unwillingness or reluctance of Gary Gitto to change his plea unless or until the government decided how to resolve Charles Gitto's claim that he was not capable of standing trial; or (2) any information reflecting in any way that Charles Gitto was not incompetent.

falsely and publicly ridiculed the Miller as the only culpable people. For example, on November 11, 2005, Gary Gitto's lawyer publicly stated:

> If one looks beyond the examiner's suspicions and focused on the
> evidence he reports, the only conclusion that one can reach is that
> the wrongdoing was accomplished not by anyone named Gitto at
> all, but by Frank Miller, the president and its major stockholder,
> with the assistance of his wife, Maria -- without the knowledge of
> Gary Gitto or his father, Charles.

See Paul Burton, Examiner's Report Alleges Massive Fraud by Gitto Officials, The Deal (Nov. 11, 2005), attached at Tab J. In sharp contrast, Miller publicly accepted responsibility very early on and extolled his cooperation with this Office:

> "It's worth emphasizing that this alleged wrongdoing was first
> disclosed to the justice department by Mr. Miller," Dwyer said.
> "Mr. Miller has fully cooperated with the government and has met
> with the government on several occasions at their request. ....
> Given the massive nature of this alleged fraud perpetrated by the
> Gittos, Mr. Miller was simply faced with the choice of confronting
> the truth about his conduct or commencing a strategy of denial. He
> has cooperated with the government and told the truth."

See Emily Young, Paper Wins Court Battle, Sentinel & Enterprise, (Sept. 1, 2005), attached at Tab T.

3.   **The Debate Should Be About the Extent of Miller's § 5K1.1 Departure**

Even if this Committee ultimately has reservations about any aspect of Miller's assistance in this matter, we believe that can and should be addressed in the *extent* of the departure under § 5K1.1, given Miller did assist. The Guideline range in this matter is high – Offense Level 32, which for first time, non-violent offender like Miller translates to a Guideline range of 121 to 151 months, leaving ample room for a calibrated assessment of how much of a departure Miller should receive for his assistance. If Miller is awarded only a modest departure, Miller still faces years in prison. Proceeding this way will balance the competing needs to impose a sentence of sufficient length to punish Miller for his wrongdoing without sacrificing 28 U.S.C. § 994's directive to ensure that he gets some reduction for the assistance he furnished. We respectfully suggest that would be the more appropriate way to handle Miller's case under all of the circumstances.

IV.   <u>Conclusion</u>

We appreciate the opportunity to submit this information and the careful attention we know that this issue will receive from this Committee.  If the Committee needs more information, we are happy to furnish it promptly.

For each of these reasons, we request that the Committee decide that the government should file a substantial assistance motion for Frank Miller.

# EXHIBIT 31

CLOSED

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:05-cv-12150-DPW

| | |
|---|---|
| LaSalle Business Credit, LLC v. Vitrotech Corporation et al | Date Filed: 10/26/2005 |
| Assigned to: Judge Douglas P. Woodlock | Date Terminated: 01/21/2010 |
| Demand: $9,999,000 | Jury Demand: Both |
| Cause: 18:1964 Racketeering (RICO) Act | Nature of Suit: 470 Racketeer/Corrupt Organization |
| | Jurisdiction: Diversity |

**Plaintiff**

**LaSalle Business Credit, LLC**
*f/k/a LaSalle Business Credit Inc*

represented by **Bethany Schols**
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, IL 60606
312-346-1300
Fax: 312-782-8416
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Panos**
Craig & Macauley, P.C.
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
617-367-9500
Fax: 617-742-1788
Email: panos@craigmacauley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John L. Conlon**
Schwartz, Cooper, Greenberger, &
Krauss, Chtd.
180 N. LaSalle St. Suite 2700
Chicago, IL 60601
312-346-1300
Fax: 312-782-8416
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard A. Sugarman**
LeClair Ryan, P.C.
11th Floor
One International Place

| | | Jess) (Entered: 09/24/2008) |
|---|---|---|
| 01/15/2009 | 85 | MOTION for Discovery *to Permit Plaintiff to Take Single Deposition* by LaSalle Business Credit, LLC.(Koltun, Joseph) (Entered: 01/15/2009) |
| 01/29/2009 | 86 | MEMORANDUM in Opposition re 85 MOTION for Discovery *to Permit Plaintiff to Take Single Deposition* filed by Jess Rae Booth. (Booth, Jess) (Entered: 01/29/2009) |
| 02/27/2009 | | Judge Douglas P. Woodlock: Electronic ORDER entered granting 85 MOTION for Discovery to Permit Plaintiff to Take Single Deposition by LaSalle Business Credit, LLC. (Lovett, Jarrett) (Entered: 02/27/2009) |
| 05/26/2009 | | Judge Douglas P. Woodlock: Electronic ORDER entered. Joint Status Report due by 6/1/2009.(Lovett, Jarrett) (Entered: 05/26/2009) |
| 05/27/2009 | 87 | STATUS REPORT by Jess Rae Booth. (Booth, Jess) (Entered: 05/27/2009) |
| 07/06/2009 | | Judge Douglas P. Woodlock: Electronic ORDER entered. ORDER TO SHOW CAUSE: The plaintiff, failing to file a status report by 6/1/09, is directed to demonstrate why, in light of its failure to submit a status report, despite an extended period in which to do so, this case should not be dismissed for want of prosecution; Plaintiff's Show Cause Response is due by 7/10/2009.(Lovett, Jarrett) (Entered: 07/06/2009) |
| 07/08/2009 | 88 | RESPONSE TO ORDER TO SHOW CAUSE by LaSalle Business Credit, LLC. (Koltun, Joseph) (Entered: 07/08/2009) |
| 08/05/2009 | 89 | STATUS REPORT *and Request for Related Relief* by LaSalle Business Credit, LLC. (Koltun, Joseph) (Entered: 08/05/2009) |
| 08/21/2009 | | ELECTRONIC NOTICE of Hearing : Status Conference set for 9/15/2009 11:30 AM in Courtroom 1 before Judge Douglas P. Woodlock. By 9/8/09, the parties shall file a JOINT STATUS REPORT indicating the current status of the case, including discovery proceedings, settlement discussions, pending or contemplated motions, proposed dates for pretrial conferences and for trial, and any other matters which should be addressed at the conference. ALL PARTIES ARE REQUIRED TO BE PRESENT IN PERSON. (Lovett, Jarrett) (Entered: 08/21/2009) |
| 09/08/2009 | 90 | STATUS REPORT *of the Parties filed* by LaSalle Business Credit, LLC. (Koltun, Joseph) (Entered: 09/08/2009) |
| 09/09/2009 | 91 | CERTIFICATE OF SERVICE by LaSalle Business Credit, LLC re 90 Status Report. (Koltun, Joseph) (Entered: 09/09/2009) |
| 09/15/2009 | | Electronic Clerk's Notes for proceedings held before Judge Douglas P. Woodlock: Status Conference held on 9/15/2009: Pro Se defendant, Jess Rae Booth present, Court updated on current status of the case; Jess Rae Booth's demand has not been accepted; Jess Rae Booth's settlement requirements not met; Court declines to engage in settlement negotiations; Court Orders the plaintiff to file a Motion for Summary Judgment by 10/15/09; Jess Rae Booth's response is due by 12/4/09; a hearing on the plaintiff's Motion for Summary Judgment is set for 02:30 PM on 1/20/2010 in courtroom 1 before |

| | | Judge Douglas P. Woodlock. The plaintiff is Ordered to provide Jess Rae Booth with copies of deposition transcripts no later than by 10/18/09. (Court Reporter: Debra Joyce)(Attorneys present: Clark, Koltun, Rein) (Lovett, Jarrett) (Entered: 09/15/2009) |
|---|---|---|
| 10/15/2009 | 92 | MOTION for Summary Judgment *Against Jess Rae Booth* by LaSalle Business Credit, LLC.(Koltun, Joseph) (Entered: 10/15/2009) |
| 10/15/2009 | 93 | STATEMENT of facts re 92 MOTION for Summary Judgment *Against Jess Rae Booth Pursuant to LR 56.1.* (Koltun, Joseph) (Entered: 10/15/2009) |
| 10/15/2009 | 94 | AFFIDAVIT of Eric S. Rein re 93 Statement of facts by LaSalle Business Credit, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4A, # 5 Exhibit 4B, # 6 Exhibit 4C, # 7 Exhibit 4D, # 8 Exhibit 4E, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18, # 23 Exhibit 19, # 24 Exhibit 20)(Koltun, Joseph) (Entered: 10/15/2009) |
| 10/15/2009 | | ELECTRONIC NOTICE of Hearing on Motion 92 MOTION for Summary Judgment *Against Jess Rae Booth* : Motion Hearing set for 1/20/2010 02:30 PM in Courtroom 1 before Judge Douglas P. Woodlock. (Lovett, Jarrett) (Entered: 10/15/2009) |
| 12/04/2009 | 96 | Response by Jess Rae Booth to 93 Statement of facts. (Attachments: # 1 Affidavit, # 2 Exhibit Exhibit 21, # 3 Exhibit Exhibit 22, # 4 Exhibit Exhibit 23, # 5 Exhibit Exhibit 25, # 6 Exhibit Exhibit 26, # 7 Exhibit Exhibit 27, # 8 Exhibit Exhibit 28, # 9 Exhibit Exhibit 29, # 10 Exhibit Exhibit 30)(Booth, Jess) (Entered: 12/04/2009) |
| 12/04/2009 | 97 | Opposition re 92 MOTION for Summary Judgment *Against Jess Rae Booth* filed by Jess Rae Booth. (Booth, Jess) (Entered: 12/04/2009) |
| 12/04/2009 | 98 | EXHIBIT re 96 Response, by Jess Rae Booth. (Booth, Jess) (Entered: 12/04/2009) |
| 12/30/2009 | | ELECTRONIC NOTICE issued requesting courtesy copy for 94 Affidavit,.. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office by. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (York, Steve) (Entered: 12/30/2009) |
| 01/08/2010 | 99 | NOTICE by LaSalle Business Credit, LLC re 92 MOTION for Summary Judgment *Against Jess Rae Booth Plaintiff's Submission Pursuant to Court Request* (Attachments: # 1 Exhibit A - Part I, # 2 Exhibit A Part 2, # 3 Exhibit B, # 4 Exhibit C)(Koltun, Joseph) (Entered: 01/08/2010) |
| 01/20/2010 | | Electronic Clerk's Notes for proceedings held before Judge Douglas P. Woodlock: Motion Hearing held on 1/20/2010 re 92 MOTION for Summary Judgment *Against Jess Rae Booth* filed by LaSalle Business Credit, LLC: Oral arguments heard; Court recesses; Court resumes; the parties have entered into an settlement agreement; a 30 day settlement order of dismissal shall enter; Court DENIES AS MOOTt 92 MOTION for Summary Judgment |

|  |  | *Against Jess Rae Booth* filed by LaSalle Business Credit, LLC. (Court Reporter: Brenda Hancock)(Attorneys/Parties present: Panos, Rein, Booth (Pro Se)) (Lovett, Jarrett) (Entered: 01/21/2010) |
|---|---|---|
| 01/21/2010 | 100 | Judge Douglas P. Woodlock: ORDER entered. 30 DAY SETTLEMENT ORDER OF DISMISSAL. (Lovett, Jarrett) (Entered: 01/21/2010) |
| 01/21/2010 |  | Civil Case Terminated. (Lovett, Jarrett) (Entered: 01/21/2010) |
| 02/23/2010 | 101 | STIPULATION of Dismissal by LaSalle Business Credit, LLC. (Koltun, Joseph) (Entered: 02/23/2010) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/21/2011 15:55:45 | | |
| PACER Login: | dc0188 | Client Code: |
| Description: | Docket Report | Search Criteria: 1:05-cv-12150-DPW |
| Billable Pages: | 10 | Cost: 0.80 |

# EXHIBIT 32



**U.S. Department of Justice**

*Carmen M. Ortiz*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

DEC 0 9 2010

December 8, 2010

Ms. Kelly E. Foster
United States Probation Office
Donohue Federal Building and Courthouse
595 Main Street; Room 302
Worcester, MA 01608-2076

Re: United States v. Frank Miller et al (Cr. No. 08-CR-40026-FDS}

Dear Ms. Foster:

Enclosed s a memorandum on the losses in United States v. Frank Miller et al, with the referenced exhibits. Please do not hesitate to contact me if you have any questions on this memorandum or the supporting exhibits. I can be reached at (617) 748-3165.

Very truly yours,

CARMEN M. ORTIZ
United States Attorney

By: Thomas J. Zappala
    Auditor

cc:   Lori J. Holik, Esq.
      Assistant U.S. Attorney

      (continued)

Ms. Foster
December 8, 2010
Page 2


Michael B. Galvin, Esq.
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02110

Ian Gold, Esq.
Federal Public Defender Office
51 Sleeper Street; 5th Floor
Boston, MA  02110

John H. LaChance, Esq.
615 Concord Street; 2nd Floor
Framingham, MA  01702

Max D, Stern, Esq,
Stern, Shapiro, Weissberg & Garin
90 Canal Street
Boston, MA  02114-2022

# Memorandum
*United States Attorney*
*District of Massachusetts*



| Subject | Date |
|---|---|
| Loss in U.S. v. Miller et al. | December 7, 2010 |
| To | From |
| File re: U.S. v. Frank Miller et al. | Thomas J. Zappala, Auditor |

## INTRODUCTION

At September 30, 2004, the accounts of Gitto Global Corporation (GGC) relating to its loans from LaSalle Business Corporation (LBC) were as follows:

| | |
|---|---|
| Revolving Line of Credit at LBC: | $18,749,446.82[1] |
| Term Loan at LBC: | 833,333.42[2] |
| Controlled Disbursement A/C Overdraft at LaSalle Bank: | 253,906.56[3] |
| Overdraft at Fleet Bank Account f/b/o LBC: | 11,595,325.97[4] |
| | $31,432,012.77 |

While GGC's revolving line of credit was capped at $27,000,000, the co-conspirators were able to "borrow" additional funds by the daily cycling of funds through the account of Kingsdale Corporation (Kingsdale) d/b/a J & J Chemical Distributors. Clinton Savings Bank (CSB) provided immediate credit on deposited checks of less that $100,000, and the effect of this - when combined with the day-after-day depositing of almost $4,000,000 in checks, all of them under $100,000, drawn on GGC's Controlled Disbursement Account and made payable to J & J Chemical while simultaneously writing checks drawn on the J & J Chemical account and made payable to GGC[5] (which ultimately were used to pay down GGC's credit line) - was to create additional credit availability of approximately $8,000,000.

---

[1] See the LBC account statement for the GGC revolving loan. (Exhibit 1)

[2] See the LBC account statement for the GGC term loan. (Exhibit 1)

[3] See the LaSalle Bank statement for the GGC Controlled Disbursement Account. (Exhibit 2)

[4] See Fleet Bank statement for the GGC account f/b/o LBC. (Exhibit 3)

[5] This rapid deposit and subsequent withdrawal of uncollected funds is sometimes referred to as "check kiting".

Loss in U.S. v. Miller et al.
December 7, 2010
Page 2

CSB borrowed funds from the Federal Reserve Bank in order to support the activity in the Kingsdale account.[6] CSB documented its exposure in the Kingsdale (J & J Chemical) account with an $8,400,000 Revolving Credit Note dated July 23, 2004, which was signed by Frank Miller.[7] CSB reduced its exposure by obtaining cash collateral from Kingsdale, Frank Miller and Gary Gitto, which aggregated $2,200,000, and by obtaining their personal guarantees for the loan.

In his deposition in the related civil action, William Deakin acknowledged the $8,000,000 in "float" from CSB[8] that would need to be repaid from the proceeds of any sale of Gitto Global.

The Kingsdale operation required that new deposits be constantly made in order to keep the scheme going, and when CSB stopped providing credit to Kingsdale (by returning the Kingsdale checks written out and deposited into the Fleet Bank account), the scheme collapsed and all was exposed. LBC stopped advancing funds on the revolving line of credit, and caused LaSalle Bank to return the last checks (totaling $3,995.088.00 - the amount of the last deposit into the Kingsdale account at CSB) written on the Controlled Disbursement Account and made payable to J&J Chemical Distributors (a/k/a Kingsdale). The loss attributed to the $8,000,000 "float" was split between CSB and LBC, and the additional credit obtained through the use of the Kingsdale account is reflected in (1) the aggregate loan and overdraft balances at LBC and its affiliated accounts[9] and (2) in an overdraft or debit item at CSB.

## LBC LOSSES

As noted previously, LBC's exposure as of September 30, 2004, was $31,432,012.77. LBC received funds that reduced its exposure from the sale of the assets of GGC, and through the bankruptcy proceedings. LBC filed a Proof of Claim in the U.S. Bankruptcy Court citing Pre-Petition Indebtedness due LBC from GGC of principal in the amount of $31,288,794.03.[10] As this number is less than the $31,432,012.77 obtained by adding up the relevant account statements as of September 30, 2004, we use it as the base for calculating loss.

An addendum to LBC's Proof of Claim recites that from the sale of substantially all of GGC's assets as a going concern, pursuant to orders of the U.S. Bankruptcy Court, a payment of

---

[6] See deposition transcript of Tenaglia at pp. 36; 68-69.  (Exhibit 4)

[7] See Revolving Credit Note dated July 23, 2004.  (Exhibit 5)

[8] See Deakin deposition transcript, volume 2 (11/16/2005) at pp. 84-85.  (Exhibit 6)

[9] LBC made Fleet Bank whole by covering the overdraft.

[10] See Claim 75-1 in U.S. Bankruptcy Court Case 04-45386-JBR (Exhibit 7)

Loss in U.S. v. Miller et al.
December 7, 2010
Page 3

$7,078,547.97 was made to LBC.[11]  A second distribution was made to LBC in the amount of $776,438.30[12], and payments of $33,128.95 (01/08/07); $27,283.56 (01/08/07); $1,099,415.01 (09/24/09); and $24,271.64 (11/12/09) were made to LBC by the bankruptcy Trustee.[13]

LBC also received payments in settlement of at least one civil action it brought related to the fraud perpetrated by the defendants.  In this settlement, LBC received $1,200,000 from CSB, and another $600,000 on behalf of CSB from a liability insurance provider CSB.  We do not have information on other settlement payments or receipts by LBC, if there are any.  These payments to LBC from the bankruptcy case and from the CSB settlement total $10,839,085.43, and thus we calculate the loss to LBC, after applying all of these receipts to the pre-petition indebtedness of $31,288,794.03, as $20,449,708.60.

LBC was acquired by Bank of America, and we have asked counsel for Bank of America to furnish us with a breakdown of LBC's loss and recoveries.  They have been unable to do so to-date, and while LBC's Allowed Claim in the bankruptcy action is $24,624,989.43, Bank of America has advised us that the principal balance they have on record is $19,582,780.00.  Accordingly, we use this as the loss for LBC.

<u>CSB LOSSES</u>

Clinton Savings Bank (CSB) had exposure relating to the $3,995,088.00 deposit made on September 15, 2002, to the Kingsdale account.[14]  This deposit consisted of checks drawn on GGC's Controlled Disbursement Account at LaSalle Bank which were returned unpaid by LaSalle Bank - and for which CSB never received credit.[15]

CSB was exposed to the extent of the $3,995,088 deposit items returned by LaSalle Bank, and CSB exercised its right of set-off against the $2,200,000 in cash collateral it had obtained through its agreement with Kingsdale, Frank Miller, and Gary Gitto.  CSB reports that it initially

---

[11]See Claim 75-1 in U.S. Bankruptcy Court Case 04-45386-JBR (Exhibit 7)

[12]See Claim 75-2 in U.S. Bankruptcy Court Case 04-45386-JBR (Exhibit 8)

[13]See Trustee's Final Report, Estate Cash Reseipts and Disbursements Records for Case 04-45386 Docket Entry 1309; pp. 65, 78 & 90.  (Exhibit 9)

[14]See CSB statement for the Kingsdale Corp. Account.  (Exhibit 10)

[15]See lists of returned checks and copies of the returned checks for the 09/14/04 deposit of $3,994,602 (Exhibit 11) and the 09/15/04 deposit of $3,995,088 (Exhibit 12);  See also the LaSalle Bank account statement for the GGC Controlled Disbursement Account reflecting these returned items. (Exhibit 2)

Loss in U.S. v. Miller et al.
December 7, 2010
Page 4

had a loss of $1,771,669.70,[16] but that it received $54,000 in "adequate protection payments" in the bankruptcy case, thus reducing it's immediate loss to $1,717,669.70. When we add in the $1,200,000 paid by CSB to LBC, CSB's loss for sentencing purposes is $2,917,669.70. CSB also reports that it paid $264,389.80 in legal costs and other out-of-pocket expenses.

### OTHER CSB CONSIDERATIONS

In addition to the loss incurred directly by CSB, the amount paid by it's insurer should be counted as a part of the loss caused by the defendant's conduct. This $600,000 was paid to LBC to mitigate LBC's losses.

### WELLS FARGO

Wells Fargo Equipment Finance, Inc. (Wells Fargo) was defrauded by GGC in a manner not unlike the scheme used to defraud LBC. Wells Fargo was provided with a bogus invoice and copies of checks created to make it appear that GGC had paid $1,175,000 to buy equipment[17] - against which GGC borrowed $900,000 from Wells Fargo.[18] In fact, GGC paid only $175,000 for the equipment.[19] The loan from Wells Fargo had an unpaid principal balance of $751,508.60, and Wells Fargo received $185,000.00 from the sale of the collateral equipment[20]and an additional $25,043.63 in the bankruptcy action.[21] Thus, the loss to Wells Fargo is $541,464.97.

### BANKRUPTCY ACTION

We note that the scheme to defraud enabled GGC to continue operating and to maintain the appearance that GGC was a financially sound company - when it was not. In doing so, GGC obtained credit, or goods and services on credit, which it would not have otherwise been able to obtain had its true financial condition been known. The Final Report of the Chapter 7 Trustee in the related federal bankruptcy case (04-45386) details $41,666,344.80 in "Claims Allowed" after the company's secured creditors had been paid, at least in part.[22]

---

[16]See Paulhus letter dated 10/08/2004 (Exhibit 13)

[17]See invoice and checks provided by Wells Fargo (Exhibit 14)

[18]See Promissory Note dated March 21, 2003.  (Exhibit 15)

[19]See actual invoice provided by Federal Equipment (Exhibit 16)

[20]See Amended Proof of Claim filed by Wells Fargo (Exhibit 17)

[21]See Final Report of the Chapter 7 Trustee - General Unsecured Claims  (Exhibit 18)

[22]See Final Report of the Chapter 7 Trustee - General Unsecured Claims  (Exhibit 18)

Loss in U.S. v. Miller et al.
December 7, 2010
Page 5

The Final Report details $1,742,832.54[23] paid to unsecured creditors, and the difference between the allowed claims and the amounts paid on these claims is $39,923,512.26. This total includes allowed net claims of $24,624,989.43 for LBC and $548,817.69 for Wells Fargo. If we deduct these two claims (which we have addressed separately in this memorandum) from the net total claims of $39,923,512.26, we are left with claimants other than LBC and Wells Fargo with allowed unpaid claims of $14,749,705.14.

We reviewed the allowed claims and calculated that unpaid claims arising from transactions with GGC in the calendar year 2004 aggregated at least $6,598,185.98.[24]

CONCLUSION

The loss for sentencing purposes should be calculated as follows:

| | |
|---|---:|
| LaSalle Business Credit: | $19,582,780.00 |
| Clinton Savings Bank: | 2,917,669.70 |
| Funds Paid by CSB's Insurer | 600,000.00 |
| Loss on Wells Fargo loan: | 541,464.97 |
| | **$23,641,914.67** |

| | |
|---|---:|
| Bankruptcy Creditors Other Than LBC and Wells Fargo with Allowed Claims: | $14,749,705.14 |

---

[23]See Table of Bankruptcy Claims for Case 04-45386 (Exhibit 19)

[24]See Table of Bankruptcy Claims for Case 04-45386 (Exhibit 19)

# EXHIBIT 33

United States District Court
District of Massachusetts
Civil Action No. 12227-DPW
LaSalle Business Credit, LLC v. Gary Gitto et al
**Expert Witness Report of Craig R. Jalbert, CIRA**

### I.  Background

The company out of which this litigation matter arises, Gitto Global Corporation ("Gitto" or the "Company") was a Lunenburg, Massachusetts-based manufacturer of plastics compounds.  Its principal officers were:  Gary Gitto ("Gary"), CEO, and Frank Miller ("Miller"), COO/President.  Garys' father, Charles Gitto ("Charles"), was Chairman of the Board.  Gary held a 40% ownership interest in the Company and Miller held a 50% interest.  The Company leased its company headquarters and manufacturing plant from Tradex Corp. ("Tradex"), which is wholly owned by Charles.

In July 2002, Gitto obtained a revolving line of credit loan up to $27,000,000 (the "Revolver") from LaSalle Business Credit, LLC ("LaSalle", the "Bank" or the "Plaintiff") secured by "eligible" receivables and "eligible" inventory, as defined.  When the financing on the Revolver closed on or about July 25, 2002, LaSalle advanced approximately $26 million to Gitto.

Verdolino & Lowey, P.C. ("V&L" or the "Firm") was initially employed by the U.S. Bankruptcy Court-appointed Chapter 11 Examiner, Charles Glerum (the "Examiner" or "Glerum") of the law firm Choate, Hall & Stewart, in October 2004 to investigate alleged irregularities at Gitto that were identified in an affidavit filed by the Company's then Chief Restructuring Officer, Thomas Doherty ("Doherty").  On or about October 25, 2004, the Plaintiff filed a civil RICO action in U.S. District Court against Gary, Charles, Miller, Tradex and Tradex International Corporation ("TIC"), amongst others.

### II.  The Issues

In my capacity as expert for the Plaintiff, I have been asked to review the Company's books and records from the time LaSalle first advanced funds to the Company via the Revolver, through September 2004 (the "Operative Time Period")[1] to:  1) identify and quantify all payments made to J&J Chemical Distributors ("J&J"); 2) identify and quantify all payments made to J-Tan Sales & Marketing ("J-Tan"), Color Compounds & Consultants ("CCC"), Hemisphere Distribution Corp.("Hemisphere"), Velco Chemicals Inc. ("Velco") and Zebulon Inc.("Zebulon"); 3) quantify fictitious sales figures that were manufactured for certain legitimate customers; 4) identify and quantify all non-payroll payments to Charles, Gary, Miller, Equitech Technologies ("Equitech"), Tradex, TIC and cash; and, 5) identify and quantify company payments made in satisfaction of

---

[1] The dates of the Operative Time Period cover the period from when LaSalle first advanced funds to the Company (July 2002) through the period when the Gitto principals either resigned from the Company or were replaced (September 2004).

personal and/or lifestyle expenses on behalf of Charles, Gary and Miller. My Curriculum Vitae and history of litigation-related testimony are attached hereto as Exhibits A and B.

My hourly rate for work performed in connection with this report is $330.00. My compensation is not contingent on the outcome of this litigation.

### III.   Documentation Reviewed

From September 2004 through January 2006, Gitto's books and records were maintained at its offices in Lunenberg, Massachusetts. In January 2006, pursuant to an agreement between Gitto's counsel, Gitto's purchaser, Glerum and LaSalle, V&L took possession of approximately 750 boxes of Company books and records that Gitto's purchaser in the Ch. 11 bankruptcy proceeding did not require for continuing operations. From that date forward, V&L has been the keeper of the records for Gitto and as such, has reviewed innumerable documents over the past three months.

In connection with the work performed in this engagement, specific documents and records were re-reviewed, including, but not limited to:

     a) Gitto Global's bank statements, canceled checks and invoices for the Operative Time Period;
     b) Gitto Global's electronic accounting records from its Wang system;
     c) Gitto Global's Visa, American Express, Bank of America, Exxon Mobil and Shell Fleet credit card statements for the Operative Time Period;
     d) Documents produced by Clinton Savings Bank in response to a subpoena from the Examiner; and
     e) Approximately 35 boxes of records produced by various parties in response to subpoenas from LaSalle.

### IV.   Findings

#### A.   Creation of Fictitious Sales - J&J Chemical

According to Gitto's computer-generated general ledger, from July 1, 2002 through September 15, 2004, the Company disbursed $1,024,543,246 to J&J, a d/b/a for Kingsdale Corp., a corporation formed by Miller, Miller's brother, and by Miller's friend, Thomas Sullivan ("Sullivan"). (See attached Exhibit C). These funds were deposited in a bank account controlled by Miller. Money disbursed to J&J was funneled back to Gitto via J&J checks that were mailed to Gitto's Fleet Bank lockbox, which lockbox was "swept" each day by LaSalle for application against the Revolver. The checks from J&J were signed by either Miller, Gitto family friend, John Tersigni ("Tersigni"), or Sullivan. On Gitto's books, the J&J receipts were booked primarily against false sales invoices of fictitious customer corporations: 1) J-Tan (a Tersigni-affiliated company); 2) CCC (a legitimate Gitto raw materials supplier, but not a Gitto purchaser); 3) Hemisphere ( a Miller-affiliated company); 4) Velco (a legitimate Gitto vendor, but not a Gitto purchaser); and 5) Zebulon (a legitimate Gitto vendor, but not a Gitto purchaser). Gitto's

computer-generated general ledger reflects that $1,009,659,366.01 of the previously-disbursed J&J money was cycled back through the Company by booking alleged sales and cash receipts to the above-referenced five companies. As a further means by which to legitimize the J&J cash receipts, Gitto inflated sales figures to legitimate customers by overstating purchases. Based on Gitto's computer-generated general ledger, another $145,269,339.11 in funds previously disbursed to J&J, was cycled back into the Company by overstating sales to legitimate customer, Hitachi Cable, Inc. ("Hitachi"). The table below summarizes the amount of J&J cash receipts booked against fictitious sales attributed to the above-referenced six companies:

| Company Name | Fictitious Sales in Dollars |
|---|---|
| Colors Compounds & Consultants | $ 142,913,442.80 |
| Hemisphere Distribution Corp. | $ 174,726,791.52 |
| Hitachi Cable, Inc. | $ 145,269,339.11 |
| J/Tan Sales & Marketing | $ 184,034,750.04 |
| Velco Chemicals, Inc. | $ 194,036,514.10 |
| Zebulon Industries | $ 168,678,528.44 |
| | |
| **Total J&J Receipts Applied Against Fictitious Sales** | **$1,009,659,366.01** |

### B.   Diversion of Company Funds

Company funds were diverted to Gitto family members and Gitto associates using several mechanisms:  1) non-payroll checks issued directly to Gitto family members or associates; 2) company checks issued to companies controlled by Gitto family members or Miller; 3) company checks issued to cash that were cashed by or on behalf of Gitto family members; 4) company credit cards used for personal/lifestyle expenses; and 5) company checks issued to service providers in satisfaction of personal expenses incurred by Gitto family members, Gitto family associates or Miller.

All told, on a conservative basis, some $5,796,417.65 in Gitto funds was directed to Gary, Charles, or Miller through 1) direct payments to Charles, Gary, Miller, cash or companies controlled by Charles, Gary and Miller; and 2) payment of Charles, Gary and Miller personal expenses for which no reasonable or legitimate business purpose is evidenced by company records or sound business judgment.

### 1.   Gary Gitto

During the Operative Time Period, the Company issued non-payroll checks to Gary individually, to Equitech and to cash for Gary's benefit. The table below summarizes the aggregate amount of those payments[2]:

---

[2] Binder 1 contains a yearly breakdown of the payments to Gary, Equitech and cash; a spreadsheet enumerating the check date, check number and check amount of each check that comprises the aggregate numbers; and bates stamped copies of the back and front of each check that comprises the yearly payment totals.

| Category | Dollar Amount |
|---|---|
| Checks to Gary | $   676,860.43 |
| Checks to Equitech | $1,628,033.68 |
| Checks to Cash | $     14,007.87 |
|  |  |
| **Total Non-Payroll Checks Issued to/on Gary's Behalf** | **$2,318,901.98** |

The table below summarizes the aggregate amount of personal expenses that Gary charged to six Gitto company credit cards during the Operative Time Period:

| Credit Card | Dollar Amount |
|---|---|
| American Express | $378,801.60 |
| Fleet | $  60,330.36 |
| Citizens Bank Visa | $  23,895.75 |
| Bank of America | $    3,622.34 |
| Exxon Mobil | $    5,229.63 |
| Shell Fleet | $        232.87 |
|  |  |
| **Total Personal Expenses Charged by Gary** | **$472,112.55** |

Gary's personal charges on the company American Express card during the Operative Time Period reflect significant non-business expenses:  $49,086.43 in air travel, including flights to Bermuda, Puerto Rico, Barbados and Miami, FL with his girlfriend, Kandace White; $19,432.58 for men's clothing; $40,263 for a motorcycle; $8,341 for jewelry, including a purchase from Tiffany's; approximately $14,939 for furniture from Roche-Bobois, which presumably was for one of his homes since it was not at his Gitto office; $8,420 in ticket purchases; approximately $80,664 for hotels and inns, including lodging in vacation locations such as Bermuda, Puerto Rico, Barbados, Santiago, St. Martin, Santa Domingo and Nantucket; nearly $25,015 in fine dining expenses; and  $1,688.18 for health/beauty spa services. [3]

Gary's notable charges on the company Fleet card include $27,500 in payments to the Applewild School, just over $16,927 in furniture charges and just over $8,532 in cash advances.  His charges on the company Citizens Visa card include another $5,893 in cash advances and approximately $3,233 in additional furniture charges.  Gary was the only

---

[3] Binder 4 contains: a yearly breakdown of the payments on Gary's behalf; a spreadsheet enumerating, amongst other things, the check date, check number and check amount of each check that comprises the aggregate numbers; and bates stamped copies of the back and front of each check that comprises the yearly payment totals.  Since not all of the charges listed on each monthly credit card statement for the Operative Time Period have been deemed a personal expense, the amount of the corresponding Gitto check issued in payment of each monthly credit card statement does not necessarily match the aggregate amount of personal expenses for any given month.

individual under review who had or used a company Bank of America credit card. On that card, he incurred over $1,273 in grocery store charges; just under $1,164 in restaurant tabs and approximately $705 in air travel costs. As evidenced by the table above, Gary liberally utilized the company gasoline cards to charge fuel expenses. Over the course of the Operative Time Period, he charged just under $5,463 worth of gas to the Gitto Exxon Mobil and Shell Fleet credit cards.[4]

Further, in connection with Gitto funds used by or on behalf of Gary, since a Citizens Visa card was also issued in the name of Gary's boat captain, Brendon Burke ("Burke"), Burke's personal expenses have been included in Gary's personal expense charges. During the Operative Time Period, Burke charged $1,400.65 in personal expenses to the company Citizens Visa card.[5]

In addition to using company credit cards to pay for personal/lifestyle expenses, Gary submitted and/or authorized the payment of personal/lifestyle expenditures with Gitto checks. Gitto paid out $74,081.23 on behalf of Gary for personal expenses that included: club membership/dues, a Cadillac Escalade lease, private school payments, car maintenance and golf fees.[6] According to Gitto's computer-generated general ledger, Gitto also paid for Gary's car insurance through Travelers Insurance, which amounted to $8,148.00 for the Operative Time Period.[7]

---

[4] Binders 5 (Citizens Visa, Fleet and Bank of America), and 6 (Exxon Mobil and Shell Fleet) contain: a yearly breakdown of the credit card payments made on Gary's behalf; a spreadsheet enumerating the check date, check number and check amount of each check that comprises the aggregate numbers; and bates stamped copies of the back and front of each check that comprises the yearly payment totals. Since not all of the charges listed on each monthly credit card statement for the Operative Time Period have been deemed a personal expense, the amount of the corresponding Gitto check issued in payment of each monthly credit card statement does not necessarily match the aggregate amount of personal expenses for any given month.

[5] Binder 5 contains a yearly breakdown of the credit card payments made on Burke's behalf; a spreadsheet enumerating the check date, check number and check amount of each check that comprises the aggregate numbers; and bates stamped copies of the back and front of each check that comprises the yearly payment totals.

[6] Binder 7 contains a dollar breakdown of the personal expense amounts by year and then by expense category; a spreadsheet that identifies the Gitto check number and check amount that is associated with the payment of the charges; and bates stamped copies of the back and front of each check that comprises the payments.

[7] Binder 8 contains a summary spreadsheet that identifies the Gitto check number and check amount that is associated with the payment of the charges; the computer-generated general ledger entries which reference the individual(s) on whose behalf the payment was made; and bates stamped copies of the back and front of each check that comprises the payments.

The following table summarizes the total amount of company funds across all of the above-referenced categories paid to or on behalf of Gary during the Operative Time Period:

| Category | Dollar Amount |
|---|---|
| Non-Payroll Checks Issued on Gary's Behalf | $2,318,901.98 |
| Personal Expenses Charged by Gary | $   472,112.55 |
| Personal Expenses Charged by Brendon Burke | $       1,400.65 |
| Company Checks Issued for Gary's Personal Expenses | $     82,229.23 |
| | |
| **Total Company Funds Paid to/on Behalf of Gary** | **$2,874,644.41** |

## 2.   Charles Gitto

According to Gitto's computer-generated general ledger, during the Operative Time Period, the Company issued non-payroll checks to Charles individually, rental payments to Tradex and loan repayments to TIC. The table below summarizes the aggregate amount of those payments[8]:

| Category | Dollar Amount |
|---|---|
| Checks Issued to Charles | $   409,502.33 |
| Checks Issued to Tradex | $   808,234.18 |
| Checks Issued to Tradex International | $   537,968.38 |
| | |
| **Total Non-Payroll Checks Issued to/on Charles's Behalf** | **$1,755,704.89** |

The table below summarizes the aggregate amount of personal expenses that Charles charged to four Gitto company credit cards during the Operative Time Period:

| Credit Card | Dollar Amount |
|---|---|
| American Express | $     81,586.39 |
| Citizens Visa | $     19,555.41 |
| Exxon Mobil | $       2,130.20 |
| Shell Fleet | $       7,819.36 |
| | |
| **Total Personal Expenses Charged by Charles** | **$   111,091.36** |

More than three fourths of Charles' personal expenses on the company American Express card are devoted to restaurants, air travel and lodging. The restaurant charges are notable for the number of well-known, high-end Boston-area establishments that are

---

[8] Binder 2 contains a yearly breakdown of the payments to Charles, Tradex and TIC; a spreadsheet enumerating the check date, check number and check amount of each check that comprises the aggregate numbers; and bates stamped copies of the back and front of each check that comprises the yearly payment totals.

included therein. The lodging charges are similarly striking, not only for their known opulence, but for their location. During the Operative Time Period, Charles paid for stays at the Four Seasons Tokyo, the Four Seasons Milan, The Westin Palace Milano, the Grand Hotel Bologna and the Ballantine Resort – using the Gitto company American Express card. Charles' charges on the company Citizens Visa card are also predominantly for restaurants, lodging and air travel. During the Operative Time Period, he logged over $11,025 in fine dining charges, $1,243 in airline charges and just over $1,016 in hotel expenses. As was the case with Gary, Charles also made frequent use of the company gasoline credit cards. Over the course of the Operative Time Period, he charged over $9,949 to the Gitto Exxon Mobil and Shell Fleet cards. [9]

As was the case with his son, in addition to using company credit cards to pay for personal/lifestyle expenses, Charles submitted and/or authorized the payment of personal/lifestyle expenditures with Gitto checks. During the Operative Time Period, Gitto funds were used to pay $91,489.66 of Charles' personal expenses for items such as: a Mercedes auto lease, pharmacy charges, medical and dental expenses, vehicle maintenance and leased storage space. [10]

According to Gitto's computer-generated general ledger, Gitto also paid for Charles' car insurance through Travelers Insurance, which amounted to $5,973 for the Operative Time Period.[11] The following table summarizes the total amount of company funds across all of the above-referenced categories paid to or on behalf of Charles during the Operative Time Period:

---

[9] Binders 4 (American Express), 5 (Citizens Visa) and 6 (Exxon Mobil and Shell Fleet) contain: a yearly breakdown of the payments on Charles' behalf; a spreadsheet enumerating, the check date, check number and check amount of each check that comprises the aggregate numbers; and bates stamped copies of the back and front of each check that comprises the yearly payment totals. Since not all of the charges listed on each monthly credit card statement for the Operative Time Period have been deemed a personal expense, the amount of the corresponding Gitto check issued in payment of each monthly credit card statement does not necessarily match the aggregate amount of personal expenses for any given month.

[10] Binder 7 contains a dollar breakdown of the personal expense amounts by year and then by expense category; a spreadsheet that identifies the Gitto check number and check amount that is associated with the payment of the charges; and bates stamped copies of the back and front of each check that comprises the payments.

[11] Binder 8 contains a summary spreadsheet that identifies the Gitto check number and check amount that is associated with the payment of the charges; the computer-generated general ledger entries which reference the individual(s) on whose behalf the payment was made; and bates stamped copies of the back and front of each check that comprises the payments.

| Category | Dollar Amount |
|---|---|
| Non-Payroll Checks Issued to or on Charles's Behalf | $1,755,704.89 |
| Personal Expenses Charged by Charles | $ 111,091.36 |
| Company Checks Issued for Charles's Personal Expenses | $ 97,462.66 |
| | |
| **Total Company funds Paid to/on behalf of Charles** | **$1,964,258.91** |

### 3.   Frank Miller

According to Gitto's computer-generated general ledger, during the Operative Time Period, the Company issued non-payroll checks totaling $724,956.33 to Miller.[12]  The table below summarizes the aggregate amount of personal expenses that Miller charged to five Gitto company credit cards during the Operative Time Period:

| Credit Card | Dollar Amount |
|---|---|
| American Express | $ 68,491.11 |
| Citizens Visa | $ 17,815.04 |
| Fleet | $ 3,000.00 |
| Exxon Mobil | $ 9,401.48 |
| Shell Fleet | $ 562.01 |
| | |
| **Total Personal Expenses Charged by Miller** | **$ 99,269.64** |

Although more than half of Miller's charges on the company American Express card during the Operative Time Period are for air travel, lodging and restaurants, other personal expenses of note include:  approximately $3,203 in auto service charges from Volvo, Mercedes and Nissan, $3,222 in professional sports charges associated with the New England Patriots, $7,640 in computer store charges and over $1,631 in monthly internet fees.  Of the nearly $18,000 in Miller charges on the company Citizen's Visa card in the Operative Time Period, $14,000 are attributable to cash advances; all of the Miller charges on the company Fleet card are cash advances.  As with the above-referenced Gitto family members, Miller made frequent use of the company gasoline credit cards, too.  Over the course of the Operative Time Period, he charged over $9,963 to the Gitto Exxon Mobil and Shell Fleet cards. [13]

---

[12]Binder 3 contains:  a yearly breakdown of the payments to Miller; a spreadsheet enumerating the check date, check number and check amount of each check that comprises the aggregate numbers; and bates stamped copies of the back and front of each check that comprises the yearly payment totals.

[13]Binders 4 (American Express), 5 (Citizens Visa and Fleet) and 6 (Exxon Mobil and Shell Fleet) contain: a yearly breakdown of the credit card payments made on Miller's behalf; a spreadsheet enumerating the check date, check number and check amount of each check that comprises the aggregate numbers; and bates stamped copies of the back and front of each check that comprises the yearly payment totals.  Since not all of the charges listed on each monthly credit card statement for the Operative Time Period have been

Direct Gitto payments in satisfaction of Miller's personal expenses amounted to $122,005.36 for the Operative Time Period and included automobile leases for a Ford truck, a Lexus, a Mercedes SUV and a Volvo; vehicle maintenance costs for himself, his son and his wife; and home oil/gas expenses.[14] According to Gitto's computer-generated general ledger, Gitto also paid for Miller's car insurance through Travelers Insurance, which amounted to $11,283 for the Operative Time Period.[15]

The following table summarizes the total amount of company funds across all of the above-referenced categories paid to or on behalf of Miller during the Operative Time Period:

| Category | Dollar Amount |
|---|---|
| Non-Payroll Checks Issued to Miller | $724,956.33 |
| Personal Expenses Charged by Miller | $ 99,269.64 |
| Company Checks Issued for Miller's Personal Expenses | $133,288.36 |
| | |
| Total Company funds Paid to/on behalf of Miller | $957,514.33 |

I reserve the right to further review information or documentation that has previously been reviewed in preparation for trial and reserve the right to list further records on which testimony will be based.

Dated: April 26, 2006

Craig R. Jalbert, CIRA
Verdolino & Lowey, P.C.
124 Washington Street, Suite 101
Foxboro, MA  02035
(508) 543-1720

---

deemed a personal expense, the amount of the corresponding Gitto check issued in payment of each monthly credit card statement does not necessarily match the aggregate amount of personal expenses for any given month.

[14]Binder 8 contains a dollar breakdown of the personal expense amounts for Miller by year, as well as a dollar breakdown by expense category; a spreadsheet that identifies the Gitto check number and check amount that is associated with the payment of the charges; and bates stamped copies of the back and front of each check that comprises the payments.

[15] Binder 8 also contains a summary spreadsheet that identifies the Gitto check number and check amount that is associated with the payment of the insurance charges; the computer-generated general ledger entries which reference the individual(s) on whose behalf the payment was made; and bates stamped copies of the back and front of each check that comprises the payments.

9

# EXHIBIT 34

## *LOAN AGREEMENT*

AGREEMENT entered into this 20th day of April, 2004 by and between FRANK MILLER of Bolton, Massachusetts ("Borrower") and COMMERCE BANK & TRUST COMPANY, a Massachusetts trust company with a principal place of business at 386 Main Street, Worcester, Massachusetts ("Lender").

WHEREAS, Borrower desires to borrow Eight Hundred Thousand and 00/100 Dollars ($800,000.00) from the Lender to provide funds to Borrower to provide working capital to Gitto/Global Corporation (the "Stated Purpose") to be secured by a second mortgage on real property located at 95 Kettle Hole Road, Bolton, Massachusetts (the "Premises");

NOW, THEREFORE, the parties mutually agree as follows:

I.   *LOANS.*

    A.   Amount.

Lender hereby agrees to lend to Borrower the sum of Eight Hundred Thousand and 00/100 Dollars ($800,000.00) to be evidenced by a promissory note described in Section II(B)(1)(a) below, such loan to be upon the terms and conditions set forth in this agreement (the "Loan").

    B.   Use of Proceeds.

Borrower agrees to use the loan proceeds solely for the Stated Purpose.

    C.   Commitment Fee.

Borrower agrees to pay to Lender a commitment fee of one half of one (.5%) percent of the Loan amount.

II.   *AGREEMENTS.*

    A.   General Provisions.

Capitalized terms not otherwise defined herein shall have the respective meanings assigned to them in the Loan Documents (as defined below) where they are defined. In the event of any inconsistencies or conflicts between any of the other Loan Documents in the provisions hereof, then the terms of this agreement shall govern.

B.     Loan Documents.

1.     Simultaneously with the execution of this Agreement and the Borrower shall execute and deliver agreements in form and substance satisfactory to the Lender and its counsel, to reflect the terms and conditions of this Agreement. Such documents shall include, without limitation, the following documents of even date herewith:

(a)     Note.  Borrower shall execute and deliver a Promissory Note in the form attached hereto as **Exhibit "A"** incorporated herein by reference (the "Note").

(b)     Mortgage.     Borrower shall execute and deliver a mortgage and security agreement (the "Mortgage"). The real property covered by the Mortgage is referred to as the "Mortgaged Premises" and the personal property in which a security interest is granted by the Mortgage shall be the "Collateral". Collectively, the Mortgaged Premises and the Collateral; shall be referred to as the "Mortgaged Property".

2.     This Agreement, the Note, the Mortgage, and each of the documents, agreements and writings executed and delivered in connection herewith or therewith or with regard thereto, including, without limitation, the documents executed in connection with the Loan, as each may be further amended, supplemented, modified or replaced, are collectively referred to herein as the "Loan Documents".

3.     The word "Entity" includes any person, trust, partnership, proprietorship, corporation, government, unit of any government, or any other association.

4.     The word "Obligations" is intended to be used in its most comprehensive sense. Obligations include any and all advances, debts, and Liabilities of the Borrower to Lender, previous, now, or hereafter made, incurred or created, whether voluntary or involuntary, whether as the result of loans, other credit transactions, imposed by law or however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, voluntary or involuntary, whether or not such Obligations are evidenced by a writing, whether or not such Obligations arise from the sale of goods, the loaning of money, or otherwise, whether or not such Obligations are presently contemplated by the parties, or whether Borrower is liable individually or jointly with others, including without limitation the loan evidenced by the Note.

C.     Representations, Warranties and Covenants.

The Borrower represents, warrants and covenants the following:

1.     No Notice of Violations.  The Borrower has not received any notice or communication (i) from any public authority that the Mortgaged Property does not comply with zoning, environmental or subdivision laws or that there exists any condition which violates any municipal, county, state or federal law, rule or regulation;  (ii) from any insurance carrier of the Mortgaged Property regarding any dangerous, illegal or other condition requiring any corrective

2

action;  (iii) regarding any litigation or proceeding, pending or threatened, against or relating to the Mortgaged Property;  (iv) regarding any taking, condemnation or assessment, actual or proposed, with respect to the Mortgaged Property;  or (v) regarding any hazardous materials (as defined in any relevant governmental law and/or regulation) on the Mortgaged Property.

2.    Mortgage Representations.  All representations and warranties contained in the Mortgage, the Note, and the other Loan Documents are true, accurate and complete in all material respects on the date hereof as if made and incorporated by reference herein.

3.    Priority Lien.  The Mortgage secures the Note, and such security is and shall remain superior to all other mortgages, liens and encumbrances on the Mortgaged Property, except a first mortgage to Washington Mutual.

4.    No Agreement.  As of the date hereof, there are no agreements affecting or relating to the Mortgaged Property and no balances due for any goods, services or labor supplied to or for the benefit of the Mortgaged Property, other than those relating to the normal operation of the Mortgaged Property, which have been contracted for by or on behalf of the Borrower, disclosed to Lender in writing prior to the execution of this Agreement and listed on Exhibit B, attached hereto and incorporated herein by reference.  To the extent any claims are made against the Lender or the Mortgaged Property as a result of any such agreement, the Borrower shall pay such claims promptly when due.

5.    No Conflict or Default.  The execution and delivery of this Agreement and all instruments, agreements and documents contemplated herein do not and will not conflict with, and are not and will not be in violation of, and do not and will not constitute a default under any mortgage, deed of trust or other agreement or instrument to which the Borrower is a party or by which any of them is bound, or any statute, rule or regulation, order, injunction or decree.

6.    Financial Statements.  The respective financial statements of the Borrower and most recently provided to Lender (the "Financial Statements") are true, accurate and complete and fairly present the financial condition of the Borrower as of the date thereof, and there has been no material change in the financial condition of the Borrower from the date thereof to the date hereof.

7.    [Intentionally Reserved]

8.    Bankruptcy.  The Borrower has not ever (i) commenced a voluntary proceeding seeking relief with respect to itself or themselves, or its or their debts, under any bankruptcy, insolvency or other similar law, (ii) sought appointment of a trustee, receiver, liquidator or other similar official for itself or themselves or any part of its or their assets, (iii) consented to any of the foregoing in any involuntary proceeding against it or them, (iv) generally not paid its or their debts as they became due, (v) admitted in writing its or their inability to do so, (vi) made an assignment for the benefit of creditors, (vii) offered to or entered into any composition, extension, reorganization or other agreement or arrangement with its or their creditors, or (viii)

had an involuntary proceeding commenced against it seeking relief with insolvency or similar law, or seeking appointment of a trustee, receiver, liquidator or similar official for it or them or any part of its or their assets.

9.      [Intentionally Reserved]

10.      Changes in Financial Statements.  Since the date of the financial statements referred to in the section called "Financial Statements", there has not been:

(a)      any change in the condition of Borrower's assets or Liabilities;

(b)      any material damage, destruction or loss, whether or not covered by insurance, of Borrower's property;

11.      No Undisclosed Liabilities.  Borrower has no Liabilities, material in the aggregate, which are not disclosed in the Financial Statements.

12.      Property.  Borrower owns all of the Mortgaged Property as a tenant by the entirety and has full, good, clear and marketable title thereto, free and clear of all liens, encumbrances, and security interests, except in favor of Lender and a first mortgage to Washington Mutual.

13.      Compliance with Laws.  Borrower is in compliance with all applicable Laws.

**The representations and warranties in this Agreement are part of the consideration inducing the Lender to enter into this Agreement, and the agreements by the Lender contained in or given pursuant to this Agreement are expressly contingent upon the accuracy of the foregoing representations, warranties and covenants contained in this section. In the event any such provision is materially false or misleading, then the Borrower shall indemnify and hold the Lender harmless from all liability, harm, costs and expenses arising therefrom (including, without limitation, attorneys' fees and costs.)**

D.      Borrower's Agreements.

1.      Taxes.  Subject to Lender's escrow requirements provided for in the Mortgage, Borrower will promptly pay when due all taxes and assessments upon the Mortgaged Property, upon its use and operation, with respect to this document, or the granting, recording, or perfection thereof, or upon any note or notes or other negotiable instrument evidencing the Obligations, including without limitation the Loan.  Borrower will also pay all real and personal property taxes, assessments and charges, and all income and other taxes assessed or levied against it or payable by it.  All taxes will be paid in a timely manner, and in any event at such time and in such manner as to prevent any penalty from occurring or any lien or charge from attaching to its property.  Borrower will, at the request of Lender, promptly furnish Lender the bills for all paid taxes and the receipts showing payment of them.

4

2.    <u>Adverse Liens and Encumbrances</u>.  Borrower will keep all Mortgaged Property free from all adverse liens, security interests, mortgages, and encumbrances, whether or not having priority over Lender's security interest, except a first mortgage to Washington Mutual. Borrower will not execute or become bound by any certificate, document, or agreement which in any way conflicts with this document, or which would result in the acquisition by a third party of any interest having priority over the Mortgaged Property.  Borrower will not execute or allow any adverse financing statement, mortgage, or notice of lien covering any of the Mortgaged Property to be on file in any public office.

3.    <u>Supplemental Agreements</u>.  Borrower will execute or endorse and deliver to Lender supplemental agreements, or documents in such forms as Lender may require, to effectuate the purposes of this Agreement.

4.    <u>Compliance with other Agreements</u>.  Borrower will comply with the terms and conditions of any other agreement between it and Lender.  Borrower will also comply with the terms and conditions of any agreement to which it is bound, even if Lender is not a party.

5.    <u>Compliance with Laws</u>.  Borrower will comply with all applicable laws.

6.    <u>Application of Proceeds</u>.  Lender may apply proceeds of the Mortgaged Property, recoveries with respect to the Obligations, and payments to one or more of the Obligations and among principal or interest as Lender in its sole discretion may determine.

7.    <u>Appraisals</u>.  If required by its regulators, or if Borrower is in default of its obligations to Lender, then Lender may obtain either an MAI appraisal or an update to an existing appraisal (the selection of which shall be made in the Lender's discretion) for the Mortgaged Property, each such appraisal or update shall be prepared by an appraiser selected by the Lender and shall be at the Borrower's sole cost and expense. The Borrower shall cooperate with all appraisers performing any such appraisal (or any other appraisal of the Premises), which cooperation shall include, without limitation, allowing appraisers access to the Mortgaged Property and to the Borrower's books and records and to all other information requested by such appraisers.  Such appraisals will be the property of the Lender only, and Lender shall have no obligation to disclose such appraisal to Borrower or any other person or entity.

E.    <u>Access</u>.

Upon reasonable notice to the Borrower, the Lender and its employees, agents and representatives shall have access to the Mortgaged Property at any time and from time to time for the purpose of inspecting, testing, and conducting engineering and environmental studies thereon and thereat.

F.    <u>Reservation of Rights</u>.

If any Event of Default occurs, the Lender reserves any and all of its rights and remedies

5

which it may have under the Loan Documents or at law or in equity.

G.    Costs of Collection; Cost of Amending and Administering Loan.

If an Event of Default occurs, then the Borrower shall be responsible to pay, on demand, all costs and expenses (including, without limitation, attorneys' fees and costs) that the Lender incurs in connection with the collection and enforcement of all obligations owed or required to be performed under this Agreement and the other Loan Documents.

The Loan shall be made without cost to the Lender.  The Borrower shall pay to Lender any and all, commissions, costs, charges, taxes and other expenses incurred by Lender in connection with the Loan (including, without limitation, fees and disbursements of Lender's counsel and the cost of appraisals) and thereafter any such fees, commissions, costs, charges, taxes and expenses incurred by Lender from time to time in connection with the making, administering and collecting of the Loan, including, but not limited to, fees and disbursements of Lender's counsel (including counsel providing title reports and title policies or endorsements when applicable), appraisal fees, fees of the Lender's consultants, engineers and inspectors, fees and charges for surveys, costs of audits of books and records of Borrower and Guarantors, title insurance charges, mortgage taxes, and all recording and filing fees and charges.

H.    Further Assurances.

The Borrower agrees to execute and deliver or cause to be executed and delivered from time to time such additional instruments, documents and agreements as the Lender may reasonably request to carry out the terms of this Agreement, or to further evidence, secure, effectuate or perfect its obligations to the Lender under the Loan Documents or the Lender's interest or priority in the collateral granted to secure such obligations, including, without limitation, any subordination agreements necessary to insure the Mortgage and all amounts secured or to be secured thereby is and shall be superior to all mortgages, liens and encumbrances on the Mortgaged Property, except a first mortgage to Washington Mutual.

I.    Waiver; Modification.

In no event shall any action, inaction or waiver by the Lender on any one or more occasions constitute a waiver of any past, present or future defaults by the Borrower under this Agreement or any other Loan Document.  To be effective against Lender, a waiver, modification or amendment with respect to this Agreement or any other Loan Document must be executed in writing by a duly-authorized officer of Lender and expressly specify the exact defaults or provisions which are being waived.  In no event shall any oral agreements, promises, or the like be effective to modify, terminate, extend or otherwise amend this Agreement or any other Loan Document.

J.    Multiple Counterparts.

6

This Agreement may be executed in multiple counterparts, each of which shall constitute an executed whole, but which together shall constitute only one instrument.

K.      Governing Law.

This Agreement and the rights and obligations of the parties hereto under this Agreement and any other Loan Document shall in all respects be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to Massachusetts principles of conflicts of laws.

L.      Notices.

All notices or other communications required or provided for under this Agreement or any other Loan Document shall be in writing and shall be given to the party to which such notice is required or permitted to be given at the address or telex or telecopier number set forth below (or at such other address or hereto may hereafter specify to the others by notice in writing), and, unless otherwise specified herein, shall be deemed delivered (a) on receipt, if teletransmitted or delivered by hand, or (b) on the earlier of the date of receipt or three (3) Business Days after mailing, if mailed by registered or certified mail, postage prepaid. A "Business Day" shall mean any day on which banking institutions in Worcester, Massachusetts, are not required by law to remain closed.

If to Borrower:

Mr. Frank Miller
95 Kettle Hole Road
Bolton, MA  01740

If to Lender to:

Commerce Bank & Trust Company
P.O. Box 15020, 386 Main Street
Worcester, MA 01615-0020
Attn:  Senior Lender

M.      Set-Off.

The Borrower grants to Lender, as security for all of Borrower's Obligations, a direct and continuing lien and security interest in and upon all deposits, balances and other sums credited by or due from Lender to the Borrower. If any payment is not made when due under any of the Loan Documents, after giving regard to applicable grace periods, if any, specified therein, or if any Event of Default or other event which would entitle the Lender to accelerate the Loan occurs, any such deposits, balances or other sums credited by or due from the Lender to the Borrower (excluding deposits which the Borrower is holding in trust or escrow for the sole benefit of third

7

not constitute a waiver by the Lender to insist upon the strict performance of any of the Loan Documents or to declare any event of default for any payment not made when it was due and payable.

In addition to such late charge, after an Event of Default, the rate of interest payable hereunder shall be increased by four (4%) percent per annum.

Borrower agrees that it will and will cause each of its Subsidiaries and Affiliates to maintain with the Lender all of its principal operating and deposit accounts.

This Note shall become due and payable, including the entire balance of principal and interest then accrued and unpaid, prior to maturity at the option (exercisable without notice and regardless of any prior forbearance or indulgences) of the holder hereof upon any one or more of the following events, the occurrence of any of which shall be a default:

1.      default in the performance or observance of any of the agreements, covenants or conditions of this Note or contained in any instrument securing this Note (other than payments due hereunder) or in any other obligation of Borrower or any other party; or

2.      failure to make any payment due hereunder when due; or

3.      institution of bankruptcy or insolvency proceedings by or against the Borrower, or any endorser or guarantor not discharged within thirty (30) days after the filing thereof; or

4.      death, dissolution, termination of existence, insolvency or business failure of any party to the Note; or

5.      appointment of a receiver of any part of the property of any party to the Note, levy on or attachment of any property of any such party, or an assignment for the benefit of creditors by any such party.

Any deposits or other sums at any time credited by or due from the holder to Borrower or any endorser or guarantor hereof and any securities or other property of Borrower or any endorser or guarantor hereof in the possession or custody of the holder may at all times be held and treated as collateral security for the payment of this Note and any and all other liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of said respective Borrower, endorser or guarantor to the holder; and the holder on or after default in payment hereof may sell any such securities or other property at broker's board or at public sale or private sale without demand, notice or advertisement of any kind, all of which are hereby expressly waived. The holder may apply or set off such deposits or other sums against said liabilities at any time in the case of Borrower, but only with respect to matured liabilities in the case of endorsers or guarantors. In case this Note shall not be paid in full whenever it shall become due, the Borrower and any endorser or guarantor hereof agree to pay all costs and expenses of collection including court costs and reasonable attorneys' fees.

2

Each Borrower, guarantor, endorser or other person now or hereafter liable for the payment of any of the indebtedness evidenced by this Note (herein a "party") severally agrees, by making, guaranteeing or endorsing this Note or by making any agreement to pay any of the indebtedness evidenced by this Note, to waive presentment for payment, protest and demand, notice of protest, demand and of dishonor and non-payment of this Note, and consents without notice or further assent (a) to the substitution, exchange, or release of the collateral securing this Note or any part thereof at any time; (b) to the acceptance by the holder or holders at any time of any additional collateral or security or other guarantors of this Note; (c) to the modification or amendment at any time, and from time to time, of this Note, and any instrument securing this Note, at the request of any person liable hereon; (d) to the granting by the holder hereof of any extension of the time for payment of the Note or for the performance of the agreements, covenants, and conditions contained in this Note, or any instrument securing this Note, at the request of any other person liable hereon; and (e) to any and all forebearances and indulgences whatsoever; and such consent shall not alter or diminish the liability of any person.

The Borrower represents that the proceeds of this Note will be used solely for commercial and business purposes and not for personal, family, household or agricultural purposes and the Borrower acknowledges that this representation has been relied upon by the Lender.

This Note shall be the joint and several obligation of the Borrower and all sureties, guarantors and endorsers, and shall be binding upon them and their respective successors and assigns and each or any of them.

The Borrower acknowledges receipt of a copy of this Note.

The Laws of the Commonwealth of Massachusetts shall govern the formation, interpretation and enforcement of this Note and all rights, duties and interests created, incurred or arising pursuant to or in connection with this Note.

IN WITNESS WHEREOF, the Borrower has signed and sealed this Note as of the day and year first above written.

_____          _____
Witness                                                         Frank Miller

# EXHIBIT 35



100 Wall Street
New York, NY 10005-3701
tdwaterhouse.com
Member NYSE/SIPC

# ACCOUNT STATEMENT

| ACCOUNT NO. | CUSTOMER NAME | PERIOD ENDING | PAGE |
|---|---|---|---|
| 463-08509-1-7 | FRANK MILLER & | 03/31/2004 | 3 OF 4 |

## MONEY MARKET ACTIVITY

| DATE | ENTRY | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|---|
| 03/15 | DEPOSIT | OPENING BALANCE MONEY MARKET ACCT - FDIC TD WATERHOUSE BANK MONEY MARKET ACCOUNT FUNDS PURCHASED | 319.02 | 664,016.45 664,335.47 |
| 03/24 | WITHDRAWAL | TD WATERHOUSE BANK MONEY MARKET ACCOUNT FUNDS REDEEMED | ( 98,015.00) | 566,320.47 |
| 03/25 | WITHDRAWAL | TD WATERHOUSE BANK MONEY MARKET ACCOUNT FUNDS REDEEMED | ( 25,000.00) | 541,320.47 |
| 03/30 | WITHDRAWAL | TD WATERHOUSE BANK MONEY MARKET ACCOUNT FUNDS REDEEMED | ( 50,000.00) | 491,320.47 |
| 03/31 | DEPOSIT | TD WATERHOUSE BANK MONEY MARKET ACCOUNT FUNDS PURCHASED | 3,500.00 | 494,820.47 |
| 03/31 | REINVEST | TD WATERHOUSE BANK MONEY MARKET ACCOUNT MONTHLY INTEREST REINVESTED | 45.42 | 494,865.89 |
| | | CLOSING BALANCE MONEY MARKET ACCT - FDIC | | 494,865.89 |

## CASH MANAGEMENT SERVICES CHECKING ACTIVITY

| CHECK # | AMOUNT | DATE PAID | CHECK # | AMOUNT | DATE PAID |
|---|---|---|---|---|---|
| 00103 | 25,000.00 | 03/25 | 00104 | 50,000.00 | 03/30 |

TOTAL 2 CHECK(S) $75,000.00

## OTHER DEBIT AND CREDIT ACTIVITY

| ACCT | DATE | ENTRY | DESCRIPTION | QUANTITY | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| CASH | 03/24 | JOURNAL | FED FUND FEE | | 15.00 | |
| CASH | 03/24 | FUNDS WIRED | FF WIRED TO FLEET NATL BANK MA | | 98,000.00 | |
| | | | TOTAL | | 98,015.00 | |

21520 07891 003



**FleetOne Premier Statement**
2/05/2004 through 3/03/2004
Page   3 of   12
Premier Customer Service 1-800-222-1130

Account continued from previous page

## Personal Interest Checking

Frank Miller
Maria C Miller

Account Number 0082756594
Telephone Banking Access Code 1137

## ATM/Electronic Withdrawals and Transfers

| Date | Description | | Amount |
|------|-------------|--|--------|
| 2/05 | POS Purchase | Cns Maxi Drug Inc &931<br>Leominster    MA | $24.94 |
| 2/05 | Debit Card Purchase | Shaw's<br>Leominster    MA | $38.50 |
| 2/06 | Web Initiated Payment | Verizon     Online Pmt<br>020040367413466          Web | $66.65 |
| 2/06 | Web Initiated Payment | Verizon     Online Pmt<br>020040367413464          Web | $68.54 |
| 2/06 | Web Initiated Payment | Premier Ins Co  Online Pmt<br>020040367412054          Web | $241.00 |
| 2/06 | Web Initiated Payment | Verizon     Online Pmt<br>020040367413465          Web | $293.58 |
| 2/06 | Web Initiated Payment | Ford Mtr Chgo   Online Pmt<br>020040367408598          Web | $387.39 |
| 2/06 | Web Initiated Payment | American Express Online Pmt<br>020040367405879          Web | $1,500.00 |
| 2/06 | Web Initiated Payment | Mbna America   Online Pmt<br>020040367410185          Web | $1,500.00 |
| 2/06 | Web Initiated Payment | Wash Mutual    Online Pmt<br>020040367413804          Web | $7,264.18 |
| 2/09 | ATM Network Withdrawal | 280 New Lancaster Rd<br>Leominster    MA | $101.50 |
| 2/09 | ATM Network Fee | | $1.50 |
| 2/09 | Web Initiated Payment | Nordstrom     Online Pmt<br>020040370285660          Web | $500.00 |
| 2/09 | Debit Card Purchase | Victory Supermarket #1<br>Leominster    MA | $28.17 |
| 2/09 | Debit Card Purchase | Jenny Craig #674<br>Leominster    MA | $118.71 |
| 2/11 | Web Initiated Payment | Mass Electric   Online Pmt<br>020040412648449          Web | $305.22 |
| 2/12 | Web Initiated Payment | Parsons Landcapi Online Pmt<br>020040424258016          Web | $517.49 |
| 2/12 | Web Initiated Payment | American Express Online Pmt<br>020040424255344          Web | $2,500.00 |
| 2/13 | Fund Trsf Outgoing Nonrepeat | 02/13/04 027071<br>9999040213027071<br>Frank Miller<br>Critto Global Corp | $40,000.00 |
| 2/13 | Service Fee | | $15.00 |
| 2/13 | Web Initiated Payment | Waste Management Online Pmt<br>020040436064954          Web | $99.40 |
| 2/13 | Web Initiated Payment | Directv      Online Pmt<br>020040436071956          Web | $213.85 |
| 2/13 | Web Initiated Payment | Premier Ins Co   Online Pmt<br>020040436077104          Web | $359.65 |
| 2/13 | Web Initiated Payment | American Express Online Pmt<br>020040436069170          Web | $500.00 |
| 2/13 | Web Initiated Payment | Gmac Mortgage   Online Pmt<br>020040436072765          Web | $672.95 |

continues

029358090
3 - 7



TD Waterhouse Investor Services, Inc.
100 Wall Street
New York, NY 10005-3701
tdwaterhouse.com
Member NYSE/SIPC

# ACCOUNT STATEMENT

| ACCOUNT NO. | CUSTOMER NAME | PERIOD ENDING | PAGE |
|---|---|---|---|
| 463-08509-1-7 | FRANK MILLER & | 05/28/2004 | 3 OF 3 |

## MONEY MARKET ACTIVITY

| DATE | ENTRY | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|---|
| | | **OPENING BALANCE MONEY MARKET ACCT - FDIC** | | 458,769.47 |
| 05/13 | WITHDRAWAL | TD WATERHOUSE BANK | ( 65,015.00) | 393,754.47 |
| | | MONEY MARKET ACCOUNT | | |
| | | FUNDS REDEEMED | | |
| 05/14 | DEPOSIT | TD WATERHOUSE BANK | 304.31 | 394,058.78 |
| | | MONEY MARKET ACCOUNT | | |
| | | FUNDS PURCHASED | | |
| 05/20 | WITHDRAWAL | TD WATERHOUSE BANK | ( 25,000.00) | 369,058.78 |
| | | MONEY MARKET ACCOUNT | | |
| | | FUNDS REDEEMED | | |
| 05/28 | REINVEST | TD WATERHOUSE BANK | 16.12 | 369,074.90 |
| | | MONEY MARKET ACCOUNT | | |
| | | MONTHLY INTEREST REINVESTED | | |
| | | **CLOSING BALANCE MONEY MARKET ACCT - FDIC** | | 369,074.90 |

## CASH MANAGEMENT SERVICES CHECKING ACTIVITY

| CHECK # | AMOUNT | DATE PAID | CHECK # | AMOUNT | DATE PAID |
|---|---|---|---|---|---|
| 00109 | 25,000.00 | 05/20 | | | |

TAL 1 CHECK(S) $25,000.00

## OTHER DEBIT AND CREDIT ACTIVITY

| ACCT | DATE | ENTRY | DESCRIPTION | QUANTITY | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| CASH | 05/13 | JOURNAL | FED FUND FEE | | 15.00 | |
| CASH | 05/13 | FUNDS WIRED | FF WIRED TC | | 65,000.00 | |
| | | | LASALLE NATL BK | | | |
| | | | TOTAL | | 65,015.00 | |